# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLUMBIA

AMERICAN CENTER FOR
INTERNATIONAL LABOR
SOLIDARITY,
   1130 Connecticut Ave. NW, #800
   Washington, DC 20036, and

AMERICAN INSTITUTES FOR
RESEARCH,
   1400 Crystal Drive
   10th Floor
   Arlington, VA 22202, and

GLOBAL MARCH AGAINST CHILD
LABOUR,
   Fluwelen Burgwal 58
   2511 CJ
   The Hague, NL,

     *Plaintiffs*,

     v.

LORI CHAVEZ-DEREMER, in her
official capacity as Secretary of Labor,
   200 Constitution Ave. NW
   Washington, DC 20210, and

U.S. DEPARTMENT OF LABOR,
   200 Constitution Ave. NW
   Washington, DC 20210,

     *Defendants*.

Case No.

## COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

1.     For decades, Congress has authorized and appropriated money for the Department

of Labor's Bureau of International Labor Affairs (ILAB) to enter cooperative agreements to

support workers' rights programs around the world. These programs protect workers and

1

companies in the United States against unfair competition from companies and governments that violate workers' rights to free association and collective bargaining, and otherwise use forced labor, child labor, or other labor rights violations, to gain an unfair advantage in the global marketplace. ILAB is the world's largest funder of programs to combat child and forced labor internationally and one of the largest funders of programs to protect and advance workers' rights globally.

2.      Plaintiffs are nonprofit organizations that operate such programs through cooperative agreements with ILAB. As of March 1, 2025, ILAB had 69 active cooperative agreements. Plaintiffs had fifteen of those agreements, which collectively provided them with well over $100 million in funding for work they performed around the world. That funding has been crucial to Plaintiffs' ability to hire and retain qualified staff in the U.S. and abroad, partner with labor unions and other organizations, engage with national, state, and local governments, and fund advocacy and organizing efforts across five continents.

3.      In March 2025, as part of the Department of Government Efficiency's (DOGE) slashing of spending programs across the government, the Department of Labor (DOL) terminated all of ILAB's cooperative agreements en masse. In letters sent out to ILAB's partners, including Plaintiffs, DOL explained that these programs were "terminated," effective immediately, "for alignment with Agency priorities and national interest."

4.      Neither DOL nor ILAB has articulated any new agency priority. DOL and DOGE have made clear in public statements, however, that DOL does not plan to reallocate the funds to another program or otherwise spend the money that Congress specifically appropriated to combat unfair labor practices or support workers' rights abroad. Rather—ignoring a century of consensus

on the importance of international labor rights for the competitiveness of American industry and workers—DOL and DOGE have publicly ridiculed ILAB's work as "America Last" programs.

5.    DOL may not lawfully cancel all of ILAB's ongoing cooperative agreements based solely on hostility to legislative directives that the executive branch is constitutionally bound to implement, and it may not refuse to spend money that Congress appropriated for such programs. DOL's actions are therefore ultra vires, contrary to law, and arbitrary and capricious.

6.    As a result of DOL's unlawful terminations of their cooperative agreements, Plaintiffs have suffered and will suffer irreparable harm—needing to lay off workers, shutter offices, and cut ongoing projects. Unless these agency actions are set aside in their entirety, Plaintiffs will be forced to entirely abandon much of their work protecting against exploitation of labor abroad. Such an abrupt exit risks undermining progress these organizations have made toward building worker power and improving labor conditions in countries across the globe. And it will cause Plaintiffs both reputational and financial harm, including, for some Plaintiffs, immediate liability and legal risk from broken employment contracts and leases. To avoid these and other irreparable harms, and to afford Plaintiffs the opportunity to complete the work that Congress intended them to do, this Court should promptly grant declaratory and injunctive relief.

## JURISDICTION AND VENUE

7.    This Court has jurisdiction under 28 U.S.C. § 1331.

8.    Venue is proper in this district under 28 U.S.C. § 1391(e)(1)(A) because Defendants are officers and agencies of the United States and at least one Defendant resides in this district.

## PARTIES

9.    Plaintiff the American Center for International Labor Solidarity (the Solidarity Center) is a nonprofit labor organization that, among other things, operates programs through cooperative agreements with ILAB. As of March 1, 2025, the Solidarity Center had eleven active

agreements providing nearly $80 million in funding. That funding is crucial to the Solidarity Center's ability to hire and retain qualified staff in the U.S. and abroad, partner with labor unions and other organizations abroad, engage with governments, and support advocacy and organizing across five continents by providing funding, technical assistance, training, and legal services.

10.     Plaintiff the American Institutes for Research (AIR) is a nonpartisan, nonprofit organization that conducts behavioral and social science research and delivers technical assistance to solve some of the most urgent challenges in the U.S. and around the world. In its international labor work, AIR works closely with governments, employers, and workers' organizations and unions, among others, to develop and deliver data-driven technical assistance and conduct rigorous evaluations to strengthen the protection and promotion of workers' rights and decent work. As of March 1, 2025, AIR had three active agreements with ILAB to support the implementation of Mexico's labor justice reforms and strengthen labor law enforcement in Mexico. Over their lifetime, those agreements were to provide AIR with close to $60 million in funding for its work in Mexico, of which roughly $17 million was remaining. AIR's agreements are essential to its ability to carry out its work to improve working conditions in Mexico.

11.     Plaintiff the Global March Against Child Labour (Global March) is a worldwide network of trade unions, teachers' organizations, and civil society groups that works toward the shared development goals of eliminating and preventing all forms of child labor, slavery, and trafficking and ensuring access by all children to free, meaningful, and good quality public education. As an international organization with a wide reach in countries across different continents, Global March uses its knowledge, expertise, and empirical evidence to build the capacity of its partners around the globe, including governments and civil society groups. As of March 1, 2025, Global March had one active cooperative agreement with ILAB to build the

capacity of civil society organizations to fight child labor around the world. That cooperative agreement provides Global March with $4 million in funding for work in Nepal, Peru, and Uganda.

12.    Defendant Lori Chavez-DeRemer is the Secretary of Labor and is sued in her official capacity.

13.    Defendant U.S. Department of Labor is an agency of the United States.

## FACTUAL BACKGROUND

### DOL's Mandate to Support Workers' Rights and Fight Trafficking and Forced Labor Globally

14.    For nearly a century, the U.S. government has recognized the importance of international labor rights to American interests. Advocating for fair pay, safe working conditions, and organizing and bargaining rights for workers abroad helps ensure that American companies can compete on a fair playing field and, by reducing the need for American workers to compete with low-wage and exploited labor, helps improve pay and conditions for workers here at home. *See* Cong. Res. Serv., *Section 307 and Imports Produced by Forced Labor* (updated Dec. 10, 2024)[1] (explaining that Congress enacted § 307 of the Tariff Act of 1930, which bans the importation of goods produced by forced labor, "largely to protect domestic labor from competing with foreign forced labor"); Act of June 18, 1934, ch. 676, 48 Stat. 1182 (in authorizing membership in the International Labor Organization, recognizing that "progress toward the solution of the problems of international competition in industry can be made through international action concerning the welfare of wage earners" and that "the failure of a nation to establish humane conditions of labor is an obstacle in the way of other nations" pursuing that goal).

15.    To that end, Congress has consistently legislated to improve the conditions of workers abroad. Among other things, Congress has for decades supported efforts to monitor and

---

[1] https://www.congress.gov/crs-product/IF11360.

combat trafficking, child labor, and forced labor around the globe. *See, e.g.*, 22 U.S.C. § 7112 (instructing Departments of State and Labor to monitor forced and child labor); 6 U.S.C. § 242a (establishing Center for Countering Human Trafficking in Department of Homeland Security). Indeed, as the sponsor of one piece of major legislation on trafficking noted, trafficking "is one of those issues where there has been no gap between us on either side of the aisle. It has united conservatives, moderates, and liberals in a grand fight to combat the scourge of modern-day slavery." *See Various Bills and Resolutions Before the H. Comm. on Foreign Aff.*, 110th Cong. 128 (2007) (statement of Rep. Smith).

16.    The U.S. has also long emphasized the importance of workers' rights when negotiating trade agreements, dating back to the 1994 North American Free Trade Agreement (NAFTA). Incorporating labor-protection provisions into trade agreements raises labor standards abroad and, by extension, helps protect American workers from unfair competition. *See* Cong. Res. Serv., *Worker Rights Provisions in Free Trade Agreements* (updated Oct. 25, 2023).[2]

17.    By statute, Congress has spread responsibility for addressing trafficking, forced labor, and other international workers' rights issues among different agencies, including the Department of Labor. *See, e.g.*, 19 U.S.C. § 4681 (requiring establishment of Forced Labor Enforcement Task Force, "chaired by the Secretary of Homeland Security and … comprised of representatives from such other agencies with relevant expertise, including the Office of the United States Trade Representative and the Department of Labor, as the President determines appropriate").

18.    Within DOL, ILAB is the home for this work on international labor rights. *See* DOL, Secretary's Order 18-2006, 71 Fed. Reg. 77560 (Dec. 26, 2006) (delegating authority over

---

[2] https://www.congress.gov/crs-product/IF10046.

international labor issues to the Deputy Undersecretary for International Affairs, the leader of ILAB).

19.    ILAB works with governments, civil society groups, unions, and businesses to strengthen global labor standards, enforce labor commitments in U.S. trade agreements, and combat practices like child labor, forced labor, and human trafficking, including in U.S. supply chains.

20.    Both labor and industry leaders have consistently praised ILAB's work raising labor standards around the world and leveling the playing field for American businesses and workers. *See, e.g.*, Press Release, Am. Apparel & Footwear Ass'n, AAFA Reacts to U.S. Department of Labor's Action to Cancel All ILAB Contracts (Mar. 26, 2025)[3] (statement from industry group praising ILAB's work "to ensure a level playing field for American workers"); Letter from Richard Trumka & Peter Robinson to Sens. Roy Blunt & Patty Murray (Mar. 8, 2017)[4] (letter from then-Presidents of AFL-CIO and U.S. Council for International Business calling ILAB's work "critical to both employers and workers" and requesting continued funding).

21.    Among other functions, ILAB staff research and produce statutorily mandated reports on the worst forms of child and forced labor globally; coordinate the U.S. government's participation in the International Labor Organization; advise senior government officials on labor and economic issues abroad, including the effect of trade policies on American workers; and ensure that U.S. trade agreements are fair for American workers and businesses. *See* ILAB, *Mission and Offices*.[5]

---

[3] https://www.aafaglobal.org/AAFA/AAFA_News/2025_Press_Releases/ AAFA_Reacts_DOL_Action_Cancel_All_ILAB_Contracts.aspx.

[4] https://uscib.org/uscib-content/uploads/2017/03/Letter-to-Senate-re-ILAB-and-DRL-funding.pdf.

[5] https://www.dol.gov/agencies/ilab/about-us/mission.

22.     Congress has consistently authorized and appropriated funding for ILAB to make grants to support projects to improve labor rights around the world. In the fiscal year 2024 appropriations bill, Congress authorized ILAB "to administer or operate international labor activities, bilateral and multilateral technical assistance, and microfinance programs, by or through contracts, grants, subgrants and other arrangements" and appropriated $81.725 million for it to do so. Department of Labor Appropriations Act, 2024, Pub. L. No. 118-47, 138 Stat. 641 (Mar. 23, 2024). Congress further specified how those funds should be spent to support such programs abroad: The statute provided that "not less than $30,175,000 shall be for programs to combat exploitative child labor internationally and not less than $30,175,000 shall be used to implement model programs that address worker rights issues through technical assistance in countries with which the United States has free trade agreements or trade preference programs." *Id.*

23.     Congress has passed similar provisions in DOL funding bills going back decades. *See, e.g.*, Department of Labor Appropriations Act, 2023, Pub. L. No. 117-328, 136 Stat. 4856 (Dec. 29, 2022); Department of Labor Appropriations Act, 2022, Pub. L. No. 117-103, 136 Stat. 434 (Mar. 15, 2022); Department of Labor Appropriations Act, 2021, Pub. L. No. 116-260, 134 Stat. 155 (Dec. 27, 2020); Department of Labor Appropriations Act, 2003, Pub. L. No. 108-7, 117 Stat. 305 (Feb. 20, 2003).

24.     Congress continued the authorization and appropriation for ILAB's international programming in its most recent continuing resolution. *See* Full-Year Continuing Appropriations and Extensions Act, 2025, § 1101(a)(8), Pub. L. No. 119-4, 139 Stat. 11 (Mar. 15, 2025) (extending authorities and appropriations at the same level as previous fiscal year).

25.     Legislation implementing the 2018 United States-Mexico-Canada-Agreement— which President Trump negotiated to contain "the strongest and most far-reaching labor provisions

of any trade agreement" to date—also tasked ILAB with supporting projects to help achieve the goals of those labor provisions and appropriated funding for that purpose. *See* DOL, *Labor Rights and the United States-Mexico-Canada Agreement (USMCA)*.[6] In that legislation, Congress authorized and appropriated money for ILAB to fund technical assistance projects to "support reforms of the labor justice system in Mexico, including grants to support worker-focused capacity building, efforts to reduce workplace discrimination in Mexico, efforts to reduce child labor and forced labor in Mexico, efforts to reduce human trafficking, efforts to  reduce child exploitation, and other efforts related to implementation of the USMCA." USMCA Supplemental Appropriations Act, 2019, Pub. L. No. 116-113, tit. IX, 134 Stat. 98, 100 (Jan. 29, 2020).

26.    ILAB's funding for international technical assistance programs ultimately makes up the majority of the Bureau's budget.

27.    ILAB runs its international programming by entering into cooperative agreements with recipient organizations. Like a grant, a cooperative agreement is a form of federal financial assistance, although the government is typically more involved in monitoring and accountability during projects governed by cooperative agreements than projects governed by grants. *See* 31 U.S.C. §§ 6304–05; 2 C.F.R. § 200.1.

28.    Through such cooperative agreements, ILAB has funded projects to fight child and forced labor. These efforts, run in cooperation with non-governmental organizations, governments, and private-sector businesses, "combat some of the most abusive labor practices" globally. ILAB, *Projects*.[7] Indeed, ILAB has described itself as "the world's largest funder of programs to combat child labor and forced labor around the world." Marty Walsh, *ILAB at 75: A New Era of Global*

---

[6] https://www.dol.gov/agencies/ilab/our-work/trade/labor-rights-usmca.
[7] https://www.dol.gov/agencies/ilab/projects-print.

*Action on Labor Rights*, DOL (Oct. 7, 2022).[8] And the programs have been remarkably successful. ILAB has estimated that, since 2000, its projects have contributed to removing more than 86 million children from child labor. *Id.*

29.      In recent years, the agency has also funded programs to trace the use of child and forced labor in supply chains. *See* DOL, *Sweat & Toil: 2024 List of Goods Produced by Child Labor or Forced Labor & 2023 Findings on the Worst forms of Child Labor* 16 (Sept. 2024).[9] These programs build on Congress's direction, in the 2019 reauthorization of the Trafficking Victims Protection Act, that ILAB should, to the extent possible, focus its reports on child and forced labor on goods with inputs produced by child and forced labor. *See* Fredrick Douglass Trafficking Victims Prevention and Protection Reauthorization Act of 2018, Pub. L. No. 115-425, tit. I, subtit. D, § 133, 132 Stat. 5472, 5481–82 (Jan. 8, 2019); *see also* Dep't of Homeland Security, Report to Congress: 2024 Updates to the Strategy to Prevent the Importation of Goods Mined, Produced, or Manufactured with Forced Labor in the People's Republic of China at 23–24 (July 9, 2024)[10] (explaining ILAB's work, including through supply chain tracing, to help achieve the goals of the  Uyghur Forced Labor Prevention Act).

30.      ILAB also funds a substantial portfolio of projects to "promote trade partners' compliance with the labor requirements of U.S. trade agreements and preference programs—

---

[8] https://web.archive.org/web/20240619210403/https://blog.dol.gov/2022/10/07/ilab-at-75-a-new-era-of-global-action-on-labor-rights.

[9] https://www.dol.gov/sites/dolgov/files/ILAB/child_labor_reports/tda2023/2023-Sweat-n-Toil-Magazine-Final.pdf.

[10] https://www.dhs.gov/sites/default/files/2024-07/2024%20Updates%20to%20the%20Strategy%20to%20Prevent%20the%20Importation%20of%20Goods%20Mined%2C%20Produced%2C%20or%20Manufactured%20with%20Forced%20Labor%20in%20the%20People%E2%80%99s%20Republic%20of%20China.pdf.

helping to ensure a fair global playing field for workers in the United States and around the world."
ILAB, *Projects*.

**Plaintiffs' Programs Supported by ILAB**

31.    Plaintiffs have each received substantial funding from ILAB to support their work around the world.

32.    The award documents for each of Plaintiffs' ILAB cooperative agreements identify a specific source of funding in the relevant appropriations act to support the commitment of funds for the project.

33.    As of March 1, 2025, Plaintiff the Solidarity Center had eleven active cooperative agreements with ILAB to support projects abroad. In total, those cooperative agreements were worth nearly $80 million.

34.    Two of the cooperative agreements concerned projects supporting Mexico's historic labor law reforms, which Mexico adopted in 2019 as part of its commitment under the USMCA. These projects were funded via specific appropriations Congress set aside in the USMCA Implementation Act. *See supra* ¶ 25. The projects focused on supporting worker organizing in the call center, aerospace, mining, auto, and other manufacturing-for-export industries, as well as strengthening the organizing and institutional capacity of Mexican unions. So far, the Solidarity Center's ILAB-funded work in Mexico has helped more than 40,000 workers organize themselves in democratic and independent unions, engage in transparent collective bargaining, and achieve significant gains in wages and working conditions, including a 30% wage increase at a tire plant that exports to the United States. A recent interim evaluation of these projects, commissioned by ILAB and conducted by an independent consulting group, confirmed that the Solidarity Center's "bottom-up" approach had made substantial strides in organizing

workers, strengthening unions, and implementing Mexico's labor reforms. ILAB, *Interim Evaluation of ILAB-Funded Solidarity Center Protects in Mexico*, at xi (Nov. 2024).[11] The report emphasized that this work was "time- and labor-intensive," and that there would be a "risk to independent democratic labor unions if funding is no longer available." *Id.*

35.    Several other of the Solidarity Center's cooperative agreements with ILAB supported America's commitments in trade agreements and with its trade partners. For instance, since 2018, the Solidarity Center has, with funding from ILAB, worked with civil society groups and workers in the Republic of Georgia—a U.S. trade partner—to improve the knowledge of and compliance with that country's labor and workplace safety laws. The Solidarity Center's work in the Republic of Georgia concentrated on regions of the country with significant iron, steel, and wine industries—all large, high-value categories of exports to the United States. This project, which was authorized and funded through the 2023 Consolidated Appropriations Act, Pub. L. No. 117-328, was set to continue through September 2026.

36.    The Solidarity Center's ILAB cooperative agreements also support programs combatting child and forced labor, including in supply chains for goods that Americans consume. In one project, the Solidarity Center focused on Uzbekistan's cotton industry, which is the world's sixth largest and which, until recently, was dominated by a government-supported system of forced labor, including child labor. In Uzbekistan, the Solidarity Center has partnered with workers, producers, and Uzbekistan's government to improve working conditions and target continuing incidents of forced labor in the industry. DOL had recently provided the Solidarity Center with a

---

[11] https://www.dol.gov/sites/dolgov/files/ILAB/evaluation_type/other/1-SC-Mexico-Evaluation-Report-English-508-Compliant.pdf.

further $1.1 million in funding for this project, which was set to continue through December 31, 2026.

37.    As of March 1, 2025, Plaintiff AIR had three active cooperative agreements with ILAB. These projects focused on helping implement and ensure the success of Mexico's historic labor justice reforms and strengthen Mexican labor law enforcement, generally. Each was funded out of the supplemental appropriations Congress set aside in the USMCA Implementation Act. *See supra* ¶ 25. In one project, AIR was working to strengthen the institutional capacity of federal and state labor inspectorates, including by developing training programs, building technology and data management tools, and fostering private sector and union enforcement partnerships. In another project, AIR was focused on increasing the effectiveness of new conciliation mechanisms that Mexico adopted as part of its labor justice reforms. And in a third, AIR was working to improve Mexican federal government and union institutional capacity to ensure that union elections and negotiations are fair and democratic. All of AIR's labor rights work in Mexico was entirely funded by ILAB cooperative agreements.

38.    As of March 1, 2025, Plaintiff Global March had one cooperative agreement with ILAB. That project provided Global March with $4 million in funding to build the capacity of civil society organizations around the world to fight child labor. Working with local partners in Nepal, Peru, and Uganda, Global March was using these funds to support civil society organizations that advocate for improved child-labor policy; to pilot initiatives to raise awareness and address child labor in specific geographic areas; and to establish functioning child labor monitoring systems in each country.

**Defendants' Unlawful Terminations of Plaintiffs' Cooperative Agreements**

39.     Since March 2025, Defendants have unlawfully terminated all of ILAB's external grantmaking and agreements for technical assistance projects, including funding for Plaintiffs' ongoing work.

40.     On February 26, 2025, the Office of Management and Budget (OMB) issued a memorandum to agencies engaging in "foreign assistance," requesting that agencies work with grantees and other partners to ensure that each funded project is "align[ed] … with the President's America First foreign policy." *See* OMB, Budget Data Request No. 25-08.[12]

41.     The OMB memorandum directed agencies to require each implementing partner to fill out a lengthy questionnaire, which included questions such as whether the project "create[s] measurable benefits for U.S. domestic industries, workforce, or economic sectors," whether it is expected to "prevent illegal immigration," and whether it works to "protect children." The memorandum then instructed agencies to score each project on a scale of 180 and develop a recommendation for the Department of State and OMB about whether to continue, modify, or terminate each program.

42.     On or about March 3, ILAB staff reached out to all organizations with active cooperative agreements or grants and asked them to fill out that questionnaire. ILAB requested responses from recipients by March 5, 2025.

43.     Around the same time, ILAB staff asked partners with cooperative agreements, including some Plaintiffs, to revise agreement materials, including work plans, to comply with President Trump's recent Executive Orders governing discrimination, diversity, equity, and inclusion (*e.g.*, Executive Order No. 14173). ILAB staff provided positive feedback to partners

---

[12] https://media.taftlaw.com/wp-content/uploads/2025/03/26140812/OMB-BDR-Memo.pdf.

with active projects, including Plaintiffs. For example, on March 13, an ILAB Senior International Relations Officer wrote to the Solidarity Center to confirm that a project under review was "in compliance with current active Executive Orders." At no time did ILAB staff raise any concerns or indicate that any of Plaintiffs' agreements were not in alignment and potentially subject to termination.

44.    Soon thereafter, Defendants took steps to cancel all of ILAB's cooperative agreements, including Plaintiffs'.

45.    The first notice came on March 13, 2025, when a Grant Officer at ILAB wrote to Plaintiff the Solidarity Center to announce that ILAB was immediately terminating funding for a project in Uzbekistan's cotton industry.

46.    The termination letter stated that the cooperative agreement "no longer effectuates the program goals." The letter went on to assert that the project had faced "significant challenges" already, and that the resulting delay and increasing complexity "ha[d] undermined the project's prospects for achieving its long-term objectives."

47.    The statements in the March 13 letter were an abrupt about-face from DOL's previous evaluation of the Solidarity Center's programming in Uzbekistan. Just months earlier, in December 2024, the Department had sent the Solidarity Center positive feedback and increased funding by an additional $1.1 million.

48.    On March 14, 2025, ILAB sent notice that two more of the Solidarity Center's awards, for projects in Georgia, Brazil, and Chile, would be terminated immediately. These notices stated that the agreements were "being terminated pursuant to a directive from the U.S. Department of Labor Office of the Secretary and Bureau of International Labor Affairs (ILAB) for alignment with Agency priorities and national interest." Both letters further claimed that "[t]he decision to

terminate this cooperative agreement is a policy determination vested in ILAB leadership and the Secretary of Labor."

49.    That evening, Defendant Chavez-DeRemer posted on the social media site X that terminating ILAB programs "saved taxpayers $30M by eliminating 'America Last' programs in foreign countries like Indonesia, Colombia, Guatemala, Chile, & Brazil," and that, "[u]nder @POTUS, the American Worker ALWAYS comes First." Secretary Chavez-DeRemer (@SecretaryLCD), X (Mar. 14, 2025, 6:34 PM).[13]

50.    A few minutes later, the official DOGE X account reposted Defendant Chavez-DeRemer's message, specifically applauding her for the "[g]reat job" terminating funding for the Solidarity Center's grant-supported work in Uzbekistan. *See* Department of Government Efficiency (@DOGE), X (Mar. 14, 2025, 6:45 PM).[14]

51.    As it turns out, those initial cancellations represented just the beginning of Defendants' wholesale destruction of ILAB's international programming, including its support for Plaintiffs' work. On Wednesday, March 26, John Clark, a political appointee within DOL, directed ILAB to terminate all of its remaining cooperative agreements due to a "lack of alignment with agency priorities and national interest." Lauren Kaori Gurley, *Trump administration moves to cut programs that fight child labor abroad*, Wash. Post (Mar. 27, 2025).[15] Agency leaders soon confirmed to ILAB staff that they had "taken a decision to immediately terminate all of ILAB's grants." *Id.*

---

[13] https://x.com/SecretaryLCD/status/1900677057211736407.
[14] https://x.com/doge/status/1900679742577082799.
[15] https://www.washingtonpost.com/business/2025/03/27/trump-labor-department-international-child-labor.

52.    In total, Defendants canceled 69 ILAB programs combatting child labor, forced labor, and trafficking, and working to enforce and improve labor standards, in more than 40 countries. *Id.*

53.    As a result of this decision, Defendants will not spend millions of dollars that Congress appropriated for those purposes.

54.    The official DOGE account on X confirmed that Defendants do not plan to reallocate or spend those appropriated funds as Congress directed. It congratulated Defendants for their "[g]reat work … cancelling $577M in 'America Last' grants for $237M in savings." Department of Government Efficiency (@DOGE), X (Mar. 26, 2025, 4:18 PM).[16]

55.    Defendant Chavez-DeRemer again quoted that post in her own message on X. There, she threatened to unlawfully "reinvest" the "saved $237M" Congress had appropriated for international projects "into developing our workforce and protecting our children." Secretary Chavez-DeRemer (@SecretaryLCD), X (Mar. 26, 2025, 4:37 PM).[17] She ended the post with "#AmericaFirst," followed by an American flag. *Id.* The Department of Labor account likewise stated—when sharing a meme targeting an ILAB-funded, International Labor Organization-led project addressing sexual violence and harassment in the workplace in Lesotho—that "under the leadership" of Secretary Chavez-DeRemer, "we're reinvesting this money into the AMERICAN Workforce." U.S. Department of Labor (@USDOL), X (Apr. 1, 2025, 12:38 PM).[18]

56.    Defendants began sending termination notices to ILAB recipients that same day. By that evening at 5:44 p.m., Plaintiff AIR had learned that its $33.45 million project to work with the Mexican government to support labor justice reform implementation and union capacity to

[16] https://x.com/doge/status/1904991292700123167.
[17] https://x.com/SecretaryLCD/status/1904996097329594713.
[18] https://x.com/USDOL/status/1907110344977236094.

comply had been terminated. AIR's other two cooperative agreements were cancelled the following morning, March 27.

57.    Plaintiff the Solidarity Center similarly received notice on March 27 that Defendants were terminating its eight remaining cooperative agreements with ILAB. Plaintiff Global March likewise received notice on March 27 that ILAB had terminated its cooperative agreement.

58.    Some ILAB partners, including Plaintiff the Solidarity Center, learned about the loss of crucial ILAB funding through the official DOGE account's social media post. That post touted the savings from canceling several Solidarity Center agreements—including "$12.2M for 'worker empowerment in South America'" and "$6.25M for 'improving respect for Worker's rights in agricultural supply chains' in Honduras, Guatemala, and El Salvador." Department of Government Efficiency (@DOGE), X (Mar. 26, 2025, 4:18 PM).[19]

59.    In this last round of terminations, each notice stated that, "[i]n compliance with 2 CFR 200.340 and the termination conditions of the cooperative agreement," each agreement was "being terminated pursuant to a directive from the U.S. Department of Labor Office of the Secretary and Bureau of International Labor Affairs (ILAB) for alignment with Agency priorities and national interest."

60.    On information and belief, many of the ILAB projects that Defendants cancelled scored highly on the OMB questionnaire designed to ensure that foreign assistance programs were aligned with the President's foreign policy.

---

[19] https://x.com/DOGE/status/1904991292700123167.

**Injuries to Plaintiff from Defendants' Unlawful Terminations**

61.    Defendants' unlawful dismantling of ILAB's federal financial assistance program and termination of Plaintiffs' cooperative agreements have already caused Plaintiffs significant harm.

62.    In just the few weeks since Defendants terminated the agreement covering its project in Uzbekistan, Plaintiff the Solidarity Center has laid off all of that project's staff. As a result of that layoff, the Solidarity Center needed to pay to relocate the terminated project director from Uzbekistan to his native Georgia. And the Solidarity Center has begun taking similar steps with respect to projects around the world. It has laid off all or the majority of its staff supporting DOL-funded projects in all implementing countries (Mexico, Brazil, Colombia, Peru, Liberia, Nigeria, Guatemala, Bangladesh, Philippines, Georgia, and Uzbekistan), had to pay to relocate the Philippines project director to his home in Sri Lanka, and partially or entirely closed project offices in Mexico, Liberia, and Brazil. As of March 2025, the Solidarity Center relied on ILAB funding for approximately 22% of its projected 2025 budget. ILAB funding comprised the majority of the Solidarity Center's funding for programs in Mexico (85%), Uzbekistan (100%), Georgia (100%), Brazil (65%), Colombia (55%), Peru (55%), and Malaysia (70%), and approximately half its funding for programs in the Philippines, Central America, Bangladesh, Liberia, and Nigeria.

63.    Because ILAB's funding makes up such a significant portion of the Solidarity Center's operating budget, Defendants' termination of that funding will force the Solidarity Center to lay off 40 employees, or 17% of its staff around the world. Because of contractual and other legal mandates governing its staff and offices both here and abroad, laying off staff will force the Solidarity Center to incur significant costs. For example, the staff of the Solidarity Center's Mexico office are supported almost entirely—about 85%—by ILAB funding under the USMCA

Supplemental Appropriations Act. The Solidarity Center has estimated that it will need to lay off almost that entire staff, and that it will accordingly owe at least $400,000 in legally mandated severance, unused benefits, and employer-paid taxes alone.

64.    Plaintiff AIR likewise has determined that the cancellation of its ILAB funding will force it to abandon its work supporting labor justice reform implementation and labor law enforcement, generally, in Mexico. AIR anticipates terminating virtually all of its 64 staff members in Mexico. It will also be forced to end its intensive cooperation with Mexican federal and state governments and cancel its subcontract awards with two Mexican universities and two U.S.-based civil society organizations, totaling roughly $3.39 million. As a result of ILAB agreement cancellations, AIR also anticipates terminating an additional nine consultants and most or all of the 18 AIR headquarters-based staff dedicated to the projects.

65.    Plaintiff Global March has similarly already had to scale back its work since losing its ILAB funding just weeks ago and will need to do so further absent this Court's intervention. Global March anticipates that it will need to reduce staff by 60% in its offices in the Netherlands and India. Given these cuts, Global March will no longer be able to support its partners' work with national governments in Uganda, Peru, and Nepal, including work in the coffee industry and other crucial supply chains for U.S. companies. As a result, Global March's partner organization in Uganda has already determined that it will need to shut its doors entirely, while partners in Nepal and Peru will need to cut back their staff by 30%.

66.    This downsizing will force Plaintiffs to abandon many or all of their projects midstream. Shutting down these programs risks losing the value of the investments that Plaintiffs and their partners have already made. And because many of Plaintiffs' projects are at crucial stages, it will be particularly destructive to Plaintiffs' reputations and missions if they are shut

down immediately. For instance, Plaintiff the Solidarity Center had only secured an agreement with the Uzbekistan government allowing it to operate inside the country in 2023. Terminating the Soldarity Center's Uzbekistan project early will effectively undo that nascent work with that country's government, jeopardize the Solidarity Center's registration and legal status, and make it impossible to achieve the shared goal of fostering international investment in an ethical cotton sector in the country.

67.    Across the globe, Plaintiffs will face severe reputational harm if they are forced to abruptly abandon their work and partners as a result of Defendants' unlawful termination of ILAB's support. This reputational harm will make it more difficult for Plaintiffs to resume their work, even if they were later able to secure new funding.

## COUNT I
### (Ultra Vires)

68.    Plaintiffs have a non-statutory right of action to enjoin and declare unlawful official action that is ultra vires.

69.    Article I of the U.S. Constitution vests "[a]ll legislative Powers" in Congress. U.S. Const. art. I, § 1. Members of the executive branch have no constitutional authority to amend or override statutes that have been lawfully enacted. Agencies and agency officials may act only pursuant to authority conferred on them by Congress.

70.    Several laws, including the USMCA Implementation Act and the Department of Labor Appropriations Acts for fiscal years 2021, 2022, 2023, and 2024, charge ILAB with implementing programs that combat child labor and address workers' rights issues in U.S. trading partner countries. Congress required ILAB to spend a minimum amount on these priorities, and only Congress can amend or eliminate this responsibility.

71.    Defendants exceeded their authority and usurped legislative authority that the Constitution confers on Congress by terminating all of ILAB's cooperative agreements and making it impossible for ILAB to fulfill Congress's mandate based on a policy disagreement with that directive.

## COUNT II
### (APA – Contrary to Law – Appropriations Acts)

72.    The APA directs courts to hold unlawful and set aside agency actions that are "not in accordance with law." 5 U.S.C. § 706(2)(A).

73.    Several laws, including the USMCA Implementation Act and the Department of Labor Appropriations Acts for fiscal years 2021, 2022, 2023, and 2024, charge ILAB with implementing programs that address workers' rights issues in U.S. trading partner countries. By requiring ILAB to spend a minimum amount on these priorities, Congress made clear that operating and providing federal financial assistance for such programs is a mandatory duty.

74.    Defendants acted contrary to those statutes by eliminating ILAB's entire federal financial assistance portfolio. Defendants have no authority to violate those statutes based on a policy disagreement with Congress's directives

## COUNT III
### (APA – Contrary to Law – The Impoundment Control Act)

75.    The Administrative Procedure Act (APA) directs courts to hold unlawful and set aside agency actions that are "not in accordance with law." 5 U.S.C. § 706(2)(A).

76.    The Impoundment Control Act requires the executive to make appropriated funds "available for obligation" unless the President sends a special message to Congress detailing a request to rescind or reserve funds and Congress then passes a recission bill rescinding the funding. 2 U.S.C. § 683.

77.    The President has not sent a special message to Congress requesting that the funds appropriated for ILAB's international funding programs be rescinded, and Congress has not rescinded those appropriations.

78.    The Impoundment Control Act also requires the President to send a special message to Congress whenever the executive proposes to defer spending appropriated funds, and it prohibits deferral of any budget authority except to provide for contingencies, to achieve savings made possible by changed requirements or greater efficiency, or as otherwise specifically provided by law. *Id.* § 684.

79.    The President has not sent a special message to Congress requesting deferral of the budget authority for ILAB's federal financial assistance programs, and none of the statutory circumstances that would permit such a deferral is applicable.

80.    Defendants' termination of Plaintiffs' cooperative agreements despite the congressional appropriation to support them, as well as their statements that none of the ILAB appropriations will be spent on the purposes Congress designated, are contrary to the Impoundment Control Act, in violation of the APA.

## COUNT IV
### (APA – Contrary to Law – Anti-Deficiency Act)

81.    The APA directs courts to hold unlawful and set aside agency actions that are "not in accordance with law." 5 U.S.C. § 706(2)(A).

82.    The Anti-Deficiency Act provides, in relevant part, that "[i]n apportioning or reapportioning an appropriation, a reserve may be established only—(A) to provide for contingencies; (B) to achieve savings made possible by or through changes in requirements or greater efficiency of operations; or (C) as specifically provided by law." 31 U.S.C. § 1512(c)(1).

83.    By refusing to spend funds that Congress has appropriated for ILAB's programming, Defendants have acted contrary to the Anti-Deficiency Act, in violation of the APA, by creating a reserve that is not authorized by any of the Anti-Deficiency Act's three exceptions.

## COUNT V
### (APA – Arbitrary and Capricious)

84.    The APA directs courts to hold unlawful and set aside agency actions that are "arbitrary, capricious, [or] an abuse of discretion." 5 U.S.C. § 706(2)(A).

85.    Defendants offered no reasoned explanation for abruptly terminating all of ILAB's cooperative agreements supporting programs abroad. Defendants pursued an unreasonable and unlawful goal of entirely terminating a congressionally mandated program.

86.    Defendants likewise failed to account for the reliance interests that Plaintiffs, their partner organizations, and workers—both abroad and, through international competition, back home—hold in the successful completion of Plaintiffs' ILAB-supported projects.

87.    Defendants therefore acted arbitrarily and capriciously by terminating, without warning or justification, Plaintiffs' cooperative agreements and forcing them to abandon their projects, which are consistent with longstanding American labor and trade policy.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs pray that this Court:

a.    Declare that Defendants' mass termination of all of ILAB's statutorily mandated grant and cooperative agreement programs is unlawful;

b.    Vacate Defendants' ILAB termination notices and order reinstatement of the ILAB cooperative agreements, including Plaintiffs' agreements;

c.    Award Plaintiffs their costs and attorneys' fees for this action; and

d.    Grant any other relief as this Court deems appropriate.

Dated: April 15, 2025                              Respectfully submitted,

                                                  /s/ Nicolas A. Sansone
                                                  Stephanie Garlock (D.C. Bar No. 1779629)
                                                  Allison M. Zieve (D.C. Bar No. 424786)
                                                  Nicolas A. Sansone (D.C. Bar No. 1686810)
                                                  Public Citizen Litigation Group
                                                  1600 20th Street NW
                                                  Washington, DC 20009
                                                  (202) 588-1000

                                                  *Attorneys for Plaintiffs*