**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

|  |  |
|---|---|
| AMERICAN CENTER FOR INTERNATIONAL LABOR SOLIDARITY, et al., *Plaintiffs*, v. LORI CHAVEZ-DEREMER, et al., *Defendants*. | Case No. 1:25-cv-01128 (BAH) |

**MEMORANDUM OF LAW IN SUPPORT OF PLAINTIFFS'
MOTION FOR A PRELIMINARY INJUNCTION**

Stephanie Garlock (DC Bar No. 1779629)
Allison M. Zieve (DC Bar No. 424786)
Nicolas A. Sansone (DC Bar No. 1686810)
Public Citizen Litigation Group
1600 20th Street NW
Washington, DC 20009
(202) 588-1000

*Counsel for Plaintiffs*

May 5, 2025

# TABLE OF CONTENTS

Table of Authorities ............................................................................................................ ii

Introduction ......................................................................................................................... 1

Statement of Facts ............................................................................................................... 2

       A.    Congress's mandate to ILAB to fund and support technical assistance
            projects focusing on workers' rights abroad ........................................................ 2

       B.    Plaintiffs' cooperative agreements with ILAB .................................................... 5

       C.    DOL's decision to terminate all ILAB cooperative agreements .......................... 6

       D.    Effects of the termination of ILAB funding programs on Plaintiffs ................... 8

Legal Standards ................................................................................................................. 10

Argument ........................................................................................................................... 11

   I.    Plaintiffs are likely to succeed on the merits. ................................................... 11

       A.    This Court has jurisdiction over Plaintiffs' claims. ........................................... 11

       B.    Plaintiffs are likely to succeed on their APA claims. ....................................... 17

          1.    Defendants' en masse termination of ILAB cooperative agreements is
              contrary to law. .......................................................................................... 18

          2.    Defendants' en masse termination of ILAB cooperative agreements is
              arbitrary and capricious. ............................................................................ 22

       C.    Plaintiffs are likely to succeed on their constitutional claim. ........................... 27

   II.    Plaintiffs will suffer irreparable harm absent preliminary relief. ...................... 29

   III.   The balance of equities and public interest favor Plaintiffs ............................... 31

Conclusion ........................................................................................................................ 32

# TABLE OF AUTHORITIES

**Cases**

*AIDS Vaccine Advocacy Coalition v. Department of State*,
No. 25-cv-00400-AHA, 2025 WL 752378 (D.D.C. Mar. 10, 2025). .......................... 12, 16, 18

*Albrecht v. Committee on Employee Benefits of Federal Reserve Employee Benefits System*,
357 F.3d 62, 68 (D.C. Cir. 2004) .................................................................................. 11

*American Near East Refugee Aid v. USAID*,
703 F. Supp. 3d 126 (D.D.C. 2023) ........................................................... 11, 13, 14

*Amerijet International, Inc. v. Pistole*,
753 F.3d 1343 (D.C. Cir. 2014) .................................................................................. 24

*Ark Initiative v. Tidwell*,
816 F.3d 119 (D.C. Cir. 2016) .................................................................................... 22

*Beattie v. Barnhart*,
663 F. Supp. 2d 5 (D.D.C. 2009) ............................................................................... 29

*Bell v. Hood*,
327 U.S. 678 (1946) .................................................................................................... 29

*Bowen v. Massachusetts*,
487 U.S. 879 (1988) ...................................................................................... 13, 14, 15

*C.G.B. v. Wolf*,
464 F. Supp. 3d 174 (D.D.C. 2020) ........................................................................... 31

*California v. U.S. Department of Education*,
132 F.4th 92 (1st Cir. 2025) ....................................................................................... 16

*Chicago Women in Trades v. Trump*,
No. 25-cv-2005, 2025 WL 1114466 (N.D. Ill. Apr. 14, 2025) ................................. 12

*City & County of San Francisco v. Trump*,
897 F.3d 1225 (9th Cir. 2018) ............................................................................. 18, 21

*City of Houston, Tex. v. HUD*,
24 F.3d 1421 (D.C. Cir. 1994) ................................................................................... 20

*City of New Haven v. United States*,
634 F. Supp. 1449 (D.D.C. 1986) .............................................................................. 21

*Climate United Fund v. Citibank, N.A.*,
No. 25-cv-698-TSC, 2025 WL 1131412 (D.D.C. Apr. 16, 2025) ....................... 12, 15

*Clinton v. City of New York,*
   524 U.S. 417 (1998) .......................................................................................... 27

*Columbus Regional Hospital v. United States,*
   990 F.3d 1330 (Fed. Cir. 2021) ....................................................................... 14

*Community Action Programs Executive Directors Ass'n of New Jersey, Inc. v. Ash,*
   365 F. Supp. 1355 (D.N.J. 1973) ..................................................................... 28

*Community Legal Services in East Palo Alto v. HHS,*
   No. 25-cv-02847-AMO, 2025 WL 1168898 (N.D. Cal. Apr. 21, 2025) ........... 16, 29

*Correctional Services Corp. v. Malesko,*
   534 U.S. 61 (2001) ........................................................................................... 29

*Crowley Goverment Services, Inc. v. GSA,*
   38 F.4th 1099 (D.C. Cir. 2022) ....................................................................... 12

*Department of Education v. California,*
   145 S. Ct. 966 (2025) ................................................................................. 15, 30

*Department of State v. AIDS Vaccine Advocacy Coalition,*
   145 S. Ct. 753 (2025) ....................................................................................... 15

*DHS v. Regents of the University of California,*
   591 U.S. 1 (2020) ............................................................................................. 22

*Everglades Harvesting & Hauling, Inc. v. Scalia,*
   427 F. Supp. 3d 101 (D.D.C. 2019) ................................................................. 30

*\*FCC v. Fox Television Stations, Inc.,*
   556 U.S. 502 (2009) ................................................................................... 23, 24

*Free Enterprise Fund v. Public Company Accounting Oversight Board,*
   561 U.S. 477 (2010) ......................................................................................... 29

*Great-West Life & Annuity Ins. Co. v. Knudson,*
   534 U.S. 204 (2002) ......................................................................................... 15

*Healthy Teen Network v. Azar,*
   322 F. Supp. 3d 647 (D. Md. 2018) ................................................................. 25

*\*In re Aiken County,*
   725 F.3d 255 (D.C. Cir. 2013) ......................................................................... 18

*In re Grant,*
   635 F.3d 1227 (D.C. Cir. 2011) ....................................................................... 17

*INS v. Chadha*,
   462 U.S. 919 (1983)....................................................................................... 27

*J.W. Hampton, Jr. & Co. v. United States*,
   276 U.S. 394 (1928)....................................................................................... 28

*Kendall v. United States*,
   37 U.S. (12 Pet.) 524 (1838).......................................................................... 18

*Kidwell v. Department of Army, Board for Correction of Military Records*,
   56 F.3d 279 (D.C. Cir. 1995).................................................................... 11, 15

*\*League of Women Voters of United States v. Newby*,
   838 F.3d 1 (D.C. Cir. 2016)...................................................................... 31, 32

*Lincoln v. Vigil*,
   508 U.S. 182 (1993)....................................................................................... 18

*Local 2677, America Federation of Government Employees v. Phillips*,
   358 F. Supp. 60 (D.D.C. 1978)...................................................................... 28

*Maine Community Health Options v. United States*,
   590 U.S. 296 (2020)................................................................................. 13, 20

*Maine v. USDA*,
   No. 1:25-cv-00131-JAW, 2025 WL 1088946 (D. Me. Apr. 11, 2025) ................... 16

*Maryland Department of Human Resources v. HHS*,
   763 F.2d 1441 (D.C. Cir. 1985)..................................................................... 17

*Megapulse, Inc. v. Lewis*,
   672 F.2d 959 (D.C. Cir. 1982)....................................................................... 11

*Metzger, Shadyac & Schwarz v. United States*,
   12 Cl. Ct. 602 (1987) .................................................................................... 13

*Michigan v. EPA*,
   576 U.S. 743 (2015)....................................................................................... 22

*Mistretta v. United States*,
   488 U.S. 361 (1989)....................................................................................... 28

*\*Motor Vehicle Manufacturers Association of the United States v. State Farm Mutual
   Automobile Insurance Co.*,
   463 U.S. 29 (1983)................................................................................... 22, 25

*National Council of Community Mental Health Centers v. Weinberger*,
   361 F. Supp. 897 (D.D.C. 1973)................................................................... 18

*National Council of Nonprofits v. Office of Management & Budget*,
  No. 25-cv-239-LLA, 2025 WL 368852 (D.D.C. Feb. 3, 2025)..........................................25, 27

*National Federation of Independent Business v. OSHA*,
  595 U.S. 109 (2022)...........................................................................................................18

*New York v. Trump*,
  No. 1:25-cv-39-JJM, 2025 WL 1098966 (D.R.I. Apr. 14, 2025)......................................16

*New York v. Trump*,
  No. 1:25-cv-39-JJM, 2025 WL 715621 (D.R.I. Mar. 6, 2025).....................................25, 31

*Nken v. Holder*,
  556 U.S. 418 (2009)............................................................................................................10

*Pacito v. Trump*,
  No. 2:25-cv-255-JNW, 2025 WL 893530 (W.D. Wash. Mar. 24, 2025) ........................14, 23

*Petties v. District of Columbia*,
  227 F.3d 469 (D.C. Cir. 2000) ...........................................................................................17

*RFE/RL, Inc. v. Lake*,
  No. 1:25-cv-799-RCL, 2025 WL 900481 (D.D.C. Mar. 25, 2025)...................................24

*San Antonio Housing Authority v. United States*,
  143 Fed. Cl. 425 (2019) .....................................................................................................13

*San Francisco Unified School District v. Americorps*,
  No. 25-cv-02425, 2025 WL 1180729 (N.D. Cal. Apr. 23, 2025)......................................16

*Sherley v. Sebelius*,
  644 F.3d 388 (D.C. Cir. 2011)............................................................................................10

*St. Bernard Parish Government v. United States*,
  134 Fed. Cl. 730 (2017) ...............................................................................................13, 14

*United States Department of the Navy v. Federal Labor Relations Authority*,
  665 F.3d 1339 (D.C. Cir. 2012)..........................................................................................27

*Whitman-Walker Clinic, Inc. v. HHS*,
  485 F. Supp. 3d 1 (D.D.C. 2020)........................................................................................30

*Widakuswara v. Lake*,
  No. 25-5144, 2025 WL 1288817 (D.C. Cir. May 3, 2025) ...............................................17

*Widakuswara v. Lake*,
  No. 25-cv-2390-JPO, 2025 WL 945869 (S.D.N.Y. Mar. 28, 2025)..................................24

*Winter v. Natural Resources Defense Council, Inc.*,
    555 U.S. 7 (2008) ............................................................................................................... 10

*Wisconsin Gas Co. v. FERC*,
    758 F.2d 669 (D.C. Cir. 1985) (per curiam) ....................................................................... 30

*Woonasquatucket River Watershed Council v. USDA*,
    No. 1:25-cv-00097-MSM, 2025 WL 1116157 (D.R.I. Apr. 15, 2025) .................................. 16

**Statutes**

2 U.S.C. § 683(a) ..................................................................................................................... 21

2 U.S.C. § 683(b) ..................................................................................................................... 21

28 U.S.C. § 1491(a)(1) ............................................................................................................. 11

31 U.S.C. § 1512(c)(1) ............................................................................................................. 22

5 U.S.C. § 706(2)(A) .......................................................................................................... 17, 22

*Department of Labor Appropriations Act, 2021,
    Pub. L. No. 116-260, 134 Stat. 1547 (Dec. 27, 2020) .......................................................... 3

*Department of Labor Appropriations Act, 2022,
    Pub. L. No. 117-103, 136 Stat. 421 (Mar. 15, 2022) ...................................................... 3, 19

*Department of Labor Appropriations Act, 2023,
    Pub. L. No. 117-328, 136 Stat. 4834 (Dec. 29, 2022) ..................................................... 3, 19

*Department of Labor Appropriations Act, 2024,
    Pub. L. No. 118-47, 138 Stat. 628 (Mar. 23, 2024) ............................................... 3, 4, 19, 20

Omnibus Trade and Competitiveness Act of 1988,
    Pub. L. No. 100-418, 102 Stat. 1107 (Aug. 23, 1988) .......................................................... 3

*USMCA Supplemental Appropriations Act,
    Pub. L. No. 116-113, 134 Stat. 98 (Jan. 29, 2020) ......................................................... 4, 20

**Congressional Material**

S. Rep. No. 118-84 (July 27, 2023) ........................................................................... 4, 19, 26, 32

**Other Authorities**

*California v. U.S. Department of Education*, 1:25-cv-10548 (D. Mass. Mar. 6, 2025),
    ECF No. 1 (complaint) ......................................................................................................... 16

ILAB, *2022 List of Goods Produced by Child Labor or Forced Labor* (Sept. 2022) ................... 3

Lauren Kaori Gurley, *Trump Administration Moves to Cut Programs That Fight Child Labor Abroad*, Wash. Post (Mar. 27, 2025) ....................................................................... 7

Marty Walsh, *ILAB at 75: A New Era of Global Action on Labor Rights*, DOL (Oct. 7, 2022).. 27

Office of Management & Budget, Budget Data Request No. 25-08 (Feb. 26, 2025)............... 6, 25

Press Release, American Apparel & Footwear Ass'n, AAFA Reacts to U.S. Department of Labor's Action to Cancel All ILAB Contracts (Mar. 26, 2025)................................................ 5

Secretary Chavez-DeRemer (@SecretaryLCD), X (Mar. 14, 2025, 6:37 PM) .............................. 7

Secretary Chavez-DeRemer (@SecretaryLCD), X (Mar. 26, 2025, 4:37 PM) ................. 8, 20, 28

## INTRODUCTION

For more than a century, Congress has understood that the strength of American industry and the American workforce is inextricably tied to a global labor marketplace in which American businesses and workers may be forced to compete with those that gain an unfair advantage through the use of forced or child labor, or other violations of workers' rights. Congress has accordingly tasked a component of the Department of Labor (DOL) called the Bureau of International Labor Affairs (ILAB) with addressing workers' rights issues in countries around the world. In particular, Congress has for decades mandated that ILAB fund projects that provide technical assistance to U.S. trade partner governments, unions, community organizations, and others working to promote respect for labor rights and improve working conditions around the world.

Over the last two months, Defendants DOL and U.S. Secretary of Labor Lori Chavez-DeRemer have defied Congress's judgment and terminated all ILAB support for these crucial projects. The termination notices gave no project-specific reasons for termination, stating only that the programs were being cut "for alignment with Agency priorities and national interest." Around that same time, on social media, Defendants ridiculed the very concept of supporting workers' rights abroad, despite Congress's express endorsement of that support through its funding for ILAB. Defendants also ignored that, as DOL had long recognized, helping American workers was a key reason that Congress required ILAB to fund projects like these.

Defendants' decision to terminate ILAB's technical assistance program and their actions to cancel all of ILAB's ongoing projects are unlawful. Defendants have violated the statutes mandating that ILAB spend appropriated funds on programs to combat child labor and support the labor commitments of U.S. trade partners. In so doing, they also violated the Impoundment Control Act and the Anti-Deficiency Act. And Defendants' actions likewise run afoul of the separation of powers principle that undergirds our constitutional plan, which requires the executive to implement

1

and abide by federal law. Defendants' actions are also arbitrary and capricious. A bare invocation of "agency priorities" is insufficient to justify such a wholesale shift in agency policy, particularly where Defendants appear to be pursuing a policy of defying Congress's mandates. Moreover, Defendants have ignored the substantial reliance interests that organizations that received ILAB funding, workers and worker organizations abroad, and U.S. trade partner governments had in the programming that ILAB had funded.

Defendants' unlawful actions will cause irreparable harm on a global scale, including to Plaintiffs—three nonprofit organizations that, until March of 2025, received substantial funding from ILAB to support workers' rights and anti-child labor projects around the world. In the weeks since Defendants cut off their funding and ended their projects, Plaintiffs have had to lay off staff, shutter offices, and abandon partnerships with foreign governments, unions, and community organizations. The tangible consequences for those partners around the world demonstrate that the balance of equities and public interest strongly favor preliminary relief. Workers in plants that supply the U.S. are losing their chance to win union recognition and negotiate wage increases. Government inspectors are no longer being trained. And U.S. trade partners are losing the support on which they had come to rely to implement labor law reforms and uphold their commitments under U.S. trade agreements. Absent this Court's intervention soon, these harms will continue to accrue. The Court should grant Plaintiffs' request for a preliminary injunction.

## STATEMENT OF FACTS

**A.    Congress's mandate to ILAB to fund and support technical assistance projects focusing on workers' rights abroad**

The U.S. government has long recognized the importance of international labor rights to American foreign policy and to the strength of American industry and the American workforce. As Congress has stated, "the denial of worker rights should not be a means for a country or its

industries to gain competitive advantage in international trade." Omnibus Trade and Competitiveness Act of 1988, tit. I, § 1101(b)(14), Pub. L. No. 100-418, 102 Stat. 1107, 1125 (Aug. 23, 1988). To that end, in 1995, Congress tasked ILAB with operating and funding technical assistance programs that combat child labor, and it has since expanded ILAB's remit to cover projects addressing other exploitative labor arrangements and the promotion of workers' rights around the globe more broadly. *See* Department of Labor Appropriations Act, 1995, Pub. L. No. 103-333, 108 Stat. 2539, 2546 (Sept. 30, 1994) (appropriating funds for an "International Program on the Elimination of Child Labor"); ILAB, *2022 List of Goods Produced by Child Labor or Forced Labor* at 9 (Sept. 2022).[1]

In recent years, Congress has regularly appropriated millions of dollars for ILAB "to administer or operate international labor activities, bilateral and multilateral technical assistance, and microfinance programs, by or through contracts, grants, subgrants and other arrangements." *See* Department of Labor Appropriations Act, 2024, Pub. L. No. 118-47, 138 Stat. 628, 641 (Mar. 23, 2024) (2024 Appropriations Act); Department of Labor Appropriations Act, 2023, Pub. L. No. 117-328, 136 Stat. 4834, 4846 (Dec. 29, 2022) (2023 Appropriations Act); Department of Labor Appropriations Act, 2022, Pub. L. No. 117-103, 136 Stat. 421, 434 (Mar. 15, 2022) (2022 Appropriations Act); Department of Labor Appropriations Act, 2021, Pub. L. No. 116-260, 134 Stat. 1547, 1559 (Dec. 27, 2020) (2021 Appropriations Act). In addition, Congress has mandated that DOL spend above a set floor on certain key priorities. For instance, in 2024, it instructed ILAB to spend $30.75 million each on "programs to combat exploitative child labor internationally" and "model programs that address worker rights issues through technical assistance in countries with

---

[1] https://www.dol.gov/sites/dolgov/files/ILAB/child_labor_reports/tda2021/2022-TVPRA-List-of-Goods-v3.pdf.

which the United States has free trade agreements or trade preference programs." 2024 Appropriations Act, 138 Stat. at 641. As the Senate Appropriations Committee explained concerning the 2024 appropriation, the appropriation for ILAB "is available to help improve working conditions and labor standards for workers around the world by carrying out ILAB's statutory mandates and international responsibilities"—which include "promoting the elimination of the worst forms of child labor and forced labor," and "ensur[ing] workers and businesses in the United States are not put at a competitive disadvantage by trading partner countries not adhering to their labor commitments under trade agreements and trade preference programs." S. Rep. No. 118-84, at 31 (July 27, 2023).

In 2020, Congress also tasked ILAB with funding projects that support the implementation of the United States-Mexico-Canada Agreement (USMCA), which President Trump had negotiated. In particular, Congress instructed ILAB to fund projects to support the success of the historic labor-law reforms that Mexico had agreed to implement when it signed the USMCA. *See* USMCA Supplemental Appropriations Act, Pub. L. No. 116-113, 134 Stat. 98, 100 (Jan. 29, 2020) (USMCA Supplemental Appropriations Act). Congress appropriated $180 million to be obligated over the next four years and mandated that ILAB "shall" spend it on such projects. *Id.*

With its various streams of statutorily authorized funding, ILAB has supported programs to combat abusive labor practices and further American trade and labor interests around the world. Both labor and industry groups have long supported and applauded ILAB's efforts. As the president and CEO of the American Apparel & Footwear Association—which represents major brands, retailers, and manufacturers—recently put it, "ILAB, through its grants, technical assistance, and direct support, works to build institutions in countries around the world so that they can effectively raise labor standards and eliminate opportunities for less scrupulous foreign

businesses to profit from labor abuses while American businesses and workers play by the rules." Press Release, American Apparel & Footwear Ass'n, AAFA Reacts to U.S. Department of Labor's Action to Cancel All ILAB Contracts (Mar. 26, 2025).[2]

### B.    Plaintiffs' cooperative agreements with ILAB

Plaintiffs are nonprofit organizations that, as of March 1, 2025, received funding from ILAB to support their work around the world. Each of Plaintiffs' ILAB projects was operated under a cooperative agreement with DOL.

Plaintiff the American Center for International Labor Solidarity (Solidarity Center) is a workers' rights organization that, as of March 1, 2025, had eleven active projects with ILAB, worth nearly $80 million in funding for the organization. *See* Bader-Blau Decl. ¶¶ 3, 9–12. Those projects—authorized and funded both by annual appropriations bills and by the USMCA Supplemental Appropriations Act—sought to, among other things, improve working conditions and respect for workers' rights in key export industries in Central America; combat unsafe working conditions in Bangladesh's garment, shrimp, and construction sectors; and build both state and union capacity in Mexico, following that country's historic 2019 labor law reforms in compliance with the USMCA. *See id.* ¶ 10. When DOL terminated the Solidarity Center's awards, each project had substantial time left, including some projects set to run with ILAB funding through 2028. *See id.*

Plaintiff the American Institutes for Research (AIR) is a nonpartisan, nonprofit organization that, as of March 1, 2025, had three active projects with ILAB, worth around $50 million in funding for the organization through 2027. *See* Seidenfeld Decl. ¶¶ 3, 7. That funding,

---

[2] https://www.aafaglobal.org/AAFA/AAFA_News/2025_Press_Releases/AAFA_Reacts_DOL_Action_Cancel_All_ILAB_Contracts.aspx.

all of which came from the USMCA Supplemental Appropriations Act, supported AIR's work to promote labor rights and labor law reform in Mexico. *Id.* ¶¶ 5–9.

Plaintiff the Global March Against Child Labor (Global March) is a worldwide network of groups working to fight child labor. *See* Dubbelt Decl. ¶ 3. As of March 1, 2025, the Global March had one ILAB project focused on capacity building for civil society organizations fighting child labor in Nepal, Peru, and Uganda. *Id.* ¶¶ 7, 9. That award, funded by the fiscal year 2021 appropriations act, provided Global March with $4 million in funding through the end of 2025. *Id.* ¶¶ 7–8.

### C.    DOL's decision to terminate all ILAB cooperative agreements

Since March 2025, at the instruction of Defendants the DOL and Secretary Lori Chavez-DeRemer, ILAB has unlawfully terminated all of its external grantmaking for technical assistance projects, in direct contravention of Congress's mandate.

In early March, at the direction of the Office of Management and Budget (OMB), ILAB asked all organizations with cooperative agreements to fill out extensive surveys supposedly designed to evaluate whether each project aligned with the administration's policy priorities. *See* Off. of Mgmt. & Budget, Budget Data Request No. 25-08 (Feb. 26, 2025) (OMB Budget Data Request No. 25-08);[3] Bader-Blau Decl. ¶ 15; Seidenfeld Decl. ¶ 13; Dubbelt Decl. ¶ 15. Soon thereafter, however, ILAB shut down its entire portfolio of international projects—without regard to how any given project scored on ILAB's assessment of those survey results.

On March 13, DOL's Office of Grants Management sent Plaintiff Solidarity Center a termination letter for a project focused on Uzbekistan's cotton industry. *See* Bader-Blau Decl. ¶ 18. Although ILAB had just months earlier rewarded the project an additional $1.1 million in

---

[3] https://media.taftlaw.com/wp-content/uploads/2025/03/26140812/OMB-BDR-Memo.pdf.

funding, the letter claimed that the project "no longer effectuate[d] the program goals" and had run into "significant challenges." *See* Ex. B to Bader-Blau Decl. at 1; Bader-Blau Decl. ¶ 14. The following day, DOL sent termination letters for two additional Solidarity Center cooperative agreements. Bader-Blau Decl. ¶ 19. Those notices provided no justification, other than that the terminations were "pursuant to a directive from the U.S. Department of Labor Office of the Secretary and Bureau of International Labor Affairs (ILAB) for alignment with Agency priorities and national interest." *See* Ex. B to Bader-Blau Decl. at 2–3. That night, Secretary Chavez-DeRemer boasted on the social media site X that terminating ILAB projects "saved taxpayers $30M by eliminating 'America Last' programs in foreign countries like Indonesia, Colombia, Guatemala, Chile, & Brazil," and that, "[u]nder @POTUS, the American Worker ALWAYS comes First." Secretary Chavez-DeRemer (@SecretaryLCD), X (Mar. 14, 2025, 6:37 PM).[4]

Two weeks later, on March 26, a political appointee within DOL directed ILAB staff to terminate all of ILAB's remaining cooperative agreements, citing a "lack of alignment with agency priorities and national interest." Lauren Kaori Gurley, *Trump Administration Moves to Cut Programs That Fight Child Labor Abroad*, Wash. Post (Mar. 27, 2025).[5] With this decision, Defendants shut down many projects that had scored highly on the OMB survey that evaluated alignment with U.S. foreign policy priorities—little surprise, given how much of ILAB and its partners' work is designed to support America's trading partners. *See* Bader-Blau Decl. ¶ 15; Seidenfeld Decl. ¶ 13.

Over the following days, ILAB provided notices of termination for all remaining awards. Those notices each stated that the cancellations were "pursuant to a directive from the U.S.

---

[4] https://x.com/SecretaryLCD/status/1900677057211736407.
[5] https://www.washingtonpost.com/business/2025/03/27/trump-labor-department-international-child-labor.

Department of Labor Office of the Secretary and Bureau of International Labor Affairs (ILAB) for alignment with Agency priorities and national interest." *See, e.g.*, Ex. B to Bader-Blau Decl. at 4–11; Ex. A to Seidenfeld Decl.; Ex. B to Dubbelt Decl. In a post on X announcing the terminations, Secretary Chavez-DeRemer wrote that the agency had "just saved $237M," and promised to "reinvest" that money—which Congress had appropriated for ILAB's international projects—"into developing our workforce and protecting our children. #AmericaFirst[.]" Secretary Chavez-DeRemer (@SecretaryLCD), X (Mar. 26, 2025, 4:37 PM) (@SecretaryLCD Mar. 26 X Post).[6]

### D.    Effects of the termination of ILAB funding programs on Plaintiffs

Defendants' decision to terminate ILAB's entire portfolio of international technical assistance projects, including Plaintiffs' cooperative agreements, has caused and continues to cause Plaintiffs significant harm. Plaintiffs each relied on their DOL awards to fund a substantial portion of their work on international labor issues abroad. *See* Bader-Blau Decl. ¶ 11 (stating that ILAB funding accounted for 24% of the Solidarity Center's projected 2025 budget and the majority of support for its work in seven countries); Seidenfeld Decl. ¶ 20 (stating that ILAB funding was the only source of support for AIR's work with the Mexican government); Dubbelt Decl. ¶ 22 (stating that ILAB funding provided 60% of Global March's funding). Plaintiffs have thus already had to lay off staff; end partnerships with governments, unions, universities, and community organizations around the globe; and entirely shut down certain programs. *See* Bader-Blau Decl. ¶¶ 23–30 (cataloging substantial cuts to the Solidarity Center's work, including layoffs of 17% of its workforce and closing down of project offices in five different countries); Seidenfeld Decl. ¶ 20 (discussing AIR's need to terminate dozens of staff and shutter its Mexico City office,

---

[6] https://x.com/SecretaryLCD/status/1904996097329594713.

which employed 64 people); Dubbelt Decl. ¶¶ 23–24 (noting that Global March plans to lay off 60% of its staff and that one partner organization will shut down entirely). Plaintiffs have determined that, unless their funding is restored soon, they will be unable to rebuild these programs or continue this work, given the difficulty rehiring staff with relevant expertise and connections and rebuilding relationships with partners they have had to abandon. *See* Bader-Blau Decl. ¶ 24; Seidenfeld Decl. ¶ 21.

These abrupt closures or reductions in Plaintiffs' work—necessitated by Defendants' equally abrupt termination of ILAB cooperative agreements—will cause Plaintiffs significant additional financial and other harm. The Solidarity Center and AIR both anticipate that they will incur substantial employment costs as a result of their need to lay off staff in the United States and abroad. *See* Bader-Blau Decl. ¶ 25 (projecting at least $400,000 in legally mandated severance, reimbursement for unused benefits, and taxes from shuttering its Mexico project alone); Seidenfeld Decl. ¶ 22 (predicting $2.7 million in costs from terminating staff). The Solidarity Center has also determined that, absent prompt restoration of funding, it will have to shut down its projects in Mexico, Uzbekistan, and the Republic of Georgia, which will jeopardize the organization's legal status and ability to operate in those countries. *See* Bader-Blau Decl. ¶¶ 25–26.

Abandoning their projects mid-stream will also hurt Plaintiffs' ability to carry out their work and fulfill their missions. For example, the Solidarity Center has already had to cut off legal aid and training for workers at a tire plant in Mexico, at a crucial point right before those workers embarked on the complex process of petitioning for recognition and challenging a corrupt, employer-backed union. *See id.* ¶ 27. AIR has already pulled out of commitments with the Mexican government, including to provide training for government staff, unions, and workers, and to complete crucial upgrades to various electronic systems. *See* Seidenfeld Decl. ¶ 23. And Global

March has determined that it will no longer be able to partner with community groups combatting child labor in the coffee supply chain. *See* Dubbelt Decl. ¶ 25. Without restoration of ILAB funding, each Plaintiff anticipates needing to make further cuts to their mission-critical work in the next weeks and months. *See* Bader-Blau Decl. ¶¶ 27–30; Seidenfeld Decl. ¶¶ 21, 23; Dubbelt Decl. ¶ 25. Although, if funding is restored soon, Plaintiffs anticipate that they could rehire staff and rebuild their broken partnerships, doing so will become increasingly difficult as time passes. *See* Bader-Blau Decl. ¶ 24; Seidenfeld Decl. ¶ 21.

Even with just these initial cuts, Plaintiffs have suffered reputational harm with governments and other partners crucial to their work. For example, Mexican labor authorities have expressed to AIR and its partners that they no longer have confidence in AIR's ability to help the government meet its obligations under a pioneering labor law. *See* Seidenfeld Decl. ¶ 24. The Solidarity Center is similarly concerned that it has lost the trust of local partner organizations that it previously supported using DOL funding, and that it will not be able to maintain its reputation as a resource for credible research and analysis if it is unable to stay engaged in field work and partnerships around the world. *See* Bader-Blau Decl. ¶ 33.

## LEGAL STANDARDS

"A plaintiff seeking a preliminary injunction must establish [1] that he is likely to succeed on the merits, [2] that he is likely to suffer irreparable harm in the absence of preliminary relief, [3] that the balance of equities tips in his favor, and [4] that an injunction is in the public interest." *Sherley v. Sebelius*, 644 F.3d 388, 392 (D.C. Cir. 2011) (quoting *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008)). Where, as here, the government is the opposing party, the last two factors of the analysis merge. *Nken v. Holder*, 556 U.S. 418, 435 (2009).

## ARGUMENT

I.    **Plaintiffs are likely to succeed on the merits.**

A.    **This Court has jurisdiction over Plaintiffs' claims.**

As Plaintiffs have alleged, Defendants' decision to terminate ILAB's international technical assistance projects exceeded Defendants' constitutional authority. It was also both contrary to law and arbitrary and capricious under the APA. This Court has jurisdiction over those claims.

**1.** In recent litigation, the government has argued that the Tucker Act, which directs certain contract claims against the government to the Court of Federal Claims, provides the sole avenue for relief when an agency terminates a grant program. That argument is unavailing here. The Tucker Act waives the United States' sovereign immunity for actions "founded … upon any express or implied contract with the United States" and authorizes the Court of Federal Claims to hear such cases. 28 U.S.C. § 1491(a)(1). The Tucker Act applies, and the Court of Federal Claims has exclusive jurisdiction, only "when three conditions are met: (1) The claim 'is essentially a contract action,' (2) the claim 'explicitly or in essence seeks more than $10,000 in monetary relief from the federal government,' and (3) the Court of Federal Claims can exercise jurisdiction over the claim." *Am. Near E. Refugee Aid v. USAID*, 703 F. Supp. 3d 126, 132 (D.D.C. 2023) (internal citations omitted) (quoting *Albrecht v. Comm. on Emp. Benefits of Fed. Rsrv. Emp. Benefits Sys.*, 357 F.3d 62, 68 (D.C. Cir. 2004), and *Kidwell v. Dep't of Army, Bd. for Corr. of Mil. Recs.*, 56 F.3d 279, 284 (D.C. Cir. 1995)). Here, the first and third requirements are not met.

As to the first requirement, this case is not "essentially a contract action." To determine whether an action "essentially" sounds in contract, courts consider both "the source of the rights upon which the plaintiff bases its claims" and "the type of relief sought (or appropriate)." *Megapulse, Inc. v. Lewis*, 672 F.2d 959, 968 (D.C. Cir. 1982). Here, the rights that Plaintiffs assert

11

stem from the separation of powers principle embodied in the Constitution and from federal statutes including appropriations laws, the Impoundment Control Act, the Anti-Deficiency Act, and the arbitrary and capricious standards of the Administrative Procedure Act (APA). Their claims are thus constitutional and statutory, not contractual. *See Climate United Fund v. Citibank, N.A.*, No. 25-cv-698-TSC, 2025 WL 1131412, at *9 (D.D.C. Apr. 16, 2025) (explaining, in exercising jurisdiction over challenge to Environmental Protection Agency's pause in funding for a program, that "[w]hile it is true that the parties have entered into grant agreements that operate as contracts, the claims here turn on, at least in part, examining the federal regulations and federal statute governing Plaintiffs' grant awards"); *Chi. Women in Trades v. Trump*, No. 25-cv-2005, 2025 WL 1114466, at *9 (N.D. Ill. Apr. 14, 2025) (stating that the Tucker Act does not apply where the plaintiffs' "claims arise under the First and Fifth Amendments, the Spending Clause, and the separation of powers and thus all derive from the Constitution" and "are not claims for, or like, breach of contract"). "[I]t would be quite extraordinary to consider Plaintiffs' claims to sound in breach of contract when they do not at all depend on whether the terms of particular awards were breached—they instead challenge whether the agency action here was unlawful, irrespective of any breach." *AIDS Vaccine Advoc. Coal. v. Dep't of State*, No. 25-cv-00400-AHA, 2025 WL 752378, at *9 (D.D.C. Mar. 10, 2025).

Like the source of the rights that Plaintiffs assert, the remedies they seek also are not contractual. Plaintiffs ask to set aside Defendants' unlawful ILAB termination notices and order reinstatement of the ILAB cooperative agreements, thereby restoring ILAB's international technical assistance program. That relief is quintessentially equitable and does not resemble the "explicitly contractual remedy of specific performance" or the "prototypical contract remedy of money damages." *Crowley Gov't Servs., Inc. v. GSA*, 38 F.4th 1099, 1107 (D.C. Cir. 2022)

(internal quotation marks omitted); *see also Me. Cmty. Health Options v. United States*, 590 U.S. 296, 326–27 (2020) (distinguishing claim for money damages or "past due sums" from claims seeking prospective declaratory and injunctive relief). Although setting aside ILAB's across-the-board termination of its grant programs would restore Plaintiffs' funding, the Supreme Court has long recognized that "[t]he fact that a judicial remedy may require one party to pay money to another is not a sufficient reason to characterize the relief as 'money damages.'" *Bowen v. Massachusetts*, 487 U.S. 879, 893 (1988). Thus, in *Bowen*, the Court held that an order to "undo" the Secretary of Health and Human Services' "refusal to reimburse the State" in violation of the Medicaid statute would not constitute "money damages" and so was "within the District Court's jurisdiction under § 702's waiver of sovereign immunity." *Id.* at 910. The same is true here.

As to the third requirement, the Tucker Act does not apply because the Court of Federal Claims could not exercise jurisdiction over Plaintiffs' claims, which do not concern contracts. To constitute a contract subject to the jurisdiction of the Court of Federal Claims, an agreement "must contain 'the four required elements of offer, acceptance, consideration, and proper government authority.'" *Am. Near E. Refugee Aid*, 703 F. Supp. 3d at 132 (quoting *San Antonio Hous. Auth. v. United States*, 143 Fed. Cl. 425, 463 (2019)). "In the context of government contracts, 'consideration must render a benefit to the government.'" *Id.* (quoting *Metzger, Shadyac & Schwarz v. United States*, 12 Cl. Ct. 602 (1987)). "The benefit to the federal government must be 'tangible' and 'direct,' rather than 'generalized' or 'incidental.'" *Id.* (quoting *St. Bernard Parish Gov't v. United States*, 134 Fed. Cl. 730, 736 (2017)).

Here, Plaintiffs' cooperative agreements with DOL do not reflect the consideration needed to constitute "contracts" and, therefore, for the Tucker Act to apply. Rather, where agencies enter into cooperative agreements to fund external projects that advance the agency's overall mission,

the agreements provide no tangible, direct benefit to the government that constitutes consideration. *See, e.g.*, *id.* at 133–34 (holding that cooperative agreement for projects to improve water and sanitation projects in the West Bank did not have consideration for Court of Federal Claims jurisdiction); *St. Bernard Par. Gov't*, 134 Fed. Cl. At 735–36 (stating that "restoration of a natural resource and a reduction in the amount of emergency funds that the Government would spend in future flooding emergencies" was not a direct benefit that constituted consideration); *see also Pacito v. Trump*, No. 2:25-cv-255-JNW, 2025 WL 893530, at *4 (W.D. Wash. Mar. 24, 2025) (observing that "cooperative agreements generally do not confer a 'direct' and 'tangible' benefit on the United States—a requirement for Tucker Act jurisdiction"). Plaintiffs' cooperative agreements with DOL support projects that combat forced and child labor and promote U.S. trade partners' commitments to fair labor practices. The U.S. government benefits from those projects insofar as they advance American interests. But because that indirect benefit is not enough to qualify as consideration, the Court of Federal Claims would have no jurisdiction over claims related to the agreements. *Cf. Columbus Reg'l Hosp. v. United States*, 990 F.3d 1330, 1340 (Fed. Cir. 2021) (holding that an agreement between FEMA and a state for disaster-assistance funding was supported by consideration because the conditions imposed on the state conferred a benefit on the federal government).

In addition, the Court of Federal Claims could not provide Plaintiffs the injunctive relief they seek. The Supreme Court has "categorically" held that "the Court of Claims has no power to grant equitable relief." *Bowen*, 487 U.S. at 905 (internal quotation marks omitted). As a result, when plaintiffs seek such remedies, courts "respect the plaintiff's choice" and may hear those claims as long as that relief is not "negligible in comparison" to potential monetary recovery, even if a plaintiff "file[s] the complaint with an eye to future monetary awards." *Kidwell*, 56 F.3d at

14

284. Thus, precluding jurisdiction here would leave Plaintiffs without any forum to challenge Defendants' unlawful termination of ILAB's statutorily mandated funding for technical assistance projects and to secure the forward-looking relief they seek. *See Climate United Fund*, 2025 WL 1131412, at *11 (asserting jurisdiction after recognizing that plaintiffs "challenge EPA's thinly veiled attempts to dismantle the entirety of a congressionally created program and seek other declaratory relief that … the Federal Court of Claims cannot grant").

**2.** The Supreme Court's recent decisions on the emergency docket do not alter this analysis. In early March, the Supreme Court declined to stay a preliminary order requiring the government to disburse certain foreign assistance funds, even as the government argued that the plaintiffs had raised claims for monetary relief that belonged in the Court of Claims. *See Dep't of State v. AIDS Vaccine Advoc. Coal.*, 145 S. Ct. 753 (2025). A month later, the Court granted a stay of a temporary restraining order that several states had secured in their challenge to the Department of Education's termination of funding for certain teacher-training programs. *See Dep't of Educ. v. California*, 145 S. Ct. 966, 968 (2025). In the single paragraph discussing jurisdiction, the Court wrote that the agency was "likely to succeed in showing the District Court lacked jurisdiction to order the payment of money under the APA" because "the APA's limited waiver of immunity does not extend to orders 'to enforce a contractual obligation to pay money' along the lines of what the District Court ordered." *Id*. (quoting *Great-West Life & Annuity Ins. Co. v. Knudson*, 534 U.S. 204, 212 (2002)). At the same time, the Court reiterated that "a district court's jurisdiction 'is not barred by the possibility' that an order setting aside an agency's action may result in the disbursement of funds." *Id*. at 968 (quoting *Bowen*, 487 U.S. at 910).

Those contrasting decisions do not change the jurisdictional framework, which remains governed by *Bowen* and other binding precedents. *See Cmty. Legal Servs. in E. Palo Alto v. HHS*,

No. 25-cv-02847-AMO, 2025 WL 1168898, at *3 (N.D. Cal. Apr. 21, 2025) (observing that the government "fail[ed] to identify anything different about the law following [*California*], much less a significant change sufficient to warrant dissolution of earlier-granted injunctive relief"); *Woonasquatucket River Watershed Council v. USDA*, No. 1:25-cv-00097-MSM, 2025 WL 1116157, at *14 (D.R.I. Apr. 15, 2025) (concluding that *California* did not divest the court of jurisdiction to hear claims related to the freezing of federal funds); *Maine v. USDA*, No. 1:25-cv-00131-JAW, 2025 WL 1088946, at *19 n. 8 (D. Me. Apr. 11, 2025) (same).

To the extent that the Supreme Court's recent orders shed any light on the jurisdictional question here, this case more closely resembles *AIDS Vaccine Advocacy Coalition* than *California*. In *California*, the plaintiff States only alleged, and the TRO was only based on, claims under the APA that related to the terms of the individual grant awards. *See California v. U.S. Dep't of Educ.*, 1:25-cv-10548 (D. Mass. Mar. 6, 2025), ECF No. 1 (complaint); *California v. U.S. Dep't of Educ.*, 132 F.4th 92, 96–97 (1st Cir. 2025) (observing that "the terms and conditions of each individual grant award" were at issue). In *AIDS Vaccine Advocacy Coalition*, by contrast, the plaintiffs raised both statutory and constitutional claims, and those claims did not depend on the terms of any contract or allege a breach of those terms. *See AIDS Vaccine Advoc. Coal.*, 2025 WL 752378, at *9. This case looks like the latter: Plaintiffs allege both APA and constitutional claims, and the terms and conditions of each award are not at issue. *See generally* Compl., ECF No. 1. In such circumstances, neither any holding in *California* nor the Tucker Acts applies. *See, e.g.*, *S.F. Unified Sch. Dist. v. Americorps*, No. 25-cv-02425, 2025 WL 1180729, at *8–9 (N.D. Cal. Apr. 23, 2025); *New York v. Trump*, No. 1:25-cv-39-JJM, 2025 WL 1098966, at *2 (D.R.I. Apr. 14, 2025).

**3.** Finally, this case is not governed by the D.C. Circuit's recent order in *Widakuswara v. Lake*, No. 25-5144, 2025 WL 1288817 (D.C. Cir. May 3, 2025), *pet. for rehearing en banc filed* (May 5, 2025). There, after expedited briefing, a divided motions panel of the D.C. Circuit stayed a district court's order that, among other things, would have required the U.S. Agency for Global Media to restore grants to Radio Free Asia and Middle East Broadcasting Networks. In a per curiam concurring statement, Judges Katsas and Rao, over the dissent of Judge Pillard, determined that the government was likely to establish that the district court did not have jurisdiction over challenges to grant terminations in that case. *See id.* at *4–5. But that per curiam concurrence holds no precedential force. *See In re Grant*, 635 F.3d 1227, 1232 (D.C. Cir. 2011); *Petties v. District of Columbia*, 227 F.3d 469, 472 (D.C. Cir. 2000). Moreover, as Judge Pillard explained in dissent, the per curiam concurrence's conclusions ignore binding precedent—including the well-established principle that, because "federal grant programs originate in and remain governed by statutory provisions expressing the judgment of Congress concerning desirable public policy," claims that turn on the interpretation of those statutes are not contract claims for Tucker Act purposes. *Widakuswara*, 2025 WL 1288817, at *13 (Pillard, J., dissenting) (quoting *Md. Dep't of Hum. Res. v. HHS*, 763 F.2d 1441, 1449 (D.C. Cir. 1985) (Bork, J.)). That binding precedent confirms the Court's jurisdiction here.

## B.    Plaintiffs are likely to succeed on their APA claims.

The APA authorizes a reviewing court to "hold unlawful and set aside agency action" found to be "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A). Plaintiffs are likely to succeed on their claims that Defendants violated several statutory commands and acted arbitrarily and capriciously by terminating all active ILAB cooperative agreements and refusing to spend the money, as Congress directed, on projects promoting labor rights around the world.

17

1.    **Defendants' en masse termination of ILAB cooperative agreements is contrary to law.**

a.  **Defendants violated various appropriations statutes.**

Because "[a]dministrative agencies are creatures of statute," *Nat'l Fed'n of Indep. Bus. v. OSHA*, 595 U.S. 109, 117 (2022), they are "not free simply to disregard statutory responsibilities," *Lincoln v. Vigil*, 508 U.S. 182, 193 (1993). Accordingly, the executive branch "does not have unilateral authority to refuse to spend" "the full amount appropriated by Congress for a particular project or program." *In re Aiken Cnty.*, 725 F.3d 255, 261 n.1 (D.C. Cir. 2013) (Kavanaugh, J.); *see City & Cnty. of San Francisco v. Trump*, 897 F.3d 1225, 1232 (9th Cir. 2018) ("Aside from the power of veto, the President is without authority to thwart congressional will by canceling appropriations passed by Congress.").

For that reason, executive branch agencies violate relevant appropriations statutes when they refuse to spend money that Congress appropriated for a specific purpose or terminate programming or agreements that the agency had previously initiated to satisfy its obligation to spend appropriated funds. *See, e.g.*, *Kendall v. United States*, 37 U.S. (12 Pet.) 524 (1838) (deciding that Postmaster General could not refuse to pay a contractor for services rendered once Congress specifically directed payment); *AIDS Vaccine Advoc. Coal.*, 2025 WL 752378, at *1, *15–17 (explaining that an agency cannot refuse to spend money appropriated for foreign assistance because the executive's "authority to determine *how* to spend appropriated funds" cannot be interpreted to "usurp[] Congress's exclusive authority to dictate *whether* the funds should be spent in the first place"); *Nat'l Council of Cmty. Mental Health Ctrs. v. Weinberger*, 361 F. Supp. 897, 901 (D.D.C. 1973) (holding that the Department of Health, Education, and Welfare could not lawfully refuse to expend funds Congress had appropriated for grants under the Community Mental Health Centers Act).

18

With respect to ILAB, Congress has repeatedly directed ILAB to fund technical assistance projects to promote workers' rights around the globe, combat child and forced labor, and support the labor commitments of U.S. trade partners. It has done so in annual appropriations bills going back years, and it did so in legislation implementing the USMCA. *See supra* at 3–4. To fulfill its mandates under these statutes, ILAB, as of March 1, 2025, was funding 69 technical assistance projects abroad. For example, as the agreements specify, Plaintiff Solidarity Center's eleven active projects were funded by the 2021, 2022, 2023, and 2024 DOL Appropriations Acts, as well as the USMCA Supplemental Appropriations Act. *See* Bader-Blau Decl. ¶ 10. Plaintiff AIR's three projects were funded by the USMCA Supplemental Appropriations Act. *See* Seidenfeld Decl. ¶ 8. And Plaintiff Global March's cooperative agreement was funded by the 2021 DOL Appropriations Act. *See* Dubbelt Decl. ¶ 8.

ILAB's funding of such programs is mandatory under the relevant statutory language. While the statutes give ILAB some "flexibility … to target additional resources where conditions on the ground and other factors create the greatest opportunities to make significant progress" on these priorities, S. Rep. No. 118-84, at 31, that flexibility is not limitless. Rather, Congress mandated, for each of the last several years, that "not less than" $30.715 million of the appropriated funds "shall" be spent on "programs to combat exploitative child labor," and "not less than" that same amount "shall be used to implement" workers' rights programs in U.S. trade partner countries. *See* 2024 Appropriations Act, 138 Stat. at 641; *see also* 2023 Appropriations Act, 136 Stat. at 4846 (same); 2022 Appropriations Act, 136 Stat. at 434 (same); S. Rep. No. 118-84, at 31 (stating that the language of the 2024 DOL appropriations statute "set[s] aside funding for grants, contracts and other arrangements for technical assistance on worker rights and for combatting child labor"). The USMCA Supplemental Appropriations Act similarly instructed that ILAB "shall" use

the appropriated $180 million "to support reforms of the labor justice system in Mexico." USMCA Supplemental Appropriations Act, 134 Stat. at 100. As the repeated use of the word "shall" indicates, the statutes impose a mandatory duty on ILAB to spend those funds on the priorities and purposes listed. *See Me. Cmty. Health Options*, 590 U.S. at 310 ("The first sign that the statute imposed an obligation is its mandatory language: 'shall.'").

Defendants acted contrary to Congress's express commands when they terminated all ongoing ILAB projects and made clear, in repeated public statements, that they will not reallocate those funds for the purposes specified by law. Indeed, Defendants have repeatedly threatened to unlawfully reallocate those funds to a purpose *outside* the scope of Congress's authorization. *See* @SecretaryLCD Mar. 26 X Post (threatening to "reinvest" funds from ILAB partners into projects focusing on American workers). Moreover, "a federal agency's budgetary authority lapses on the last day of the period for which the funds were obligated." *City of Houston v. HUD*, 24 F.3d 1421, 1426 (D.C. Cir. 1994). Here, the authorizations to obligate funds in past appropriations bills have expired, except for the most recent continuing resolution. *See, e.g.*, 2024 Appropriations Act, 138 Stat. at 641 (making funds "available for obligation through December 31, 2024"); USMCA Supplemental Appropriations Act, 134 Stat. at 100 (instructing that relevant funds will "remain available until December 31, 2023"). Accordingly, Defendants could not now belatedly attempt to re-satisfy the directives in past appropriations bills by entering new cooperative agreements. Defendants' decision to terminate ILAB's program funding cooperative agreements, then, is contrary to the directives in each ILAB appropriations bill and is therefore contrary to law.

### b. Defendants' action violates the Impoundment Control and Anti-Deficiency Acts.

Because Defendants have unlawfully refused to spend money Congress appropriated in duly enacted appropriations statutes, they have also violated two statutes imposing limits on the

20

executive's budget authority: the Congressional Budget and Impoundment Control Act (Impoundment Control Act) and the Anti-Deficiency Act.

Congress enacted the Impoundment Control Act in response to President Nixon's repeated "withholding" of appropriated "funds from various programs he did not favor" "as a means of shaping domestic policy to his liking." *City of New Haven v. United States*, 634 F. Supp. 1449, 1454 (D.D.C. 1986). "[T]o restore responsibility for the spending policy of the United States to the legislative branch," Congress, through the Impoundment Control Act, created specific procedures for the executive branch to seek permission to avoid spending appropriated funds. *City & Cnty. of San Francisco*, 897 F.3d at 1234 n.3 (quoting H.R. Rep. No. 93-658, *as reprinted in* 1974 U.S.C.C.A.N. 3462, 3463). Under those procedures, if the President does not want to spend funds that Congress has appropriated for a program, he must transmit a special message to Congress detailing his request not to spend the money. 2 U.S.C. § 683(a). Even then, the President is allowed not to spend the funds available for obligation only if both houses of Congress pass a bill rescinding the funding within 45 days. *Id.* § 683(b). Absent compliance with the mechanism laid out in the ICA, congressionally appropriated funds "shall be made available for obligation." *Id*.

None of the Impoundment Control Act's preconditions has been satisfied here. President Trump has not sent a message to Congress asking for permission not to spend the money already appropriated for ILAB programming, and Congress has not agreed to relieve the executive of its obligation to spend those funds. Accordingly, Defendants lack authority to terminate ILAB's cooperative agreements because that decision necessarily results in a failure to spend the funds Congress appropriated to ILAB for its grantmaking functions.

Meanwhile, by sitting on the claimed "savings" from their unlawful impoundment of ILAB funds, Defendants have also violated the Anti-Deficiency Act. That Act specifies that the executive branch may create a temporary "reserve" of appropriated funds only for specified reasons: "to provide for contingencies; … to achieve savings made possible by or through changes in requirements or greater efficiency of operations; or … as specifically provided by law." 31 U.S.C. § 1512(c)(1). In terminating ILAB funding, Defendants did not identify any contingencies or sources of law that justify holding appropriated ILAB funds in reserve. Nor did they identify any valid reasons for creating such a reserve based on efficiency or a change in operational requirements. Instead, Defendants pointed to a policy disagreement with the programmatic choices of appropriations bills enacted during previous administrations. That is not a valid reason to create a reserve under the Anti-Deficiency Act.

### 2. Defendants' en masse termination of ILAB cooperative agreements is arbitrary and capricious.

The APA "requires agencies to engage in 'reasoned decisionmaking,' and directs that agency actions be 'set aside' if they are 'arbitrary' or 'capricious.'" *DHS v. Regents of the Univ. of Cal.*, 591 U.S. 1, 16 (2020) (internal citation omitted) (first quoting *Michigan v. EPA*, 576 U.S. 743, 750 (2015), then quoting 5 U.S.C. § 706(2)(A)). When reviewing an agency action under the arbitrary and capricious standard, "the court must confirm that the agency has fulfilled its duty to 'examine the relevant data and articulate a satisfactory explanation for its action including a rational connection between the facts found and the choice made.'" *Ark Initiative v. Tidwell*, 816 F.3d 119, 127 (D.C. Cir. 2016) (quoting *Motor Vehicle Mfrs. Ass'n of U.S. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983)). The decision to terminate all ILAB's cooperative agreements, and as a result to shut down the Bureau's entire technical assistance program, is arbitrary and capricious for several reasons.

First, Defendants did not provide a reasoned explanation for their decision to terminate ILAB's international technical assistance programming and all its cooperative agreements. In messages terminating the cooperative agreements, Defendants provided only a cursory, vague explanation: that each agreement was being terminated "pursuant to a directive from the U.S. Department of Labor Office of the Secretary and Bureau of International Labor Affairs (ILAB) for alignment with Agency priorities and national interest."[7] *See* Ex. B to Bader-Blau Decl. at 2–11; Ex. A to Seidenfeld Decl.; Ex. B to Dubbelt Decl. Defendants did not cite any publicly available directive, or otherwise offer any explanation for how each and every ILAB cooperative agreement was suddenly inconsistent with unspecified agency priorities or American interests. Defendants neither acknowledged that termination was a stark change in position, nor explained the reason for this about face. But an agency may not "depart from a prior policy *sub silentio*." *FCC v. Fox Television Stations, Inc.*, 556 U.S. 502, 515 (2009); *see also Pacito*, 2025 WL 893530, at *11 (concluding that, without any "factual findings or bases for" the State Department's decision to terminate funding for refugee assistance programs, the termination "constitutes" an arbitrary and capricious "shift in agency policy without any reasoned explanation"). Defendants' unexplained

---

[7] In one of the first termination letters sent, which cut funding for Plaintiff the Solidarity Center's project in Uzbekistan, Defendants offered a different explanation. *See* Ex. B to Bader-Blau Decl. at 1. There, they claimed that the project "no longer effectuate[d] the program goals" and had faced "significant challenges to meeting its goals," resulting in delay and increasing complexity. *Id.* This purported rationale for termination was an abrupt and unexplained shift from the agency's previous evaluation of the project, which had recently received positive feedback and additional funding. *See* Bader-Blau Decl. ¶¶ 10(d), 14. That alone would make the termination of this Solidarity Center grant arbitrary and capricious. *See FCC v. Fox Television Stations, Inc*., 556 U.S. 502, 516 (2009) ("[A] reasoned explanation is needed for disregarding facts and circumstances that underlay or were engendered by [a] prior policy."). But Defendants' termination of this first grant, and the fig-leaf justification provided, do not in fact stand alone. This first termination turned out to be part of the decision to cancel all ILAB cooperative agreements, further confirming the arbitrary and capricious nature of the pretextual rationale originally offered.

action here thus fails the APA's "requirement that an agency provide reasoned explanation for its action." *Fox Television Stations, Inc.*, 556 U.S. at 515.

Even apart from that unexplained change in position, the "conclusory statement[]" Defendants provided to justify the program terminations "will not do" to satisfy their obligations under the APA. *Amerijet Int'l, Inc. v. Pistole*, 753 F.3d 1343, 1350 (D.C. Cir. 2014). Courts have repeatedly held that an agency's bare invocation of agency or administration priorities is insufficient to satisfy the APA's reasoned decision-making requirement. Judge Lamberth recently held as much in similar circumstances, when determining that nonprofit news organizations were likely to succeed on their APA challenge to the U.S. Agency for Global Media's termination of grant funding. *See RFE/RL, Inc. v. Lake*, No. 1:25-cv-799-RCL, 2025 WL 900481, at *3 (D.D.C. Mar. 25, 2025). There, the agency termination letter had simply stated that "the award no longer effectuates agency priorities." *Id.* Such a "conclusory statement, unsupported by any facts or reasoning," Judge Lamberth reasoned, "can scarcely be characterized as an explanation," and it certainly does not offer a "satisfactory explanation," establishing a "rational connection between the facts found and the choices made." *Id.*; *see also Widakuswara v. Lake*, No. 25-cv-2390-JPO, 2025 WL 945869, at *5 (S.D.N.Y. Mar. 28, 2025) (rejecting a "single sentence" explanation tying "colossal changes" at agency to an Office of Personnel Management memorandum and executive order because that "single line, devoid of data or any independent explanation, is grossly insufficient and falls far short of reasoned analysis").

Defendants' invocation of "agency priorities and national interest" further fails the APA's reasoned decision-making requirement because Defendants appear to be rejecting policy priorities embodied in federal law. To be sure, the appropriations statutes authorizing ILAB to fund technical assistance and other projects abroad provide Defendants with wide latitude in both substance and

form, giving the agency multiple ways to implement these programs and providing only broad guidelines on the types of international labor issues to be targeted. What Defendants cannot do is decide not to spend the funds Congress appropriated for these purposes. *See supra* at 18–22. "[F]urthering the President's wishes cannot be a blank check for [the agency] to do as it pleases." *Nat'l Council of Nonprofits v. Off. of Mgmt. & Budget*, No. 25-cv-239-LLA, 2025 WL 368852, at *11 (D.D.C. Feb. 3, 2025); *see New York v. Trump*, No. 1:25-cv-39-JJM, 2025 WL 715621, at *12 (D.R.I. Mar. 6, 2025) (holding that plaintiffs had substantial likelihood of success on APA claims where agencies had paused statutorily mandated funding streams based only on "the contravening policies of the President"); *Healthy Teen Network v. Azar*, 322 F. Supp. 3d 647, 661 (D. Md. 2018) (rejecting agency's policy-based rationale for terminating funding for teen pregnancy prevention programs where agency's rationale was not "related to the relevant factors in the congressional appropriation").

Second, Defendants failed to consider several important aspects of the problem when they decided to shut down ILAB's technical assistance programs. *See State Farm*, 463 U.S. at 43. For one thing, Defendants did not address the fact that terminating all projects would make it impossible for ILAB to satisfy its statutory obligation to spend tens of millions of dollars annually on programs to combat exploitative child labor and promote workers' rights in U.S. trade partner countries. *See supra* at 3–4, 18; *see also* Lee Decl. ¶¶ 4–7. In addition, Defendants ignored the substantial evidence showing whether each individual ILAB project aligned with the administration's priorities. In early March, at the direction of OMB, ILAB staff instructed each partner with an active cooperative agreement to fill out a lengthy questionnaire "[t]o assess alignment of" those projects "with the President's America First foreign policy, which requires that each dollar of foreign assistance makes America safer, stronger, and more prosperous." *See*

OMB Budget Data Request No. 25-08 at 1. Defendants did not consider the individualized results of that assessment, but instead plowed ahead with a full termination of all ILAB programming. Had Defendants evaluated any of the evidence before them about the alignment of ILAB's cooperative agreements with agency priorities, they would have seen that much of this work is, in fact, consistent with their own stated desire to protect American workers. *See* Seidenfeld Decl. ¶ 13 (noting informal feedback from agency staff that AIR projects had scored highly); Bader-Blau Decl. ¶ 15 (same as to Solidarity Center projects); *see also* Lee Decl. ¶ 11 (explaining value of ILAB projects to implementation of trade policy and other foreign policy functions). As Congress itself recognized by continually funding ILAB's technical assistance work, these projects make America stronger and more prosperous by, among other things, "ensur[ing] workers and businesses in the United States are not put at a competitive disadvantage" when other countries ignore their labor commitments. S. Rep. No. 118-84, at 31.

Third, Defendants' decision to shut down the longstanding ILAB technical assistance programming is arbitrary and capricious because they did not consider the significant reliance interests, much less "weigh any such interests against competing policy concerns." *Regents*, 591 U.S. at 33. ILAB partners with cooperative agreements, including Plaintiffs, have depended on ILAB's funding and expertise to build their portfolio of work in dozens of countries around the world. *See* Bader-Blau Decl. ¶¶ 10–11; Seidenfeld Decl. ¶¶ 6–7; Dubbelt Decl. ¶¶ 22–24. Defendants failed to consider the reliance interests of U.S. trade partners, whose governments have worked with organizations funded by ILAB to implement major labor-law reforms and improve the rights and conditions of workers in their countries. *See* Bader-Blau Decl. ¶¶ 26, 32; Seidenfeld Decl. ¶ 23; Dubbelt Decl. ¶ 10. And Defendants ignored the reliance interests of those workers and other exploited laborers around the world who have benefited and would continue to benefit from

the projects that ILAB supported. *See, e.g.*, Bader-Blau Decl. ¶¶ 12, 27 (documenting success of ILAB-funded project in securing wage increases for workers in a Mexican tire factory, as well as risk to similar organizing efforts from the termination of ILAB funding); Marty Walsh, *ILAB at 75: A New Era of Global Action on Labor Rights*, DOL (Oct. 7, 2022)[8] (estimating that, since 2000, ILAB's projects have contributed to removing more than 86 million children from child labor around the world). For all these reasons, Defendants' termination of ILAB's funding for technical assistance projects is arbitrary and capricious.

### C.    Plaintiffs are likely to succeed on their constitutional claim.

Defendants' actions terminating all ILAB cooperative agreements and making it impossible for ILAB to carry out its statutory mandates also violate separation of powers principles and are therefore *ultra vires*. The Framers of the U.S. Constitution "divide[d] the delegated powers of the new federal government into three defined categories, legislative, executive and judicial, to assure, as nearly as possible, that each Branch of government would confine itself to its assigned responsibility." *INS v. Chadha*, 462 U.S. 919, 951 (1983). As relevant here, "[t]here is no provision in the Constitution that authorizes the President to enact, to amend, or to repeal statutes." *Clinton v. City of New York*, 524 U.S. 417, 438 (1998), including statutes instructing agencies to spend money on certain programs or priorities. Indeed, under our constitutional system, "the appropriation of the government's resources is reserved for Congress, not the Executive Branch." *Nat'l Council of Nonprofits*, 2025 WL 368852, at \*12; *see U.S. Dep't of the Navy v. Fed. Lab. Rels. Auth.*, 665 F.3d 1339, 1346 (D.C. Cir. 2012) (explaining that the Appropriations Clause, U.S. Const. art. I, § 9, cl. 7, "protects Congress's exclusive power over the federal purse" (internal quotation marks omitted)); *Cmty. Action Programs Exec. Directors Ass'n of N.J., Inc. v. Ash*, 365

---

[8] https://web.archive.org/web/20240619210403/https://blog.dol.gov/2022/10/07/ilab-at-75-a-new-era-of-global-action-on-labor-rights.

F. Supp. 1355, 1360–61 (D.N.J. 1973) ("[O]nce Congress has appropriated funds for a specific program, the Executive Branch … has no authority under the Constitution to refuse to spend those funds.").

Defendants violated those separation of powers principles and disregarded Congress's authority to make law, including appropriations law, when they unilaterally decided not to spend any of the money Congress appropriated for ILAB to support international technical assistance programs. Defendants' justifications make clear that their termination of ILAB's cooperative agreements was not an exercise of executive "discretion" to "interpret[] a statute and direct[] the details of its execution," *J.W. Hampton, Jr. & Co. v. United States*, 276 U.S. 394, 406 (1928), or to flexibly implement Congress's "broad general directives," *Mistretta v. United States*, 488 U.S. 361, 372 (1989). Rather, Defendants have acknowledged repeatedly that they canceled ILAB's projects because they do not want to spend the appropriations as required by law. For example, on March 26, Defendant Chavez-DeRemer posted on the social media site X that "the era of Americans' tax dollars bankrolling foreign handouts for things like 'Improving Gender Equity in the Mexican Workplace' is over." @SecretaryLCD Mar. 26 X Post. The "$237M" that the Secretary claimed had been saved by canceling ILAB's projects "will be used to reinvest into developing our workforce and protecting our children." *Id.* That choice, however, is not one available to the Secretary or the Department under the operative statutes. "An administrator's responsibility to carry out the Congressional objectives of a program does not give [her] the power to discontinue that program, especially in the face of a Congressional mandate that it shall go on." *Loc. 2677, Am. Fed'n of Gov't Emp. v. Phillips*, 358 F. Supp. 60, 77–78 (D.D.C. 1978). Defendants acted contrary to such a congressional mandate here, in violation of bedrock separation of powers principles.

This Court has the power to declare Defendants' usurpation of Congress's lawmaking power unlawful and issue an injunction against it. "[I]njunctive relief has long been recognized as the proper means for preventing entities from acting unconstitutionally." *Correctional Servs. Corp. v. Malesko*, 534 U.S. 61, 74 (2001). Accordingly, the Court's "established practice" is "to sustain the jurisdiction of federal courts to issue injunctions to protect rights safeguarded by the Constitution." *Bell v. Hood*, 327 U.S. 678, 684 (1946). That established practice extends to claims based on separation of powers principles, which the Supreme Court has recognized can be raised through an implied private right of action directly under the Constitution. *Free Enter. Fund v. Pub. Co. Accounting Oversight Bd.*, 561 U.S. 477, 491 n.2 (2010). Plaintiffs are therefore likely to succeed on their claim that Defendants' actions with respect to ILAB funding are *ultra vires*.

## II.    Plaintiffs will suffer irreparable harm absent preliminary relief.

"An irreparable harm is an imminent injury that is both great and certain to occur, and for which legal remedies are inadequate." *Beattie v. Barnhart*, 663 F. Supp. 2d 5, 9 (D.D.C. 2009). Here, Plaintiffs have already suffered irreparable injury in the several weeks since Defendants shut down ILAB's international technical assistance program, and they will continue to suffer further irreparable harm if this Court does not promptly provide relief.

As a direct result of Defendants' decision to terminate all ILAB cooperative agreements, Plaintiffs have lost millions of dollars in funding that they had anticipated using to support their staff and programming. Global March anticipates laying off 60% of its staff. Dubbelt Decl. ¶ 23. The Solidarity Center has needed to fire 17% of its workforce and shutter entire offices. Bader-Blau Decl. ¶¶ 22–26. And AIR has been forced to end its partnerships with the Mexican government and close its Mexico City office, which was entirely supported by the organization's ILAB cooperative agreements. Seidenfeld Decl. ¶ 20. Because Plaintiffs will be unable to carry out their work absent preliminary relief, they have shown irreparable harm. *Compare Cmty. Legal*

*Servs. in E. Palo Alto*, 2025 WL 1168898, at *4 (finding irreparable harm where "[p]laintiffs will be forced to abandon much of their mission-driven work if the Government fails to comply with" statutes and regulations requiring funding) *with California*, 145 S. Ct. at 969 (finding government's arguments on irreparable harm "compelling[]" where plaintiff states had represented "they have the financial wherewithal to keep their programs running").

To make matters worse, Plaintiffs will suffer further financial harm as a result of their sudden and unexpected need to lay off a substantial portion of their staff. AIR, for example, anticipates incurring $2.7 million just in costs for terminating employees. *See* Seidenfeld Decl. ¶ 22. The Solidarity Center has calculated that it will owe at least $400,000 in severance just from its projects in Mexico. *See* Bader-Blau Decl. ¶ 25. Although economic injury standing alone may not be sufficient for irreparable harm in some circumstances, it is sufficient "where the loss threatens the very existence of the movant's business." *Wis. Gas Co. v. FERC*, 758 F.2d 669, 674 (D.C. Cir. 1985) (per curiam). For at least the Solidarity Center, that threat is very real. The Solidarity Center has been advised that, if the severance costs and other legal liability from shutting down its Mexico program exceed the amount of funds the organization has available, it may face substantial legal risk and an inability to operate in Mexico. *See* Bader-Blau Decl. ¶ 25. And "'where economic loss will be unrecoverable, such as in a case against a Government defendant where sovereign immunity will bar recovery, economic loss can be irreparable' even if it would not wipe the [plaintiff] out." *Whitman-Walker Clinic, Inc. v. HHS*, 485 F. Supp. 3d 1, 58 (D.D.C. 2020) (quoting *Everglades Harvesting & Hauling, Inc. v. Scalia*, 427 F. Supp. 3d 101, 115 (D.D.C. 2019)).

Moreover, the loss of funding will "unquestionably make it more difficult for [Plaintiffs] to accomplish their primary mission[s]." *League of Women Voters of United States v. Newby*, 838

F.3d 1, 9 (D.C. Cir. 2016). Plaintiffs have already or will soon need to shutter entire offices and programs in countries around the world. *See* Bader-Blau Decl. ¶¶ 23, 25; Seidenfeld Decl. ¶ 20. And they have pulled out of partnerships at crucial times—leaving U.S. trade partner governments, unions, and workers without crucial support and assistance in the middle of organizing efforts, training programs, and upgrades to key government systems. Bader-Blau Decl. ¶¶ 27–29; Seidenfeld Decl. ¶ 22; Dubbelt Decl. ¶ 25. This damage to Plaintiffs' work will be difficult, if not impossible, to repair, if funding is not promptly restored. Plaintiffs have suffered substantial reputational harm from their abrupt abandonment of their local partners in countries around the world. Bader-Blau Decl. ¶¶ 30, 32; Seidenfeld Decl. ¶¶ 24–25; Dubbelt Decl. ¶ 26. In addition, they have already laid off, or will in the next several weeks need to lay off, staff with the expertise and connections to governments and nongovernmental organizations that would allow Plaintiffs to easily restart their projects, should funding be restored. Bader-Blau Decl. ¶¶ 23–24; Seidenfeld Decl. ¶¶ 20–21.

"It is so obvious that it almost need not be stated that when money is obligated and therefore expected … and is not paid as promised, harm follows—debt is incurred, debt is unpaid, essential … services stop, and budgets are upended." *New York*, 2025 WL 715621, at *13. All of those harms already have occurred and will continue to occur here, so Plaintiffs have amply shown the irreparable harm needed to justify preliminary relief.

## III. The balance of equities and public interest favor Plaintiffs.

Finally, the balance of the equities and public interest support enjoining Defendants' unlawful decision to cancel all cooperative agreements for ILAB technical assistance projects. "It is well established that the Government cannot suffer harm from an injunction that merely ends an unlawful practice." *C.G.B. v. Wolf*, 464 F. Supp. 3d 174, 218 (D.D.C. 2020) (internal quotation marks omitted). There is likewise "generally no public interest in the perpetuation of an unlawful

agency action." *League of Women Voters*, 838 F.3d at 12. "To the contrary there is a substantial public interest in having governmental agencies abide by the federal laws that govern their existence and operations." *Id.* (internal quotation marks omitted). Thus, Plaintiffs' "extremely high likelihood of success on the merits is a strong indicator that [injunctive relief] would serve the public interest." *Id.*

Here, there is a substantial public interest in restoring the ILAB technical assistance projects. Restoring funding for these programs will allow Plaintiffs and other ILAB partners to continue their important work combatting forced and child labor and helping foreign governments and industries in the global supply chain comply with international labor standards. *See* Bader-Blau Decl. ¶¶ 10, 27–29; Seidenfeld Decl. ¶¶ 7, 21, 23; Dubbelt Decl. ¶¶ 9–10, 25; Lee Decl. ¶¶ 6–10. This work will benefit the workers, unions, civil society groups, and governments around the world with which Plaintiffs and other ILAB awardees have partnered. *See* Bader-Blau Decl. ¶¶ 10, 12–13, 27–29; Seidenfeld Decl. ¶¶ 7, 23; Dubbelt Decl. ¶¶ 9–10, 25. It will likewise benefit the American workers and businesses who would otherwise need to compete with goods produced by low-wage, exploited labor. *See* S. Rep. No. 118-84, at 31. And it will ultimately benefit American policy interests by helping to ensure that U.S. trade partners are complying with their obligations under negotiated trade agreements. *Id.*; *see also* Lee Decl. ¶ 11.

## CONCLUSION

For the foregoing reasons, Plaintiffs respectfully request that this Court issue a preliminary injunction requiring Defendants to reinstate all ILAB cooperative agreements that were terminated between March 13 and March 27, 2025, and enjoining Defendants from terminating any of those agreements during the course of the litigation.

Dated: May 5, 2025

Respectfully submitted,

/s/ Stephanie Garlock
Stephanie Garlock (DC Bar No. 1779629)
Allison M. Zieve (DC Bar No. 424786)
Nicolas A. Sansone (DC Bar No. 1686810)
Public Citizen Litigation Group
1600 20th Street NW
Washington, DC 20009
(202) 588-1000

*Counsel for Plaintiffs*