**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

---

AMERICAN CENTER FOR
INTERNATIONAL LABOR SOLIDARITY,
*et al.*,

          *Plaintiffs*,

    v.

LORI CHAVEZ-DEREMER, in her official
capacity as Secretary of Labor, *et al.*

          *Defendants*.

---

Case No. 1:25-cv-01128 (BAH)

**DEFENDANTS' OPPOSITION TO PLAINTIFFS'
MOTION FOR SUMMARY JUDGMENT ON COUNTS I–IV AND
MOTION FOR A PRELIMINARY INJUNCTION ON COUNT V**

## <u>TABLE OF CONTENTS</u>

INTRODUCTION ................................................................................................................ 1

BACKGROUND ................................................................................................................ 3

LEGAL STANDARDS ...................................................................................................... 8

ARGUMENT ..................................................................................................................... 9

I.    The Court lacks subject-matter jurisdiction over any of Plaintiffs' claims. ............9

II.    Plaintiffs' constitutional claim (Count I) fails. ....................................................19

    A.    A free-floating constitutional right of action is not available because
of potential alternative remedies............................................................... 19

    B.    Plaintiffs' separation-of-powers claim is at most statutory, not
constitutional, and meritless...................................................................... 20

    C.    Plaintiffs' requested relief threatens the separation of powers. ................ 21

III.    Plaintiffs' APA claims (Counts II–V) fail. .........................................................23

    A.    APA review is unavailable because of potential alternative remedies. .... 23

    B.    Termination of these agreements is committed to agency discretion by
law............................................................................................................. 24

    C.    Defendants' actions are not contrary to statute (Counts II–IV). ............... 25

    D.    Defendants' actions are not arbitrary and capricious (Count V). ............. 29

IV.    Plaintiffs are not entitled to their requested relief..................................................30

    A.    Plaintiffs' alleged injuries can be remedied at law. ................................. 30

    B.    The balance of the equities and public interest disfavor injunctive
        relief. .................................................................................................... 33

    C.    Any relief must be limited to redress only *Plaintiffs'* alleged injuries. .... 35

    D.    Plaintiffs should be ordered to post security in connection with any
        preliminary injunctive relief (Count V). .................................................. 36

    E.    This Court should stay any relief pending the Government's determination
        of whether to appeal. .............................................................................. 37

CONCLUSION............................................................................................................. 37

## TABLE OF AUTHORITIES

**CASES**

*Adams v. Vance*,
570 F.2d 950 (D.C. Cir. 1977)........................................................................................9, 23

*Air Transp. Ass'n of Am., Inc. v. Exp.-Imp. Bank of the U.S.*,
840 F. Supp. 2d 327 (D.D.C. 2012) ............................................................................32

*Am. Ground Transp., Inc. v. United States*,
165 Fed. Cl. 659 (2023) ..............................................................................................16

*Am. Ins. Ass'n v. Garamendi*,
539 U.S. 396 (2003).................................................................................................21, 22

*Am. Meat Inst. v. USDA*,
968 F. Supp. 2d 38 (D.D.C. 2013), *aff'd*, 746 F.3d 1065 (D.C. Cir. 2014)...........................33

*Am. Near E. Refugee Aid v. U.S. Agency for Int'l Dev.*,
703 F. Supp. 3d 126 (D.D.C. 2023) .............................................................................17

*Anatol Zukerman & Charles Krause Reporting, LLC v. U.S. Postal Serv.*,
64 F.4th 1354 (D.C. Cir. 2023) ....................................................................................30

*Auster v. Ghana Airways Ltd.*,
514 F.3d 44 (D.C. Cir. 2008)..........................................................................................8

*Bancoult v. McNamara*,
445 F.3d 427 (D.C. Cir. 2006).................................................................................22, 23

*Boivin v. U.S. Airways, Inc.*,
297 F. Supp. 2d 110 (D.D.C. 2003) ...........................................................................31

*Bowen v. Massachusetts*,
487 U.S. 879 (1988)......................................................................................................24

*Celotex Corp. v. Catrett*,
477 U.S. 317 (1986) .......................................................................................................8

*Chaplaincy of Full Gospel Churches v. England*,
454 F.3d 290 (D.C. Cir. 2006)......................................................................................31

*Chi. & S. Air Lines, Inc. v. Waterman S.S. Corp.*,
333 U.S. 103 (1948)......................................................................................................23

*City of Wheeling, W. Va. v. United States*,
20 Cl. Ct. 659 (Fed. Cl. 1990), *aff'd*, 928 F.2d 410 (Fed. Cir. 1991) .....................................18

*Clapper v. Amnesty Int'l USA*,
568 U.S. 398 (2013)......................................................................................................35

*Coggeshall Dev. Corp. v. Diamond*,
  884 F.2d 1 (1st Cir. 1989) ...........................................................................................11

*Ctr. for Biological Diversity v. McAleenan*,
  404 F. Supp. 3d 218 (D.D.C. 2019) ..............................................................................8

*Ctr. for Pub. Integrity v. Dep't of Def.*,
  486 F. Supp. 3d 317 (D.D.C. 2020) ............................................................................29

*D'Andrea Bros. LLC v. United States*,
  96 Fed. Cl. 205 (2010) ................................................................................................18

*Dalton v. Specter*,
  511 U.S. 462 (1994) ....................................................................................................20

*\*Dep't of Educ. v. California*,
  145 S.Ct. 966 (2025) ........................................................................................... *passim*

*Fed. Express Corp. v. U.S. Dep't of Com.*,
  39 F.4th 756, 763 (D.C. Cir. 2022) .............................................................................20

*Feng Wang v. Pompeo*,
  354 F. Supp. 3d 13 (D.D.C. 2018) ................................................................................9

*Garcia v. Vilsack*,
  563 F.3d 519 (D.C. Cir. 2009) ....................................................................................24

*Gen. Land Off. v. Biden*,
  722 F. Supp. 3d 710 (S.D. Tex. 2024) ........................................................................27

*Gill v. Whitford*,
  585 U.S. 48 (2018) ......................................................................................................36

*Gulf Oil Corp. v. Dep't of Energy*,
  514 F. Supp. 1019 (D.D.C. 1981) ...............................................................................31

*Harisiades v. Shaughnessy*,
  342 U.S. 580 (1952) ....................................................................................................23

*Heckler v. Chaney*,
  470 U.S. 821 (1985) ..............................................................................................22, 25

*Hi-Tech Pharmacal Co. v. FDA*,
  587 F. Supp. 2d 1 (D.D.C. 2008) ...........................................................................30, 31

*Holder v. Humanitarian L. Project*,
  561 U.S. 1, 33-34 (2010) ............................................................................................34

*Holy Land Found. for Relief & Dev. v. Ashcroft*,
  219 F. Supp. 2d 57 (D.D.C. 2002) ..............................................................................34

*Hulli v. Mayorkas*,
  549 F. Supp. 3d 95 (D.D.C. 2021) ........................................................................8

*\*Ingersoll-Rand Co. v. United States*,
  780 F.2d 74 (D.C. Cir. 1985) .................................................................... *passim*

*Johnson v. Eisentrager*,
  339 U.S. 763 (1950) ............................................................................................23

*Kendall v. United States*,
  37 U.S. 524 (12 Pet.) (1838) .............................................................................28

*Kokkonen v. Guardian Life Ins. Co. of Am.*,
  511 U.S. 375 (1994) ............................................................................................8

*\*Lincoln v. Vigil*,
  508 U.S. 182 (1993) .............................................................................24, 25, 26

*Lujan v. Defs. of Wildlife*,
  504 U.S. 555 (1992) ...........................................................................................35

*Madsen v. Women's Health Ctr., Inc.*,
  512 U.S. 753, 765 (1994) ..................................................................................35

*Maryland v. King*,
  567 U.S. 1301 (2012) .........................................................................................34

*\*Megapulse, Inc. v. Lewis*,
  672 F.2d 959 (D.C. Cir. 1982) .................................................................. *passim*

*Middle E. Broad. Networks, Inc. v. United States of Am.*,
  No. 25-5150, 2025 WL 1378735 (D.C. Cir. May 7, 2025) ..............................11

*Mo. Health and Med. Org. v. United States*,
  641 F.2d 870 (Ct. Cl. 1981) ..............................................................................18

*Moore v. United States*,
  48 Fed. Cl. 394 (2000) .......................................................................................18

*Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.*,
  463 U.S. 29 (1983) .............................................................................................30

*Murthy v. Missouri*,
  603 U.S. 43 (2024) .............................................................................................35

*Mylan Pharms., Inc. v. Shalala*,
  81 F. Supp. 2d 30 (D.D.C. 2000) ..................................................................9, 33

*Nat'l Mining Ass'n v. Jackson*,
  768 F. Supp. 2d 34 (D.D.C. 2011) ....................................................................31

*Nat'l Council of Community Mental Health Ctrs., Inc. v. Weinberger,*
  361 F. Supp. 897 (D.D.C. 1973) ..................................................................................28

*Neb. Dep't of Health & Hum. Servs. v. U.S. Dep't of Health & Hum. Servs.,*
  435 F.3d 326 (D.C. Cir. 2006) ....................................................................................35

*Nken v. Holder,*
  556 U.S. 418 (2009) ....................................................................................................33

*Nyunt v. Chairman, Broad. Bd. of Governors,*
  589 F.3d 445 (D.C. Cir. 2009) ....................................................................................20

*Open Tech. Fund v. Pack,*
  470 F. Supp. 3d 8 (D.D.C. 2020) ................................................................................34

*Perry Capital LLC ex rel. Inv. Funds v. Mnuchin,*
  864 F.3d 591 (D.C. Cir. 2017) ....................................................................................24

*Pub. Citizen v. Stockman,*
  528 F. Supp. 824 (D.D.C. 1981) ................................................................................27

*Safari Club Int'l v. Jewell,*
  47 F. Supp. 3d 29 (D.D.C. 2014) ..........................................................................31, 33

*San Antonio Hous. Auth. v. United States,*
  143 Fed. Cl. 425 (2019) ........................................................................................17, 18

*Schneider v. Kissinger,*
  412 F.3d 190 (D.C. Cir. 2005) ....................................................................................22

*Sherley v. Sebelius,*
  644 F.3d 388 (D.C. Cir. 2011) ......................................................................................8

*Slattery v. United States,*
  635 F.3d 1298 (Fed. Cir. 2011) (*en banc*) ................................................................10

*Spectrum Leasing Corp. v. United States,*
  764 F.2d 891 (D.C. Cir. 1985) ..............................................................................11, 12

*St. Bernard Parish Gov't v. United States,*
  134 Fed. Cl. 730 (2017), *aff'd on other grounds,* 916 F.3d 987 (Fed. Cir. 2019) ..................17

*State v. Musk,*
  2025 WL 520583 (D.D.C. Feb. 18, 2025) ....................................................................8

*Strait Shipbrokers Pte. Ltd. v. Blinken,*
  560 F. Supp. 3d 81 (D.D.C. 2021) ................................................................................9

*Talavera v. Shah,*
  638 F.3d 303 (D.C. Cir. 2011) ......................................................................................8

*Texas v. United States*,
    537 F.2d 466 (Ct. Cl. 1976) ...................................................................................18

*Thermalon Indus. v. United States*,
    34 Fed. Cl. 411 (Fed. Cl. 1995) ......................................................................16, 17

*Trump v. Sierra Club*,
    140 S. Ct. 1 (2019)..................................................................................................27

\**U.S. Conf. of Catholic Bishops v. U.S. Dep't of State*,
    Case No. 1:25-cv-00465 (TNM), 2025 WL 763738 (D.D.C. Mar. 11, 2025) ...........1, 9, 10, 14

*United States v. Bormes*,
    568 U.S. 6 (2012)....................................................................................................32

*United States v. Curtiss-Wright Exp. Corp.*,
    299 U.S. 304 (1936)................................................................................................22

*United States v. President & Fellows of Harvard Coll.*,
    323 F. Supp. 2d 151 (D. Mass. 2004) ...................................................................16

*Versata Dev. Corp. v. Rea*,
    959 F. Supp. 2d 912 (E.D. Va. 2013) ...................................................................24

*Widakuswara v. Lake*,
    No. 25-5144, 2025 WL 1288817 (D.C. Cir. May 3, 2025)....................................10

*Wilkerson v. United States*,
    67 F.3d 112 (5th Cir. 1995) ............................................................................18, 19

*Winter v. Nat. Res. Def. Council, Inc.*,
    555 U.S. 7 (2008)......................................................................................................8

*Wis. Gas Co. v. FERC*,
    758 F.2d 669 (D.C. Cir. 1985)........................................................................31, 32

*Worthy v. Herter*,
    270 F.2d 905 (D.C. Cir. 1959)...............................................................................23

*York Assocs., Inc. v. Sec'y of Hous. & Urb. Dev.*,
    815 F. Supp. 16 (D.D.C. 1993) .............................................................................18

*Youngstown Sheet & Tube Co. v. Sawyer*,
    343 U.S. 579 (1952)..........................................................................................21, 22

*Zivotofsky ex rel. Zivotofsky v. Kerry*,
    576 U.S. 1 (2015)....................................................................................................21

## STATUTES

2 U.S.C. § 683 .................................................................................................27, 28

2 U.S.C. § 687 ......................................................................................................27

5 U.S.C. § 701 ...............................................................................................13, 24

5 U.S.C. § 704 ......................................................................................................24

28 U.S.C. § 1346 ..................................................................................................11

28 U.S.C. § 1491 ............................................................................................10, 11

31 U.S.C. 1502 ...........................................................................................27, 28, 29

31 U.S.C. 1512 ...............................................................................................27, 29

31 U.S.C. 1513 ......................................................................................................29

31 U.S.C. 1553 ............................................................................................27, 28, 29

Further Consolidated Appropriations Act,
    Pub. L. No. 118-47, Division D, tit. I, 138 Stat. 641 (Mar. 23, 2024). ....................................3

The Impoundment Control Act of 1974,
    Pub. L. No. 93-344, tit. X, 88 Stat. 297 (1974)
    (codified as amended at 2 U.S.C. §§ 682 *et seq.*) .................................................27

United States-Mexico-Canada Agreement (UMCA) Supplemental Appropriations Act, 2019,
    Pub. L. No. 116-113, tit. IX, 134 Stat. 11 (January 29, 2020) ....................................3

Fed. R. Civ. P. 12(h)(3) ...........................................................................................8

Fed. R. Civ. P. 56(a) ...............................................................................................8

Fed. R. Civ. P. 65(c) ..............................................................................................36

## ADMINISTRATIVE AND EXECUTIVE MATERIALS

2 C.F.R. § 200.211 ...............................................................................................12

2 C.F.R. § 200.315 ...............................................................................................16

2 C.F.R. § 200.340 .........................................................................................12, 29

Reevaluating and Realigning United States Foreign Aid,
    Executive Order 14169, 90 Fed. Reg. 8619 (Jan. 20. 2025) ......................................4

**OTHER AUTHORITIES**

Press Release, U.S. Dep't of State, *Implementing the President's Exec. Ord. on Reevaluating and Realigning U.S. Foreign Aid* (Jan. 26, 2025), https://www.state.gov/implementing-the-presidents-executive-order-on-reevaluating-and-realigning-united-states-foreign-aid/ ............................................................4

American Center for International Labor Solidarity, *Solidarity Center Statement on ILAB Program Elimination* (Mar. 27, 2025), https://www.solidaritycenter.org/solidarity-center-statement-on-ilab-program-elimination/ ...................................................................................................................15

## <u>GLOSSARY OF ABBREVIATIONS</u>

AIR        American Institutes for Research

AOR        Authorized Organization Representative

APA        Administrative Procedure Act

BDR        Budget Data Request

EO          Executive Order

FAR        Agency Foreign Assistance Review

ILAB       Department of Labor's Bureau of International Labor Affairs

OMB       Office of Management and Budget

USAGM   U.S. Agency for Global Media

USAID     U.S. Agency for International Development

USDOL     U.S. Department of Labor

USMCA    United States-Mexico-Canada Agreement

**INTRODUCTION**

Plaintiffs challenge the terminations of certain cooperative grant agreements with the Department of Labor's Bureau of International Labor Affairs (ILAB) and seek injunctive relief requiring the reinstatement of those contracts (*i.e.*, specific performance). Their five-count Complaint alleges violations of: (I) the separation of powers, (II) various appropriations statutes, (III) the Impoundment Control Act, (IV) the Anti-Deficiency Act, and (V) the Administrative Procedure Act's (APA) bar on arbitrary and capricious agency action. Counts II–IV are pleaded under the APA's bar on agency action not in accordance with law. Plaintiffs' motion is being treated as one for summary judgment on Counts I–IV and as one for a preliminary injunction on Count V. Minute Order (May 12, 2025). Their motion should be denied.

All of Plaintiffs' claims suffer from jurisdictional and substantive defects, with the first infecting all five Counts.

All five Counts stem from grant agreements with the Government and seek relief that is quintessentially contractual, so the Complaint should be dismissed. Just last month, the Supreme Court issued guidance that is dispositive of such claims: in a case challenging the government's termination of federal grants, the Supreme Court held that "the Government [was] likely to succeed in showing that the District Court lacked jurisdiction to order the payment of money under the [Administrative Procedure Act]" because the Tucker Act vests exclusive jurisdiction over such actions in the Court of Federal Claims. *Dep't of Educ. v. California*, 145 S. Ct. 966 (2025) (per curiam). And the month before, consistent with *Department of Education*, another Judge in this District held that the court had no jurisdiction to grant such relief, citing Circuit precedent holding that "jurisdiction could not lie in the district court because the suit was inherently contractual." *U.S. Conf. of Catholic Bishops v. U.S. Dep't of State*, Case No. 1:25-cv-00465 (TNM), 2025 WL 763738, at *8 (D.D.C. Mar. 11, 2025) (citing *Ingersoll-Rand Co. v. United States*, 780 F.2d 74, 77 (D.C. Cir. 1985)), *appeal docketed* USCA Case No. 25-5066. Guided by *Ingersoll-Rand*, the court held there was no jurisdiction to hear a claim by a federal grantee seeking specific performance of a federal grant agreement. As the court aptly observed: "[t]he Court squints in vain to see any

daylight. Like those plaintiffs, the [plaintiff] asks the Court to order the Government to cancel the termination, pay money due, and reinstate the contracts. That is something this Court lacks the power to do." *Id.* at *6. The same is true here. Those Supreme Court and D.C. Circuit precedents are controlling and compel dismissal of Plaintiffs' five claims for lack of jurisdiction.

As to certain claims, there are independent jurisdictional and substantive defects.

"Count I (Ultra Vires)" fails because potential alternative remedies foreclose jurisdiction and because this constitutional-styled claim only alleges a statutory violation, for which the Supreme Court has held that *ultra-vires* review is unavailable. Indeed, Plaintiffs' requested relief (an order requiring specific performance of contracts implicating foreign affairs) is the only threat to the separation of powers presented here.

As to Plaintiffs' APA claims (Counts II–V), the Court lacks jurisdiction because of the availability of alternative remedies and because termination of these agreements is committed to agency discretion. These claims also reflect Plaintiffs' fundamental misunderstanding of appropriations law and fail on the merits. Plaintiffs identify no statutory entitlement to the specific funds they were awarded by cooperative grant agreement; the appropriations they identify were to ILAB's overall program, not any specific grant or grantee. The agency undoubtedly has explicit authority to terminate such agreements for any number of reasons under the agreements' terms. None of the statutes Plaintiffs invoke to make their claims is applicable to the question Plaintiffs' press: whether the terminations were valid.

Lastly, Plaintiffs have not established the remaining factors required for the injunctive relief they seek (whether permanent, as to Counts I–IV, or preliminary, as to Count V). In this foreign-affairs context, Plaintiffs' burden on those factors is extraordinarily high. But Plaintiffs' alleged harms are all economic and therefore quintessentially reparable—which further underscores the Tucker Act's applicability here. The balance of the equities and public interest also disfavor injunctive relief, because the agency has determined that these tax dollars should not be spent on foreign projects that are inconsistent with its priorities and the national interest. Plaintiffs also lack standing to challenge anything beyond the termination of their own 15

2

contracts, because their Complaint and motion are devoid of allegations regarding injuries from the termination of *non*-parties' grant agreements. Additionally, an injunction ordering the agency to disburse funds would be improper because any such funds are unlikely to be recovered even if the agency ultimately prevails. Thus, a bond should be required if any preliminary injunctive relief is entered (on Count V). And any relief should be stayed pending the Government's determination of whether to appeal.

Accordingly, the Court should deny Plaintiffs' motion for summary judgment as to Counts I–IV and for a preliminary injunction as to Count V and dismiss the case for lack of jurisdiction.

## **BACKGROUND**

**1.** The Department of Labor's Bureau of International Labor Affairs (ILAB) plays an important role in furthering the United States' foreign-labor policy objectives. One way that ILAB advances these objectives is through awarding and administering cooperative grant agreements (*i.e.*, contracts) authorized by Congress.

There are two sources of funding for these contracts. *First*, ILAB is appropriated funds annually to administer or operate international labor activities, bilateral and multilateral technical assistance, and microfinance programs, by or through grants, subgrants and other arrangements. *See, e.g.*, Further Consolidated Appropriations Act, Pub. L. No. 118-47, Div. D, tit. I, 138 Stat. 641 (2024) (hereinafter, "DOL Appropriations Act, 2024"). These appropriations are further divided into funding for "programs to combat exploitative child labor internationally" and "to implement model programs that address worker rights issues through technical assistance in countries with which the United States has free trade agreements or trade preference programs." *Id. Second*, ILAB was appropriated funds under the United States-Mexico-Canada Agreement (USMCA) Supplemental Appropriations Act, to be available through December 31, 2023, for projects to support labor justice reform in Mexico, including efforts related to implementation of the USMCA. USMCA Supplemental Appropriations Act, 2019, Pub. L. No. 116-113, tit. IX, 134 Stat. 98, 100 (2020).

ILAB grant agreements are intended to help ensure that workers and businesses in the

United States are not put at a competitive disadvantage by trading partner countries not adhering to their labor commitments under trade agreements and trade preference programs, and promote eliminating the worst forms of child labor and forced labor.

As of March 13, 2025, ILAB had 15 active cooperative agreements with the Plaintiff organizations. Nine of these were awarded to the American Center for International Labor Solidarity (Solidarity Center) for programs to address worker rights issues in U.S. trading partners and were funded from various fiscal year appropriations, the earliest being 2021. Fiscal year 2021 appropriations were also used for an award to the Global March against Child Labor for a project to combat exploitative child labor. In addition, between fiscal years 2019 and 2022, three cooperative agreements were awarded to the American Institutes for Research (AIR) and two to the Solidarity Center for USMCA Supplemental Appropriations Act-funded projects in support of labor justice reform in Mexico.

**2.** On January 20, 2025, the President issued Executive Order 14169, Reevaluating and Realigning U.S. Foreign Aid, 90 Fed. Reg. 8619 (Jan. 20, 2025), clarifying the new Administration's priorities on foreign aid. The Order stated that foreign assistance should align with the Administration's foreign policy and mandated that Federal Agencies with responsibility for United States foreign development assistance programs review the programs for "programmatic efficiency and consistency with United States foreign policy." As Secretary of State Rubio put it, "[e]very dollar we spend, every program we fund, and every policy we pursue must be justified with the answer to three simple questions: Does it make America safer? Does it make America stronger? Does it make America more prosperous?" Press Release, U.S. Dep't of State, *Implementing the President's Exec. Ord. on Reevaluating and Realigning U.S. Foreign Aid* (Jan. 26, 2025), https://www.state.gov/implementing-the-presidents-executive-order-on-reevaluating-and-realigning-united-states-foreign-aid/.

Pursuant to Executive Order 14169, the Office of Management and Budget (OMB) issued Budget Data Request (BDR) 25-08, *Agency Foreign Assistance Review (FAR) Data Call*, on February 26, 2025. BDR 25-08 required all federal agencies to collect information about their

foreign assistance[1] in order to "assess alignment of the US Government's (USG) foreign assistance with the President's America First foreign policy, which requires that each dollar of foreign assistance makes America safer, stronger, and more prosperous." The BDR stated:

It is the policy of this Administration that all foreign assistance must make the American people safer, stronger, and more prosperous.

- **Safer:** Foreign assistance must prioritize the security of the American people by preventing threats before they reach U.S. borders, ensuring aid supports national defense, and promoting deterrence by preventing funds from benefiting hostile entities or emboldening adversaries.

- **Stronger:** Foreign assistance should strengthen America's global leadership by enhancing the nation's influence and competitiveness; promoting American sovereignty, exceptionalism, freedom, and liberty; increasing negotiating power; advancing America's interests on the world stage; and directly supporting U.S. national security and foreign policy objectives. A stronger America means prioritizing our national defense and economic independence; advancing resilient technology; securing our critical supply chains and natural resources; and building

---

[1] BDR 25-08 states that "Foreign assistance means (i) any activity funded under Title 22 of the United States Code or any other Act of or Appropriation to a foreign country, international organization, nongovernmental organization, foreign national or other non-U.S. person or entity, including but not limited to any training, service, or technical advice, any item of real, personal, or mixed property, any agricultural commodity, United States dollars, loan guarantees or forgiveness, and any currencies of any foreign country which are owned by the United States government (ii) any assistance or support provided to, or received by, non-U.S. citizen, non U.S. person or entity; foreign non-governmental organization; or U.S. person or entity related to national security, foreign policy, defense, trade, development, and multilateral and humanitarian operations (iii) any federally funded, humanitarian assistance, security assistance, development assistance, intelligence assistance, political or economic assistance, grants, loans, or technical assistance of any kind, government-subsidized political risk insurance, or any other program that facilitates the transfer of resources from the United States government to another country, or to a foreign, international or multilateral organization (iv) the services or activities of any program or entity that enables, oversees, executes, administers, or authorizes allocation, disbursement, transfer, distribution, or provision of funds, services, or resources to a foreign government, foreign entity, international organization, multinational organization, nongovernmental organization, or any other entity or individual located outside the territorial boundaries of the United States."

a world that respects freedom under law, advances sovereignty over globalism, and celebrates American leadership.

- **Prosperous:** Foreign assistance must promote American prosperity by advancing capitalism, markets that favor Americans, competition for American partnership, and economic self-reliance—not a global welfare mentality. Aid should secure exclusive partnerships, empower trade relationships that benefit U.S. businesses, strengthen American industries, protect American international investments, and create and prioritize opportunities for American workers. Taxpayer dollars must not fund dependency, socialism, or corrupt regimes that oppose free enterprise, or intervene in internal matters of another sovereign nation. A truly prosperous America prioritizes domestic growth, innovation, and economic strength over foreign handouts.

BDR 25-08 further required that agencies collect, score and report 36 non-dispositive data elements to help inform the analysis of the extent to which the assistance supports the Administration's foreign assistance priorities. ILAB contacted its recipients to collect this information on March 3, 2025, and submitted these data to OMB on March 19, 2025. BDR 25-08 also directed each Department and Agency head to "make a recommendation on whether to continue, modify, or cease each foreign assistance program." Finally, BDR 25-08 directed agencies to write a report summarizing their foreign assistance programs and answering several questions, "written in a manner that could be made available to the public." The directions stated that "OMB and State will provide guidance on when and how to make this information public." BDR 25-08 was clear that "[t]he foreign assistance review, as directed by E.O. 14169, is distinct and separate from ... any other Agency or Department led contract or grants review process."

**3.** Throughout this process, the Department of Labor continued to assess the alignment of its foreign assistance awards with the new Administration's priorities. On March 13, 2025, ILAB determined that it was appropriate to terminate a cooperative agreement with the Solidarity Center. Accordingly, a grant modification was immediately issued to freeze the remaining funds. The

6

following day, a notice of termination for Cooperative Agreement IL-3890 8-22-75-K (Enhancing Transparency and Accountability in Uzbekistan's Cotton Industry) was sent to the Solidarity Center to notify that the award was terminated "because it no longer effectuates the program goals." Dkt. No. 9-2, Exh. B.

On March 14, 2025, ILAB determined that two more cooperative agreements with the Solidarity Center did not align with agency priorities and the national interest. These awards, Cooperative Agreement 25K75IL000020 (Promoting a Just Transition for all Workers) and Cooperative Agreement 23K75IL000003-01-00 (Engaging Workers and Civil Society to Strengthen Labor Law Enforcement (Georgia)), were immediately frozen and a notice of termination was sent on March 17, 2025.

On March 26, 2025, ILAB terminated its remaining cooperative agreements with Plaintiffs, for lack of alignment with agency priorities and the national interest. These awards were frozen on March 26 and 27, and termination letters were sent on March 27 and 28, 2025. On May 16, ILAB sent "express authorization" that certain "costs to the recipients (or subrecipients) resulting from financial obligations incurred by the recipients (or subrecipients) … are allowable." Decl. of Thomas S. Kodiak ¶ 2 (attached). The guidance therefore "permits the expenditure of award funds on such costs." *Id.*; *see* Kodiak Decl. Exh. A (copy of the guidance).

**4.** Almost three weeks later (and over four weeks after the first termination challenged here), Plaintiffs filed a Complaint pleading five Counts seeking vacatur of the termination notices and "reinstatement of the ILAB cooperative agreements, including Plaintiffs' agreements." Compl. 21–24, Dkt. No. 1 (Apr. 15, 2025). Twenty days later, Plaintiffs filed a motion for preliminary injunction, Dkt. No. 9 ("Pls.' Mot.") (May 5, 2025), supported by a memorandum, Dkt. No. 9-1 ("Pls.' Mem."). Following the parties' responses to the Court's May 6 Minute Order, the Court entered a briefing schedule and ordered that Plaintiffs' motion "shall be treated … as a motion for partial summary judgment on Counts I through IV" of the Complaint. Minute Order (May 12, 2025), with Count V remaining before the Court on Plaintiffs' motion for preliminary injunction.

## **LEGAL STANDARDS**

**1.** A plaintiff bears the burden of demonstrating that the court has jurisdiction over a claim. *See Kokkonen v. Guardian Life Ins. Co. of Am.*, 511 U.S. 375, 377 (1994). At any time, if the plaintiff fails to carry that burden, the court must dismiss the action, including at the summary judgment stage. Fed. R. Civ. P. 12(h)(3); *see Auster v. Ghana Airways Ltd.*, 514 F.3d 44, 48 (D.C. Cir. 2008) ("When a court lacks subject matter jurisdiction, it must dismiss the case and not grant summary judgment.").

Rule 56 requires a court to grant summary judgment if "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). The "evidence is to be viewed in the light most favorable to the nonmoving party and the court must draw all reasonable inferences in favor of the nonmoving party," *Talavera v. Shah*, 638 F.3d 303, 308 (D.C. Cir. 2011) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986)), but the question whether the Constitution grants the government "the power to act in a certain way is a pure question of law," *Ctr. for Biological Diversity v. McAleenan*, 404 F. Supp. 3d 218, 233 (D.D.C. 2019) (citations omitted).

**2.** A preliminary injunction is 'an extraordinary remedy that should be granted only when the party seeking relief, by a clear showing, carries the burden of persuasion.'" *State v. Musk*, 2025 WL 520583, at *2 (D.D.C. Feb. 18, 2025) (quoting *Hulli v. Mayorkas*, 549 F. Supp. 3d 95, 99 (D.D.C. 2021)). To warrant preliminary relief, the movant must satisfy a four-prong test, establishing "that he is likely to succeed on the merits, that he is likely to suffer irreparable harm in the absence of preliminary relief, that the balance of equities tips in his favor, and that an injunction is in the public interest." *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008); *accord Sherley v. Sebelius*, 644 F.3d 388, 392 (D.C. Cir. 2011).

**3.** Moreover, the particular form of injunction Plaintiffs seek here—an affirmative injunction ordering ILAB to change the status quo and proceed to make payments to the Plaintiffs for the duration of this litigation, notwithstanding that Plaintiffs have no currently operative grant agreements in place—comprises a highly disfavored form of relief. Mandatory preliminary

injunctions, which seek to alter rather than preserve the status quo by compelling affirmative action, "are disfavored as an even more extraordinary remedy than the typical preliminary injunction, especially when directed at the United States Government." *Strait Shipbrokers Pte. Ltd. v. Blinken*, 560 F. Supp. 3d 81, 92–93 (D.D.C. 2021) (quotation marks and citations omitted); *see*, *e.g.*, *Mylan Pharms., Inc. v. Shalala*, 81 F. Supp. 2d 30, 36 (D.D.C. 2000). Plaintiffs seeking such relief "face a significantly heightened burden" of showing an entitlement to relief. *Feng Wang v. Pompeo*, 354 F. Supp. 3d 13, 20 (D.D.C. 2018). "[C]ourts exercise extreme caution in assessing" motions seeking affirmative injunctive relief, and as a general rule they deny such relief unless "the facts and law clearly favor the moving party." *Shipbrokers*, 560 F. Supp. 3d at 93 (quotation marks omitted).

Additionally, mandatory injunctive relief related to the President's oversight of ILAB, an instrument of foreign affairs, "deeply intrudes into the core concerns of the executive branch" and may be awarded only upon "an extraordinarily strong showing" as to each required element. *Adams v. Vance*, 570 F.2d 950, 954–55 (D.C. Cir. 1977).

## **ARGUMENT**

### I.   **The Court lacks subject-matter jurisdiction over any of Plaintiffs' claims because they pertain to cooperative grant agreements.**

Plaintiffs are unlikely to prevail on the merits of Count V and are not entitled to summary judgment on their other Counts because their claims, fundamentally, are contractual. Specifically, Plaintiffs claim they are entitled to payment under their respective grant agreements, and to reinstatement or extension of their allegedly improperly terminated grant agreements. *See* Compl. 24, ¶ b; Proposed Order Granting Prelim. Inj., Dkt. No. 9-6. Those grant agreements are contracts with the Federal Government. Because Congress vested the Court of Federal Claims with exclusive jurisdiction over such claims, this Court lacks "the authority to afford the 'drastic' emergency relief that [Plaintiffs] seek[]." *U.S. Conf. of Catholic Bishops v. U.S. Dep't of State*, 2025 WL 763738, at *8 (D.D.C. Mar. 11, 2025) (quoting *FTC v. Exxon Corp.*, 636 F.2d 1336, 1343 (D.C. Cir. 1980)), *appeal docketed* USCA Case No. 25-5066.

**1.** In *Department of Education v. California*, the Supreme Court stayed a temporary restraining order that had "enjoin[ed] the Government from terminating various education-related grants." 145 S. Ct. 966. The Supreme Court held that the government was "likely to succeed in showing the District Court lacked jurisdiction to order the payment of money under the APA," reasoning that "the Tucker Act grants the Court of Federal Claims jurisdiction over suits based on 'any express or implied contract with the United States.'" *Id.* at 968–69 (quoting 28 U.S.C. § 1491(a)(1)). The same jurisdictional bar equally applies to the claims in this case, which are based on ILAB's grant agreements with Plaintiffs, and seek payments of funds the Plaintiffs claim entitlement to under those now-terminated grant agreements. *See* Pls.' Mem. 21 (arguing that "Defendants lack authority to terminate ILAB's cooperative agreements because that decision necessarily results in a failure to spend the funds Congress appropriated to ILAB for its grantmaking function.").

The Tucker Act, 28 U.S.C. § 1491(a)(1), provides for judicial review of "any express or implied contract with the United States," *Dep't of Educ.*, 145 S. Ct. at 968 (quoting 28 U.S.C. § 1491(a)(1)), "unless such jurisdiction was explicitly withheld or withdrawn by statute," *Slattery v. United States*, 635 F.3d 1298, 1321 (Fed. Cir. 2011) (*en banc*).[2] The D.C. Circuit also has long "interpreted the Tucker Act as providing the *exclusive* remedy for contract claims against the government." *U.S. Conf. of Catholic Bishops*, 2025 WL 763738, at *4 (quoting *Transohio Sav. Bank v. Dir. Off. of Thrift Supervision*, 967 F.2d 598, 609 (D.C. Cir. 1992) (emphasis in original)); *see Widakuswara v. Lake*, No. 25-5144, 2025 WL 1288817, at *3 (D.C. Cir. May 3, 2025) (per curiam) ("The district court … likely lacked jurisdiction to restore [plaintiffs'] grants" because of the Tucker Act.).[3] Put another way, "[t]he only remedy to which the United States has consented

---

[2] Plaintiffs argue against following *Department of Education* based on the Supreme Court's short order declining to stay a preliminary order in an earlier case. Pls.' Mem. 15–16. That order contains no substantive explanation for denying preliminary relief, let alone anything that undercuts *Department of Education*'s more recent and controlling reasoning. *See Dep't of State v. AIDS Vaccine Advoc. Coal.*, 145 S. Ct. 753 (2025).

[3] Although portions of the orders supported by this recent decision have been administratively

in cases of breach of contract is to the *payment of money damages* in either the Court of Claims [now the Court of Federal Claims], if the amount claimed is in excess of $10,000, 28 U.S.C. § 1491(a)(1), or the district courts, where the amount in controversy is $10,000 or less. 28 U.S.C. § 1346(a)(1)." *Coggeshall Dev. Corp. v. Diamond*, 884 F.2d 1, 3 (1st Cir. 1989) (emphasis in original). And "[f]ederal courts do not have the power to order specific performance by the United States of its alleged contractual obligations." *Id.* at 3; *Ingersoll-Rand Co. v. United States*, 780 F.2d 74, 79–80 (D.C. Cir. 1985); *Spectrum Leasing Corp. v. United States*, 764 F.2d 891, 894–95 (D.C. Cir. 1985); *Megapulse, Inc. v. Lewis*, 672 F.2d 959, 967 (D.C. Cir. 1982). These decisions are dispositive here.

When a claim against the government is "essentially contractual," it must be pursued in the Court of Federal Claims under the Tucker Act, not in district court under the APA's sovereign immunity waiver. *Megapulse, Inc.*, 672 F.2d at 967 (D.C. Cir. 1982). In evaluating whether a claim is in essence a contract claim, the court looks to "the source of the rights upon which the plaintiff bases its claims and upon the type of relief sought." *Id.* at 968. Both factors expose that Plaintiffs' claims here are contractual.

The source of rights here, Plaintiffs' grant agreements, are contracts because they set out obligations that Plaintiffs must fulfill in exchange for consideration from the government. *See*, *e.g.*, Kodiak Decl. ¶¶ 3–5 & Exh. B at 2 (excerpt of illustrative grant agreement) ("The signature on the SF-424 … of the Authorized Organization Representative (AOR) constitutes a binding offer and constitutes agreement to the terms and conditions of award…. USDOL reserves the right to withdraw the award … as a remedy for non-compliance as described in 2 CFR 200.339-340."). Moreover, Plaintiffs seek to require the payment of funds they contend they are entitled to under their 15 separate contracts. *See* Pls.' Mot. 1 (seeking relief from "terminat[ion of] tens of millions of dollars in funding"). But they do not dispute that the payments they seek to resume are governed

stayed by the en banc court, the stay order emphasized that it "should not be construed in any way as a ruling on the merits." *Middle E. Broad. Networks, Inc. v. United States of Am.*, No. 25-5150, 2025 WL 1378735, at *1 (D.C. Cir. May 7, 2025) (citing D.C. Circuit Handbook of Practice and Internal Procedures 33 (2024)).

by the agreements' terms and conditions. And those terms include explicit authority to "withdraw the award," Kodiak Decl. ¶¶ 3, 5 & Exh. B at 2 (citing 2 C.F.R. § 200.340), "if an award no longer effectuates the program goals or agency priorities," 2 C.F.R. § 200.340; *see also* 2 C.F.R. § 200.211(c) (requiring termination provision to be included in all Federal awards).

None of these contractual elements disappears simply because of Plaintiffs' artful pleading. The D.C. Circuit has been clear that, where "the essence of [a] claim is a request for specific performance of the original contract"—whether or not it is pleaded as a contract claim— jurisdiction for that action lies exclusively with the Court of Federal Claims. *Ingersoll-Rand*, 780 F.2d at 80; *see Megapulse, Inc.*, 672 F.2d at 967 (same). The Supreme Court's recent decision in *Department of Education* confirms that that is the correct jurisdiction for suits by federal grantees challenging the Government's actions as to their grants. Plaintiffs seek to require the Government to continue to perform under their terminated grant agreements. *See* Pls.' Mem. 12 (unconvincingly attempting to distinguish between "set aside … termination" remedy and "specific performance"); *id.* at 13 (conceding that relief "would restore Plaintiffs' funding" pursuant to award terms and conditions). But the Government has *not* waived immunity with respect to specific performance—that is the whole point of channeling contract claims into the Tucker Act. *Spectrum Leasing Corp. v. United States*, 764 F.2d 891, 895 (D.C. Cir. 1985).

**2.** Plaintiffs make two arguments against the Tucker Act's application, but neither is availing.

*First*, Plaintiffs argue that "this case is not 'essentially a contract action'" based on the source of rights at issue and the relief being sought. Pls.' Mem. 11–13. That argument appears to rest on the notion that the appropriations statutes somehow create a statutory entitlement to funds for these specific Plaintiffs, thereby attempting to transform the inquiry from contractual to statutory. In other words, Plaintiffs claim they are entitled to funds by statute, not by contract. In each appropriation, however, Congress made clear that any funds disbursed to grantees like Plaintiffs are paid solely pursuant to grant agreements (*i.e.*, contracts), between ILAB and the grantees. So although Plaintiffs try to depict ILAB's hands as being tied, by characterizing the

grants as "required," even they must qualify that argument by admitting that the requirement extends only to "projects *like* these"—not *these* specific projects. Pls.' Mem. 1 (emphasis added).

Specifically, Plaintiffs repeatedly cite appropriations laws that state certain funds "shall be used" to support certain policy aims. But, as evident by their text, such statutes do not create any statutory obligation as to specific funds owed to the Solidarity Center, or AIR, or Global March; nor do they create a statutory prohibition on terminating any grant. Rather, the statutes comprise an instruction for an appropriation, and that appropriation has been made to ILAB. *See* 31 U.S.C. § 701(2)(C) (defining "appropriations" as authority making amounts *available* for obligation or expenditure). ILAB then obligated those funds to these cooperative grant agreements, subject to terms and conditions that explicitly include the agency's right to withdraw the award. At most, the appropriations statutes set the size of the grantmaking authority; they do not preclude the termination of any grant made under that authority.

Under Plaintiffs' reasoning, because all grants are funded by appropriations, all grant-related actions or terminations could be pleaded as statutory or constitutional claims—not contracts claims—that proceed in district court. This view would create a complete end-run around the exclusive jurisdiction of the Court of Federal Claim. *See* Pls.' Mem. 13 ("setting aside ILAB's across-the-board termination of its grant programs would restore Plaintiffs' funding" under their individualized agreements). The Supreme Court, like the D.C. Circuit before it, has now unequivocally rejected such a maneuver as error. *See Department of Education*, 145 S. Ct. at 968–69; *Megapulse, Inc.*, 672 F.2d at 967 & n.34 (explaining that permitting APA review of contractual claims "would ultimately result in the demise of the Court of Claims").

Again, it is well-established that a plaintiff cannot avoid the Court of Federal Claims simply by artful pleading. *See Ingersoll-Rand Co.*, 780 F.2d at 77 ("We begin with the well-accepted proposition that a plaintiff may not avoid the jurisdictional bar of the [Contract Disputes Act, vesting jurisdiction in the Court of Federal Claims] merely by alleging violations of regulatory or statutory provisions rather than breach of contract."). In a case challenging an agency's decision to terminate a contract for convenience, the D.C. Circuit explained "[t]hat the termination also

13

arguably violates certain other regulations does not transform the action into one based solely on those regulations. Nor does plaintiff's decision to allege only a violation of the regulations change the essential character of the action." *Id.* at 78 ("where plaintiff was awarded contract and government terminated for convenience, cause of action is on the contract despite plaintiff's allegations of statutory and constitutional violations" (citation omitted)); *see Megapulse, Inc.*, 672 F.2d at 967 n.34; *see also U.S. Conf. of Catholic Bishops*, 2025 WL 763738, at *4–8 (D.D.C. Mar. 11, 2025).[4]

In *U.S. Conference of Catholic Bishops*, the court found second factor (the type of relief sought) to be dispositive, reasoning that the relief the plaintiff sought in that case "sounds in contract." *Id.* (quoting *Albrecht v. Comm. on Emp. Bens. of Fed. Reserve Emp. Bens. Sys.*, 357 F.3d 62, 68 (D.C. Cir. 2004)). There, as here, the grantee sought an order enjoining the government from taking steps to give effect to a letter terminating the plaintiff's grant. *See id.* As the court explained, "[s]tripped of its equitable flair, the requested relief seeks one thing: [plaintiff] wants the court to order the Government to stop withholding the money due under [its grant agreements]." *Id.* at *7. The court held that treating the remedies sought in that case as equitable "would be to distort the obvious" since what plaintiffs asked the court to reverse is the Government's decision to cease a financial relationship with the [plaintiff]." *Id.* Notably, that plaintiff also sought an injunction pending appeal, which the D.C. Circuit denied. Order, *U.S. Conf. of Catholic Bishops v. U.S. Dep't of State*, No. 25-5066 (D.C. Cir. Mar. 28, 2025).

---

[4] Other courts, post-*Department of Education*, have similarly concluded that grant termination claims belong in the Court of Federal Claims. *See Solutions in Hometown Connections v. Noem*, No. 8:25-cv-885 (D. Md. Apr. 14, 2025), Dkt. No. 46 (denying the plaintiffs' TRO motion challenging the termination of certain U.S. Citizenship and Immigration Services grants and concluding that the plaintiffs' APA claims were "in essence contract claims against the United States for which the ... Court of Federal Claims has exclusive jurisdiction"); *Am. Ass'n of Colleges for Teacher Educ. v. McMahon*, No. 25-1281 (4th Cir. Apr. 10, 2025), Dkt. No. 30 (staying a district court's preliminary injunction in a case involving education-related grants in light of the Supreme Court's *Department of Education* decision); Electronic Order, *Mass. Fair Housing Ctr. V. Dep't of Hous. & Urb. Dev.*, No. 3:25-cv-30041-RGS (D. Mass. Apr. 14, 2025), Dkt. No. 42 (dissolving a temporary restraining order that had enjoined termination of federal grants in light of the Supreme Court's "unmistakable directive").

*Second*, Plaintiffs posit that their agreements are not contracts because they "provide no tangible, direct benefit to the government that constitutes consideration." Pls.' Mem. 14. In other words, they do not dispute offer, acceptance, or proper government authority to enter into the agreements; they only contend that there's no tangible or direct benefit on the Government's side of the bargain. *See id.* That is wrong as Plaintiffs' own submissions and the grant agreements' terms demonstrate.

For starters, Plaintiffs concede that some of the agreements provide for and facilitate monitoring U.S. trading partners' compliance with trade agreement labor obligations. *See* Pls.' Mem. 26, 32. They also concede that this information facilitates enforcing those trade agreement labor obligations. *See id.* As the Solidarity Center also admits, some of the agreements provided the Government with better enforced and more enforceable trade partnerships by increasing transparency regarding violations. The Solidarity Center, *Solidarity Center Statement on ILAB Program Elimination* (Mar. 27, 2025) ("Crucially, many of these programs were established to enforce labor provisions in countries where the United States has trade agreements. They help ensure that our trading partners live up to their commitments."), https://www.solidaritycenter.org/solidarity-center-statement-on-ilab-program-elimination/.

The grant agreements also confer knowledge and information regarding the success of ILAB projects. The agency can thus better understand what makes certain projects successful and utilize its resources more effectively going forward. Indeed, Plaintiffs concede that "learning from th[e]se projects" is shared with other federal agencies "to enable efficient cooperation and effective implementation of their mandates." Decl. of Thea Lee, Dkt. No. 9-5 ¶ 11 (citing information-sharing with U.S. Customs and Border Protection for law enforcement and investigations purposes, with the U.S. Trade Representative for trade agreement investigations, and the National Oceanic and Atmospheric Administration and Coast Guard "to improve their enforcement of illegal, unregistered, and unreported fishing"). The Federal Circuit has recognized that cooperative agreements conferring similar benefits—such as enabling the Department of Agriculture to inspect a company's facilities—constitute contracts under the Tucker Act, notwithstanding that the

15

contract "provided no direct monetary value to the United States." *See Quiman, S.A. de C.V. v. United States*, No. 98-5036, 1999 WL 44182, at *2 (Fed. Cir. 1999) (finding a cooperative agreement under which the Department of Agriculture would provide inspectors for certain facilities was not too indefinite to constitute an enforceable contract and should not fail for lack of consideration).

Here, though, the grant agreements also do confer such a direct monetary benefit on the United States. Each grant requires the grantee to both *Buy* American and *Fly* American. Kodiak Decl. ¶¶ 3, 5 & Exh. B at 4, 10. These two clauses would, at a minimum, benefit the Government through any federal taxes paid on such products or airfares, as well as increasing the revenue of U.S. businesses in ways that may further increase revenues to the Government. Plaintiffs may quibble over the magnitude of this benefit, but contractual counterparties "decide for themselves what consideration is sufficient. If bargained for, a mere peppercorn satisfies." *Am. Ground Transp., Inc. v. United States*, 165 Fed. Cl. 659, 666 (2023); *see also Restatement (Second) of Contracts* § 79 (1981) ("If the requirement of consideration is met, there is no additional requirement of ... equivalence in the values exchanged.").

The grant agreements also confer on the government royalty-free rights to media created by the grantee, additional concrete consideration. Kodiak Decl. ¶¶ 3, 5 & Exh. B at 8 ("USDOL reserves a royalty-free non-exclusive and irrevocable right to obtain, copy, publish, or otherwise use such works [created or purchased with USDOL funds] for federal purposes and to authorize others to do so."); *see* 2 C.F.R. § 200.315(d) (reserving similar rights); *Thermalon Indus., Ltd. v. United States*, 34 Fed. Cl. 411, 415 (1995) (holding "a royalty-free license to the intellectual property resulting from the research" conducted under a grant agreement constitutes "significant consideration passed to the government").

Finally, broader policy aims achieved through grant agreements are sufficient consideration. *See United States v. President & Fellows of Harvard Coll.*, 323 F. Supp. 2d 151, 164 (D. Mass. 2004) ("[T]he Cooperative Agreements between Harvard and USAID constitute contracts to assist Russia in developing capital markets and foreign investments."). Indeed,

16

Plaintiffs here claim that the grant agreements fund programs to "protect workers and companies in the United States against unfair competition from companies and governments" that violate labor commitments "to gain an unfair advantage in the global marketplace." Compl. ¶ 1. Insofar as Plaintiffs' assertion is correct, reducing unfair trade practices provides tangible value, monetary and otherwise, to the United States Government.

The consideration provided to ILAB and the United States under the grant agreements thus distinguishes this case from Plaintiffs' authorities, Pls.' Mem. 14. *American Near East Refugee Aid v. U.S. Agency for International Development* addressed a cooperative agreement between USAID and a funding recipient used to construct clean water infrastructure in Palestine, and nothing in the agreements "granted USAID or other U.S. agencies access to or use of the new infrastructure." 703 F. Supp. 3d 126, 133 (D.D.C. 2023). The court emphasized that the agreement may only, at most, serve "an important U.S. foreign policy objective" without providing any possibility of the United States receiving "a financial benefit." *Id.* at 134. Here, on the other hand, ILAB receives savings and tangible benefits associated with trade agreement compliance monitoring and enforcement, documentation reflecting knowledge, monetary benefits for U.S. companies and thus monetary benefits to the Government, rights to media, and achievement of policy objectives that directly implicate the Nation's finances.[5]

To the extent Plaintiffs suggest that a cooperative agreement's title should be dispositive, that suggestion is wrong. *See* Pls.' Mem. 12–14. Both the Court of Federal Claims and its predecessor routinely recognized that the Tucker Act confers exclusive jurisdiction over disputes regarding grant and cooperative agreements that are otherwise contractual, regardless of the agreement's title. *See Thermalon*, 34 Fed. Cl. at 415 (Tucker Act confers jurisdiction over grant

---

[5] Plaintiffs also rely on *St. Bernard Parish Government v. United States*, which did not consider the removal of sediment in watershed following Hurricane Katrina a tangible benefit to the United States. 134 Fed. Cl. 730 (2017), *aff'd on other grounds*, 916 F.3d 987 (Fed. Cir. 2019). Other Courts of Federal Claims have appropriately rejected that reasoning as "not persuasive." *San Antonio Hous. Auth.*, 143 Fed. Cl. at 462. *Pacito v. Trump*, which Plaintiffs also cite, derived its "general[]" rule from *American Near East* and *St. Bernard Parish*. No. 2:25-CV-255, 2025 WL 893530, at *4 (W.D. Wash. Mar. 24, 2025), *appeal docketed*, No. 25-1939 (9th Cir. Mar. 25, 2025).

agreement); *D'Andrea Bros. LLC v. United States*, 96 Fed. Cl. 205, 214 (2010) (Tucker Act confers jurisdiction over cooperative research and development agreement); *Moore v. United States*, 48 Fed. Cl. 394, 397 (2000) ("[I]n cases involving grants and cooperative agreements, this court has often ... h[e]ld[] that jurisdiction exists."); *San Antonio Hous. Auth. v. United States*, 143 Fed. Cl. at 462 ("[A] number of Judges of this court have noted that a contract's classification as a cooperative or grant agreement does not determine whether this court has jurisdiction."); *Mo. Health and Med. Org., Inc. v. United States*, 641 F.2d 870, 873 (Ct. Cl. 1981) (Tucker Act jurisdiction over grant agreement under Public Health Service Act); *Texas v. United States*, 537 F.2d 466, 468–69 (Ct. Cl. 1976) (Tucker Act jurisdiction over Disaster Assistance Agreement under the Federal Disaster Act); *City of Wheeling, W. Va. v. United States*, 20 Cl. Ct. 659, 663–64 (Fed. Cl. 1990) (Tucker Act Jurisdiction over grant agreement under the Federal Water Pollution Control Act), *aff'd*, 928 F.2d 410 (Fed. Cir. 1991).

Again, much like their broad argument that artful pleading can overcome the Tucker Act's jurisdictional bar, Plaintiffs' view—that agreements funding "external projects that advance the agency's overall mission" cannot count as contracts—simply cannot be right. Pls.' Mem. 13–14.

*    *    *

At bottom, Plaintiffs want the Government to again pay them pursuant to the terms and conditions of grant agreements that they (i) assert were invalidly terminated (again, pursuant to those terms and conditions), and (ii) admit provided tangible benefits to the Government. As such, jurisdiction for Plaintiffs' claims, whether viewed as seeking "to order the payment of money under the APA" or seeking specific performance under their reinstated contracts, *Department of Education*, 145 S. Ct. at 968, lies exclusively in the Court of Federal Claims.[6]

---

[6] Even if this Court concludes that the Tucker Act does not foreclose jurisdiction over the entirety of this action, the Court must still dismiss Plaintiffs' claims that do sound in contract. That is because "the issues of sovereign immunity waiver and subject matter jurisdiction ... are two separate requirements which must be satisfied *for each claim*." *York Assocs., Inc. v. Sec'y of Hous. & Urb. Dev.*, 815 F. Supp. 16, 19 (D.D.C. 1993) (emphasis added). And "the doctrine of pendant jurisdiction cannot be used to waive the United States' sovereign immunity." *Wilkerson v. United*

## II.    Plaintiffs' constitutional claim (Count I) fails.

Plaintiffs' constitutional claim (Count I) is barred because of alternative remedies and because it is essentially statutory; it also should be rejected because entertaining it would intrude on the separation of powers.

### A.    A free-floating constitutional right of action is not available because of potential alternative remedies.

Plaintiffs' "*ultra vires*" challenge to Defendants' termination of their grant agreements fails at the threshold because there exists an alternative procedure for judicial review of it. A non-statutory *ultra vires* claim will not be recognized if there is a "meaningful and adequate means of vindicating" plaintiffs' rights. *Bd. of Governors of the Fed. Reserve Sys. v. MCorp Fin., Inc.*, 502 U.S. 32, 43 (1991). Here, for all the reasons that the Tucker Act precludes APA actions for claims that are in essence contractual, the Tucker Act also impliedly precludes a non-statutory equitable *ultra vires* action based on such claims. Plaintiffs can seek relief from the Court of Federal Claims, which can adequately vindicate their asserted rights by awarding damages if they prevail.

That must be the law, or else the *Megapulse* test would be easily evaded. On plaintiffs' novel theory, every breach-of-government-contract claim could be reframed as an *ultra vires* action against the relevant executive official, and plaintiffs could then circumvent the Tucker Act's remedial and jurisdictional limits in every case. In *Department of Education*, for example, plaintiffs could have simply argued that the Secretary of Education acted *ultra vires* in terminating their grants. *See* 145 S.Ct. 966. Or, in *Ingersoll-Rand*, the company could have just sued the Secretary of Defense for the *ultra vires* act of terminating its contract. *See* 780 F.2d 74. This is a transparent workaround, and this Court should not bless it.

---

*States*, 67 F.3d 112, 119 n.13 (5th Cir. 1995). In other words, where, as here, "there is no waiver" of sovereign immunity "except to have the claims heard in the Court of Claims," this Court cannot exercise jurisdiction over those claims merely if Plaintiffs have alleged other claims for which a distinct waiver of sovereign immunity exists. *Id.* That includes Plaintiffs' arbitrary-and-capricious claim (Count V) and any others insofar as they seek reinstatement of contracts. *See* Compl., Prayer for Relief ¶ b.

**B.    Plaintiffs' separation-of-powers claim is at most statutory, not constitutional, and meritless.**

This claim asserts that the same alleged statutory violations (USMCA Implementation Act and appropriations acts for relevant fiscal years) Plaintiffs plead under the APA (Counts II–IV) also violate Article I's vesting Clause. *See* Compl. ¶¶ 69–70; Pls.' Mem. 27–29. In other words, this claim repeats Plaintiffs' allegations concerning their statutory claims and nothing else. The Supreme Court has made clear that "claims simply alleging that the President has exceeded his statutory authority are not 'constitutional' claims, subject to judicial review...." *Dalton v. Specter*, 511 U.S. 462, 473 (1994). This keeps with the long tradition of "distinguish[ing] between claims of constitutional violations and claims that an official has acted in excess of his statutory authority." *Id.* at 472. Because Plaintiffs' separation-of-powers claim here simply relabels their allegation that ILAB acted in excess of its statutory duty, the claim is statutory.

In any event, the claim also is not viable. *Ultra vires* review of agency action "is intended to be of extremely limited scope." *N. Am. Butterfly Ass'n v. Wolf*, 977 F.3d 1244, 1262 (D.C. Cir. 2020). To prevail, Plaintiffs would have to show that the termination decisions "violated a specific prohibition in the statute that is clear and mandatory, was obviously beyond the terms of the statute, or was far outside the scope of the task that Congress gave it." *Id.* at 1263. *Ultra vires* review is thus reserved for the most "extreme agency error where the agency has stepped so plainly beyond the bounds of its statutory authority, or acted so clearly in defiance of it, as to warrant the immediate intervention of an equity court." *Fed. Express Corp. v. U.S. Dep't of Commerce*, 39 F.4th 756, 763 (D.C. Cir. 2022). These are claims of last resort, and they "rarely succeed[]." *Nyunt v. Chairman, Broadcasting Bd. of Govs.*, 589 F.3d 445, 449 (D.C. Cir. 2009).

Plaintiffs' *ultra vires* argument falls far short of the "nearly insurmountable" showing necessary to succeed on such claims. *Dep't of Justice v. FLRA*, 981 F.2d 1339, 1343 (D.C. Cir. 1993). The agency errors Plaintiffs identify are ILAB's individual decisions to terminate their grants. But, as discussed above, nothing in the appropriations statutes prohibited ILAB from doing so, let alone in a "clear and mandatory" way. *N. Am. Butterfly*, 977 F.3d at 1263. To the contrary,

20

it would be absurd to read the statutes as prohibiting ILAB from terminating grants once they were awarded, and even the contracting parties did not believe that (which is why they included a termination provision in the grants). *See supra* Part I.; Kodiak Decl. ¶¶ 3, 5 & Exh. B at 2.

Again, Plaintiffs are not funded through direct congressional appropriations; rather, they are explicitly funded through grant agreements. Execution of those grant agreements—and their termination—is governed by the applicable grant terms. To the extent ILAB's conduct under those grant agreements is reviewable—as Defendants argue, in the Court of Federal Claims—their funding through broad appropriations does not inject statutory—let alone constitutional—dimensions into this contractual challenge to ILAB's execution of those agreements. At base, while the amount of ILAB's overall grant *program* is set by appropriations law, the amount of any grant *agreement* is set by the terms of that agreement. And the performance of that grant agreement is governed by the grant agreement's terms. Plaintiffs conflate that distinction. But recognizing that distinction gives meaning to both the Congressional appropriations statutes and Congress's determination that the program be executed through appropriate grant agreements.

### C.    Plaintiffs' requested relief threatens the separation of powers.

Any separation-of-powers problem in this case stems from *Plaintiffs'* requested relief—that is, for this Court to superintend an Executive Branch instrument of foreign affairs.

ILAB here determined, consistent with the President's direction, that the grants in question were no longer aligned with agency priorities and the national interest. And under Article II of the Constitution, the President and his subordinates have broad authority to attend to the foreign affairs of the Nation, including by determining how foreign aid funds are used. *See Zivotofsky ex rel. Zivotofsky v. Kerry*, 576 U.S. 1, 21 (2015) (citing *Youngstown Sheet & Tube Co. v. Sawyer*, 343 U.S. 579, 635–638 (1952) (Jackson, J., concurring)). Accordingly, while the Executive is "not free from the ordinary controls and checks of Congress merely because foreign affairs are at issue," *Zivotofsky*, 576 U.S. at 21, the "historical gloss on the 'executive Power' vested in Article II of the Constitution has recognized the President's 'vast share of responsibility for the conduct of our foreign relations,'" *Am. Ins. Ass'n v. Garamendi*, 539 U.S. 396, 414 (2003) (quoting *Youngstown*,

21

343 U.S. at 610–11 (Frankfurter, J., concurring)). Thus, "in foreign affairs the President has a degree of independent authority to act." *Id.*; *see also United States v. Curtiss-Wright Exp. Corp.*, 299 U.S. 304, 320 (1936) (The President's power in the field of international relations "does not require as a basis for its exercise an act of Congress."); *Youngstown*, 343 U.S. at 635 & n.2 (the President can "act in external affairs without congressional authority" (Jackson, J., concurring)).

Plaintiffs' contention that the Executive Branch is infringing on Congress's power of the purse is therefore incorrect *even if* funding for the specific grant agreements at issue here were congressionally mandated (and it is not). *See* Pls.' Mem. 29. "[I]f a congressional directive to spend were to interfere with the President's authority in an area confided by the Constitution to his substantive direction and control, such as his authority ... over foreign affairs ... a situation would be presented very different from [a domestic impoundment]." Mem. from William H. Rehnquist, Assistant Attorney General, Office of Legal Counsel, *Re: Presidential Authority to Impound Funds Appropriated for Assistance to Federally Impacted Schools*, 1 Suppl. Op. O.L.C. 303, 310–11 (1969).[7] Defendants' actions not only fit comfortably within the Executive Branch's unique expertise and constitutional role as to foreign affairs but also dovetail with its unreviewable discretion not to take action. *Cf. Heckler v. Chaney*, 470 U.S. 821 (1985). It is precisely the sort of conduct that a federal court should not disrupt absent a specific, valid, and binding congressional direction to the contrary.

Moreover, Plaintiffs' request that this Court supervise ILAB's foreign assistance grants by ordering specific performance of grant agreements would create a grave separation-of-powers problem. Diplomacy and foreign relations fall within the "plenary and exclusive power of the President as the sole organ of the federal government in the field of international relations." *Curtiss-Wright*, 299 U.S. at 320; *see Schneider v. Kissinger*, 412 F.3d 190, 195 (D.C. Cir. 2005) ("It cannot ... be denied that decision-making in the areas of foreign policy and national security is textually committed to the political branches."); *Bancoult v. McNamara*, 445 F.3d 427, 433

---

[7] To be clear, Defendants' position is that no impoundment has taken place. *See infra* Part III.C.2.

(D.C. Cir. 2006) ("[A]n extensive list of constitutional provisions ... entrusted foreign affairs and national security powers to the political branches[.]"); *Chi. & S. Air Lines, Inc. v. Waterman S.S. Corp.*, 333 U.S. 103, 111 (1948) ("[T]he very nature of executive decisions as to foreign policy is political, not judicial. Such decisions are wholly confided by our Constitution to the political departments of the government, Executive and Legislative."); *Johnson v. Eisentrager*, 339 U.S. 763, 789 (1950) (noting that the President is "exclusively responsible" for "conduct of diplomatic and foreign affairs"); *Harisiades v. Shaughnessy*, 342 U.S. 580, 589 (1952) (matters relating "to the conduct of foreign relations ... are so exclusively entrusted to the political branches of government as to be largely immune from judicial inquiry or interference"); *Worthy v. Herter*, 270 F.2d 905, 911 (D.C. Cir. 1959) ("It is settled that in respect to foreign affairs the President has the power of action and the courts will not attempt to review the merits of what he does. The President is the nation's organ in and for foreign affairs."). For these reasons, as mentioned above, injunctive relief related to the President's oversight of ILAB, an instrument of foreign affairs, may be awarded only upon "an extraordinarily strong showing" as to each element, because such relief "deeply intrudes into the core concerns of the executive branch." *See Adams*, 570 F.2d at 954–55.

*     *     *

Once again, Plaintiffs press an overbroad rule—that *any* alleged statutory violation by the Executive Branch violates Article I's vesting Clause and creates an *ultra vires* claim—that attempt to artfully plead around the fundamental problems with their claim, however, fails.

## III.    Plaintiffs' APA claims (Counts II–V) fail.

Plaintiffs advance two types of APA claims: that the grant terminations are contrary to one or more statutes (Counts II–IV) and are arbitrary and capricious (Count V). Compl. ¶¶72–83; Pls.' Mem.18–27. Plaintiffs move for summary judgment as to the former and for a preliminary injunction as to the latter. Plaintiffs are not entitled to either because APA review is unavailable or, alternatively, because the grant agreement terminations were lawful.

### A.    APA review is unavailable because of potential alternative remedies.

Review under the APA is available only where "there is no other adequate remedy in a

court." 5 U.S.C. § 704. That requirement reflects that "Congress did not intend the general grant of review in the APA to duplicate existing procedures for review of agency action." *Bowen v. Massachusetts*, 487 U.S. 879, 903 (1988). As the D.C. Circuit has observed, "the alternative remedy need not provide relief identical to relief under the APA, so long as it offers relief of the 'same genre.'" *Garcia v. Vilsack*, 563 F.3d 519, 522 (D.C. Cir. 2009) (citation omitted). Accordingly, if there exists an alternative adequate remedy, a plaintiff lacks a cause of action under the APA. *See Perry Cap., LLC v. Mnuchin*, 864 F.3d 591, 621 (D.C. Circ. 2017); *see also Versata Dev. Corp. v. Rea*, 959 F. Supp. 2d 912, 927 (E.D. Va. 2013) (dismissing putative APA claim because decision at issue was not a final agency action and an alternative adequate remedy existed by way of appeal to the Federal Circuit), *aff'd*, 793 F.3d 1352 (Fed. Cir. 2015).

**1.** As explained *supra* Part I., all of Plaintiffs' APA claims at their core allege a breach of contract. Because the Tucker Act provides specified remedies for such contractual claims, the Supreme Court in *Department of Education* acknowledged that Plaintiffs have an adequate alternative. Plaintiffs are therefore barred from bringing these APA claims in federal district court.

**2.** And as explained *infra* Part III.C.2., Plaintiffs' Impoundment Control Act claim (Count III) fails because that statute provides for the Comptroller to enforce it, not private parties.

### B.    Termination of these agreements is committed to agency discretion by law.

APA review of Plaintiffs' grant-termination claims is alternatively foreclosed because such terminations are quintessential agency actions "committed to agency discretion by law," for which the APA does not provide an avenue for review. 5 U.S.C. § 701(a)(2). The Supreme Court has long recognized that an agency's determination of how to allot appropriated funds among competing priorities and recipients—precisely what Plaintiffs challenge here—is classic discretionary agency action. *See Lincoln* v. *Vigil*, 508 U.S. 182, 193 (1993).

In *Lincoln*, the Supreme Court held that the Indian Health Service's decision to discontinue a program it had previously funded and to instead reallocate those funds to other programs was committed to agency discretion by law and thus not reviewable under the APA. *Id.* at 185–88, 193. The Court explained that the "allocation of funds from a lump-sum appropriation" is an

"administrative decision traditionally regarded as committed to agency discretion," because the "very point of a lump-sum appropriation is to give an agency the capacity to adapt to changing circumstances and meet its statutory responsibilities in what it sees as the most effective or desirable way." *Id.* at 192. "[A]n agency's allocation of funds from a lump-sum appropriation requires 'a complicated balancing of a number of factors which are peculiarly within its expertise': whether its 'resources are best spent' on one program or another; whether it 'is likely to succeed' in fulfilling its statutory mandate; whether a particular program 'best fits the agency's overall policies'; and, 'indeed, whether the agency has enough resources' to fund a program 'at all.'" *Id.* at 193 (quoting *Heckler*, 470 U.S. at 831). "Of course," such discretion is not unbounded, because "an agency is not free simply to disregard statutory responsibilities: Congress may always circumscribe agency discretion to allocate resources by putting restrictions in the operative statutes." *Id.* But as long as the agency abides by the relevant statutes (and whatever self-imposed obligations may arise from regulations or grant instruments), the APA "gives the courts no leave to intrude" via arbitrary-and-capricious review. *Id.* Congress made only lump-sum appropriations to ILAB, and *Lincoln* controls here.

Relatedly, courts have found that Section 701(a)(2) precludes review where, as here, "a court would have no meaningful standard against which to judge the agency's exercise of discretion," *id.* at 191 (quoting *Heckler*, 470 U.S. 830), including situations where the agency decision "involves a complicated balancing of a number of factors which are peculiarly within its expertise." *Id.* (quoting *Heckler*, 470 U.S. at 831). ILAB's agency priorities—and the determination of whether a given grant agreement is in accord with those priorities—is uniquely within the expertise of the ILAB. As such, the termination of a grant agreement as no longer effectuating agency priorities is committed to agency discretion by law.

C.    **Defendants' actions are not contrary to statute (Counts II–IV).**

Across the handful of appropriations statutes that Plaintiffs invoke, Plaintiffs are unable to identify either (i) a statutory obligation as to specific funds owed to Plaintiffs or services to be provided by Plaintiffs, or (ii) a statutory prohibition on terminating any particular grant or service.

This is fatal to their statutory arguments. Simply put, they are not entitled *under any statute* to the funds they were awarded *under specific grant agreements* authorized (but not specifically required) by statute.

**1.** The appropriations in Plaintiffs' cited statutes are not *to* any of the Plaintiffs; rather, the appropriations are *to* ILAB. And, since there is no statutory directive to the contrary, ILAB—having received its appropriation from Congress—has unreviewable "capacity to adapt to changing circumstances and meet its statutory responsibilities in what it sees as the most effective or desirable way." *Lincoln*, 508 U.S. at 192. Indeed, Plaintiffs admit that "the appropriations statutes … provide Defendants with *wide latitude in both substance and form*, giving the agency multiple ways to implement these programs and providing only broad guidelines on the types of international labor issues to be targeted." Pls.' Mem. 24–25 (emphasis added).

In other words, Plaintiffs cannot challenge their access to funding via the agency's general, programmatic appropriations. Nor can they challenge other non-parties' access to funding via the appropriations channel because, as discussed below they also lack standing to do so. *See infra* Part IV.C. Fundamentally, Plaintiffs are not funded through direct congressional appropriations; rather, they are solely funded through grant agreements awarded at ILAB's discretion. Execution and termination of those grant agreements are governed by the applicable grant agreements, not by any appropriations statute. Defendants' conduct under those grant agreements may be reviewable—as Defendants argue, in the Court of Federal Claims—but their mere funding (here, indirectly) through an appropriation does not mean that the routine execution of that individualized grant agreement takes on statutory dimensions.

**2.** Plaintiffs' Impoundment Control Act and Anti-Deficiency Act claims (Counts III and IV) fail because there is another specific procedural alternative that precludes APA review of the former, and because neither statute is applicable to the circumstances here. Instead, Plaintiffs' arguments reflect a fundamental misunderstanding of appropriations law. As relevant here, both statutes address when and how the President or OMB may determine that congressionally appropriated funds should be withheld or reserved from certain programs for one reason or another.

*See* 2 U.S.C. § 683; 31 U.S.C. § 1512.

The Impoundment Control Act of 1974, Pub. L. No. 93-344, tit. X, 88 Stat. 297, 333 (1974) (codified as amended at 2 U.S.C. §§ 681 *et seq.*), under 2 U.S.C. § 687, provides for enforcement by the Comptroller General (an official in the Legislative Branch), not private parties under 2 U.S.C. § 687. Accordingly, courts have held that private plaintiffs cannot bring suit for alleged violations of the Impoundment Control Act. *See Gen. Land Off.*, 722 F. Supp. 3d at 734 (citing 2 U.S.C. § 687) ("In short, an alleged ICA violation has only one proper plaintiff: the Comptroller General."); *Pub. Citizen v. Stockman*, 528 F. Supp. 824, 830 n.1 (D.D.C. 1981); *cf. Trump v. Sierra Club*, 140 S. Ct. 1 (2019). So too should this Court. *Gen. Land Off.*, 722 F. Supp. 3d at 735 (finding such a claim "unreviewable").

The Impoundment Control Act also is inapplicable. Individual grant agreement terminations do not constitute a rescission, reservation, or deferral under the Act, but are simply the cancelations of contracts. Plaintiffs conflate two separate, yet lawful, steps in a fruitless attempt to fashion an Impoundment Control Act claim. First, ILAB canceled grant agreements. Second, a statute then prohibited the agency from creating new, untimely obligations of the same funds under the expired appropriations. *See* 31 U.S.C. §§ 1502(a), 1553(a); Pls.' Mem. 20. The remaining funds therefore are not impounded in any sense of that statute; once the agreements were terminated, the funds could not be impounded; rather, they became unavailable by law.

Plaintiffs do not meaningfully dispute the agency's authority to cancel grant agreements in general. Nor could they: the agreements contained an express termination provision. Kodiak Decl. ¶¶ 3, 5 & Exh. B at 2. Plaintiffs' complaint is about specific cancelations and whether they were appropriate under the agreement, not under any statute. If all such specific cancelations constituted Impoundment Control Act claims, then it would make no sense for Congress to require their enforcement by the Comptroller General, as opposed to private parties. *Contra* 2 U.S.C. § 687. And it would create an absurd outcome: an agency would be *permanently* barred from canceling a grant, no matter how problematic the grant or lawful the cancelation, as soon as the availability period of its appropriations ran out (typically after a single fiscal year). In other words, because

27

any termination after the availability period would be ineligible for re-obligation, the Impoundment Control Act would prevent termination. They cite no authority for this novel and severe limit on the Government's grantmaking authority.[8]

ILAB was fully entitled to cancel these grants, to which Plaintiffs have failed to identify any *statutory* entitlement. *See supra* Part III.C.1. Then, the agency, having terminated Plaintiffs' grants, could not (as Plaintiffs concede) lawfully obligate remaining funds for new awards, because appropriations law does not allow for the making of new grants using expired funds. *See* Pls.' Mem. 20. Those expired funds are not impounded; they are simply unavailable for obligation, and the agency is following the law by not re-obligating them.

This understanding also is more consistent with the Impoundment Control Act's terms, where "budget authority" for ILAB's cooperative grant agreement program was "made available for obligation," thereby satisfying the Act. 2 U.S.C. § 683. It was appropriated to ILAB by Congress, apportioned by OMB, obligated by the agency to Plaintiffs' cooperative agreements (among others'), and then paid through outlays pursuant to the agreement terms. Now, by virtue of the terminations, *another* statute operates to render the funds unavailable for re-obligation. *See* 31 U.S.C. §§ 1502(a), 1553(a); Pls.' Mem. 20. This correct understanding also avoids the absurd results of Plaintiffs' argument, which would turn the cancelation of any multi-year grant or contract into a freestanding Impoundment Control Act problem regardless of the terms of the agreement or the justification for the cancelation.

**3.** Plaintiffs' Anti-Deficiency Act claim is similarly based on a misunderstanding of

---

[8] The authorities Plaintiffs do cite are inapposite. *See* Pls.' Mem. 18. *Kendall v. United States* predated the Tucker Act by half a century and addressed payments owed for "services rendered," not the kind of prospective terminations at issue here. 37 U.S. (12 Pet.) 524, 548 (1838). *AIDS Vaccine Advocacy Coalition v. Department of State* addressed an alleged "immediate suspension of all congressionally appropriate foreign aid," not a discrete universe of contract terminations like at issue here. No. CV 25-00400 (ADA), 2025 WL 752378, at *1, *3 (D.D.C. Mar. 10, 2025), *appeal filed*, No. 25-5098 (D.C. Cir. Apr. 2, 2025). And *National Council of Community Mental Health Centers, Inc. v. Weinberger* addressed a prospective denial of all *new* grants for which funds had been appropriated, not the retrospective termination of *existing* grants. 361 F. Supp. 897, 901 (D.D.C. 1973)

appropriations law. They argue that ILAB has created a "reserve" under the statute by canceling their grant agreements. Pls.' Mem. 22. But the apportionment and establishment of a reserve may only be carried out by the Office of Management and Budget, *not* by individual agencies like DOL or ILAB. 31 U.S.C. §§ 1512(b)(2); 1513(b)(1); *see Ctr. for Pub. Integrity v. Dep't of Def.*, 486 F. Supp. 3d 317, 333 (D.D.C. 2020) (describing "apportionment" as "one of the *OMB's* core responsibilities"); OMB Circular A-11, sec. 120 (July 2024).[9] OMB is not a defendant in this action, so Plaintiffs' Anti-Deficiency Act claim must fail.

Additionally, Plaintiffs have not established that any "reserve" has been created within the meaning of the Act. Their motion merely assumes that ILAB has created such a reserve. Pls.' Mem. 22. So does the Complaint. Compl. ¶¶ 81–83. At most, Plaintiffs apparently believe that a solitary social media post by a government office outside both OMB and DOL stating that the terminations resulted "in savings" may equate with creating a "reserve." Compl. ¶¶ 54, 58. But Plaintiffs cite no evidence that OMB has invoked the Anti-Deficiency Act or created a reserve. Nor could they because OMB only apportions budgetary resources that are *available* for obligation and, as explained, the funds remaining to be obligated to Plaintiffs' terminated agreements are *unavailable* for re-obligation by law. *See* 31 U.S.C. §§ 1502(a), 1553(a); Pls.' Mem. 20. They cannot lawfully be put in a reserve, so the Act has no relevance to these circumstances.

### D.    Defendants' actions are not arbitrary and capricious (Count V).

Even if APA review were available, Defendants' actions are fully consistent with their obligations under that statute. Termination of the grant agreements is governed by their terms. Those terms permit termination (*i.e.*, include authority to "withdraw the award," Kodiak Decl. ¶¶ 3, 5 & Exh. B at 2 (citing 2 C.F.R. § 200.340)), "if an award no longer effectuates the program goals or agency priorities," 2 C.F.R. § 200.340. Plaintiffs repeatedly admit that ILAB provided that exact justification for terminating each individual grant. Pls.' Mem. 7, 23 n.7. In other words, the agency determined that the grants were "inconsistent with the agency's priorities," including

---

[9] Apportionment discretion also is so broad as to be committed to OMB's discretion. 31 U.S.C. § 1512(b)(2) ("as the official considers appropriate").

the President and OMB's directives to ensure the activities carried out under these agreements make America safer, stronger, and more prosperous. And again, Plaintiffs also admit that ILAB has "wide latitude in both substance and form, giving the agency multiple ways to implement these programs and providing only *broad guidelines* on the types of international labor issues to be targeted." Pls.' Mem. 24–25 (emphasis added). Plaintiffs' claim amounts to a difference of opinion, which does not constitute an APA violation. *See Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983). That policy quarrel is with the agency or with Congress. It does not belong in the courts.[10]

## IV.    Plaintiffs are not entitled to their requested relief.

Whether under the Counts being considered for partial summary judgment (I–IV) or for preliminary relief (V), Plaintiffs must establish irreparable harm and that the balance of the equities and public interest favor injunctive relief. *See Anatol Zukerman & Charles Krause Reporting, LLC v. U.S. Postal Serv.*, 64 F.4th 1354, 1364 (D.C. Cir. 2023) (permanent injunction); *Hi-Tech Pharmacal Co. v. FDA*, 587 F. Supp. 2d 1, 11 (D.D.C. 2008) (preliminary injunction). They cannot establish either, so their motion should be denied. If this Court determines otherwise, it still should limit relief to, at most, Plaintiffs' own grant agreements; require Plaintiffs to post security in connection with any preliminary injunctive relief (Count V); and stay relief pending the Government's determination of whether to appeal. These steps are needed to ensure the retrievability of any funds this Court orders to be disbursed.

### A.    Plaintiffs' alleged injuries can be remedied at law.

Plaintiffs fail to establish that they will suffer irreparable harm absent injunctive relief. To demonstrate irreparable harm, Plaintiffs must meet a "high standard" and show that they face injuries that are "certain, great, actual, and imminent," *Hi-Tech Pharmacal Co.*, 587 F. Supp. 2d

---

[10] Plaintiffs do not clearly articulate or provide any authority for an argument to amalgamate the termination decisions (either the 15 for their own agreements or for unspecified others with non-parties) and substantively review them "en masse." Pls.' Mem. 22. Nor could they. Not only do Plaintiffs lack standing as to other grantee's termination decisions, but the agency also rendered individual termination decisions as to each grant agreement, so each is a discrete agency action.

at 11, and "beyond remediation," *Chaplaincy of Full Gospel Churches v. England*, 454 F.3d 290, 297 (D.C. Cir. 2006). Merely economic harms are not beyond remediation. *Wis. Gas Co. v. FERC*, 758 F.2d 669, 674 (D.C. Cir. 1985) (per curiam).

Plaintiffs identify several harms that relate to their lack of access to grant funds, in the form of harms to their operations and efforts to fulfill their missions. Pls.' Mem. 29–31. But "[m]ere injuries, however substantial, in terms of money, time and energy necessarily expended ... are not enough." *Chaplaincy of Full Gospel Churches*, 454 F.3d at 297 (quoting *Wis. Gas Co.*, 758 F.2d at 674). Rather, it is black-letter law that economic harm is generally *not* irreparable because compensation after the lawsuit generally ensures full relief. *Wis. Gas Co.*, 758 F.2d at 674 (describing that principle as "well-settled"). The only exceptions are "where the loss threatens the very existence of the movant's business," *id.*, or "where the claimed economic loss is unrecoverable," *Safari Club Int'l v. Jewell*, 47 F. Supp. 3d 29, 36 (D.D.C. 2014) (citation omitted).

The *first* exception is a narrow one—it encompasses only cases where the plaintiffs demonstrate "extreme hardship to the business." *Gulf Oil Corp. v. Dep't of Energy*, 514 F. Supp. 1019, 1025 (D.D.C. 1981). Plaintiffs may be forced to make difficult choices in critical areas of their operations without incurring irreparable harm sufficient to warrant injunctive relief. *Cf. Boivin v. U.S. Airways, Inc.*, 297 F. Supp. 2d 110, 119 (D.D.C. 2003) ("[T]he forced sale of a house . . . do[es] not rise to the level of 'irreparable' harm necessary to warrant the extraordinary remedy of a preliminary injunction."). And Plaintiffs must substantiate any alleged threat to the *business's* very existence with specific details. *Nat'l Mining Ass'n v. Jackson*, 768 F. Supp. 2d 34, 52 (D.D.C. 2011) (plaintiff needed to "offer a projection of anticipated future losses, tie that to an accounting of the company's current assets, [and] explain with ... specificity how he arrived at the conclusion that he would be forced out of business in eighteen months" to show irreparable harm on this theory).

Here, Plaintiffs assert that a lack of funds may result in Plaintiffs shutting down or suspending certain programs, but not any of their three businesses. Pls.' Mem. 29–31. None has stated that it anticipates closing its doors. And none has offered a meaningful explanation for why,

31

if payments were obtained following an action under the Tucker Act in the Court of Federal Claims, they would not be able to restart those programs. Accordingly, Plaintiffs have not offered "proof" that they will cease to exist absent injunctive relief. *Wis. Gas Co.*, 758 F.2d at 674.

Ultimately, even if Plaintiffs can claim some threat of harm, there is no reason why they cannot vindicate that threatened harm through a lawsuit challenging particular funding terminations in the correct court. Their declarations do not establish the need for broad injunctive relief in a single lawsuit as would be required to obtain the relief sought here. Furthermore, Plaintiffs' claim several monetary harms that can be mitigated through the authorization they have received to incur closeout costs chargeable to the Government. *See* Kodiak Decl. ¶ 2 & Exh. A (Examples include "rental costs under expired leases, claims under subawards and accounting, legal, clerical, and similar costs reasonably necessary for the preparation and presentation to ILAB of settlement claims and supporting data with respect to the terminated portion of the Federal award.").

The *second* exception, for monetary harms unrecoverable because a defendant enjoys sovereign immunity, likewise does not apply. As discussed above, Plaintiffs' economic injuries are reparable through the Tucker Act for contract disputes concerning monetary payments. *Supra* Part I. Sovereign immunity is not an obstacle for monetary recovery on Plaintiffs' claims because of that statute. *See United States v. Bormes*, 568 U.S. 6, 10 (2012) (explaining that the Little Tucker Act and the Tucker Act are "jurisdictional provisions that operate to waive sovereign immunity"). Plaintiffs' strategic choice to plead only other causes of action does not evade that truth.

Plaintiffs also claim "reputational harm" because of Defendants' conduct. Pls.' Mem. 31. But "[t]he loss of business opportunities, market share, and customer goodwill are typically considered to be economic harms"—and therefore recoverable. *Air Transp. Ass'n of Am., Inc. v. Exp.-Imp. Bank of the U.S.*, 840 F. Supp. 2d 327, 335 (D.D.C. 2012). Further, the alleged harm must "directly result from the action which the movant seeks to enjoin." *Wis. Gas Co.*, 758 F.2d at 674. When a harm is "based on independent market variables such as how [a company's] customers and/or retail consumers might react," that harm does not flow directly from the

challenged action. *Am. Meat Inst. v. USDA*, 968 F. Supp. 2d 38, 81 (D.D.C. 2013), *aff'd*, 746 F.3d 1065 (D.C. Cir. 2014); *see Safari Club Int'l*, 47 F. Supp. 3d at 37. Here, it also requires speculation regarding those expected reactions, which may ascribe blame to Defendants rather than Plaintiffs.

Lastly, Plaintiffs' "extensive delay in seeking a preliminary injunction weighs heavily against a finding of irreparable harm." *Maldonado v. D.C.*, 2019 WL 6877913, at *3 (D.D.C. Dec. 16, 2019) (denying preliminary injunction in part because of lack of harm due to delay). Any possible injury would have first accrued after Plaintiffs learned of the terminations in mid-March. *See supra* Background Part 3. Yet Plaintiffs waited 52 days from the first termination notice at issue and 38 days from the last to seek a preliminary injunction. On that basis alone, Plaintiffs' preliminary injunction should be denied. *See Open Top Sightseeing USA v. Mr. Sightseeing*, LLC, 48 F. Supp. 3d 87, 90 (D.D.C. 2014) ("The D.C. Circuit has found that a delay of forty-four days before bringing action for injunctive relief was "inexcusable," and "bolstered" the "conclusion that an injunction should not issue" (quoting *Fund for Animals v. Frizzell*, 530 F.2d 982, 987 (D.C.Cir.1975)); *Mylan Pharms., Inc. v. Shalala*, 81 F. Supp. 2d 30, 44 (D.D.C. 2000) (two-month delay weighed against harm).

**B.    The balance of the equities and public interest disfavor injunctive relief.**

A permanent injunction also is not appropriate because the balance of the equities and the public interest tip in Defendants' favor. *See Nken v. Holder*, 556 U.S. 418, 435 (2009) ("These factors merge when the Government is the opposing party."). Plaintiffs primarily rely on assuming they prevail on their claims' merits, Pls.' Mem. 31–32, but there are several reasons why injunctive relief would be inappropriate even if that incorrect assumption were true.

The public has an interest in ensuring that tax dollars are not spent towards foreign projects that are inconsistent with American interests. And the agency determined that the grants at issue were "inconsistent with the agency's priorities" and the President and OMB's directives to ensure ILAB's activities make America safer, stronger, and more prosperous. An injunction would displace and frustrate the Executive Branch's decisions about how to best address these questions in the arena of foreign affairs, an area where courts must give deference to the Executive Branch's

"evaluation of the facts" and the "sensitive and weighty interests of ... foreign affairs," *Holder v. Humanitarian L. Project*, 561 U.S. 1, 33–34 (2010), including "the timing of those ... decisions." *Holy Land Found. for Relief & Dev. v. Ashcroft*, 219 F. Supp. 2d 57, 74 n.28 (D.D.C. 2002), *aff'd*, 333 F.3d 156 (D.C. Cir. 2003).

In another case seeking preliminary equitable relief against a federal agency, this Court recognized that "thwarting the lawful exercise of authority of a duly appointed official would be inequitable and disserve the public interest." *Open Tech. Fund v. Pack*, 470 F. Supp. 3d 8, 31 (D.D.C. 2020), *opinion vacated on other grounds*, *appeal dismissed*, No. 20-5195, 2021 WL 11096700 (D.C. Cir. Mar. 16, 2021). As Plaintiffs recognize, the public has a strong interest in Defendants abiding by the law. Pls.' Mem. 32. Plaintiffs' requested injunctive relief would effectively disable the agency, as well as the President himself, from implementing the President's priorities consistent with their legal authorities. "Any time a [government] is enjoined by a court from effectuating statutes enacted by representatives of its people, it suffers a form of irreparable injury." *Maryland v. King*, 567 U.S. 1301, 1303 (2012) (Roberts, C.J., in chambers) (brackets and quotation omitted).

Additionally, where the Government is legally entitled to make decisions about the disbursement or allocation of federal funds but is nonetheless ordered to release the funding, such funds may not be retrievable afterwards. *See Department of Education*, 145 S. Ct. at 968–69 (noting "the Government's representation that it is unlikely to recover the grant funds once they are disbursed" as among the reasons supporting a stay of a temporary restraining order enjoining the Government from terminating various education-related grants). Indeed, the Supreme Court's decision in *Department of Education* indicates that the balance of harms favors the Defendants in this case rather than Plaintiffs. *See id.* As here, "[n]o grantee promised to return withdrawn funds should its grant termination be reinstated,' and the District Court [has not yet imposed a] bond." *Id.* at 969.

Meanwhile, Plaintiffs, as discussed above, will suffer no cognizable irreparable harm from the denial of their motion, as each of the potential harms that Plaintiffs identify is economic, and therefore inherently not irreparable. Indeed, Plaintiffs voluntarily contracted with ILAB under grant agreements that contained clauses explicitly permitting the agency to terminate those agreements based on changed agency priorities.

### C.    Any relief must be limited to redress only *Plaintiffs'* alleged injuries.

For the reasons explained above, Plaintiffs are not entitled to any relief. But if the Court concludes otherwise, the relief granted both "must be narrowly tailored to remedy the specific harm shown," *Neb. Dep't of Health & Hum. Servs. v. U.S. Dep't of Health & Hum. Servs.*, 435 F.3d 326, 330 (D.C. Cir. 2006), and "should be no more burdensome to the defendant than necessary to provide complete relief to the plaintiffs," *Madsen v. Women's Health Ctr., Inc.*, 512 U.S. 753, 765 (1994). Indeed, it is well-established that "standing is not dispensed in gross," such that "'plaintiffs must demonstrate standing for each claim that they press' against each defendant, 'and for each form of relief that they seek.'" *Murthy v. Missouri*, 603 U.S. 43, 61 (2024) (quoting *TransUnion LLC v. Ramirez*, 594 U.S. 413,431 (2021)). Accordingly, for each claim, against each Defendant, and for each form of relief sought, Plaintiffs must show "an injury that is 'concrete, particularized, and actual or imminent; fairly traceable to the challenged action; and redressable by a favorable ruling.'" *Id.* at 57 (quoting *Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 409 (2013)). And at the summary judgment stage, Plaintiffs "can no longer rest on ... 'mere allegations,' but must 'set forth' by affidavit or other evidence 'specific facts'" to show standing. *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 561 (1992).

Plaintiffs fail to make these necessary showings for the following forms of relief sought in the Complaint: (i) a declaration that Defendants lacked legal authority to terminate agreements beyond those awarded to Plaintiffs; (ii) an order vacating Defendants' termination notices for agreements beyond those awarded to Plaintiffs; (iii) an order requiring Defendants to reinstate terminated agreements beyond those awarded to Plaintiffs; and (iv) an order prohibiting Defendants from terminating any agreements beyond those awarded to Plaintiffs during the course

of the litigation. *See* Compl., Prayer for Relief ¶¶ a, b; Pls.' Mot. 1 ("all cooperative agreements").

Although Plaintiffs broadly assert that termination of "ILAB's entire portfolio of international technical assistance projects … has caused and continues to cause Plaintiffs significant harm," Pls.' Mem. 8, the Complaint and motion make clear that the only harms they press stem from termination of their specific grants (*i.e.*, the 15 described at Pls.' Mem. 5–6, 19). Indeed, in their next sentence, Plaintiffs pivot to focusing on "their DOL awards," not grants made to any non-party. Pls.' Mem. 8. And they continue to focus on "their funding," "Plaintiffs' work" and "their projects" throughout their allegations about harm. Pls.' Mem. 9; *see* Compl. ¶¶61–67 (lacking any allegation of injury based on grant terminations other than Plaintiffs' own).

In sum, Plaintiffs improperly ask the Court to remedy not just harm "to Plaintiffs" but "on a global scale." Pls.' Mem. 2. That drastic and indefinite remedy is not "tailored to redress" Plaintiffs' "particular injury," *Gill v. Whitford*, 585 U.S. 48, 73 (2018), and this Court should hold that Plaintiffs lack Article III standing to seek relief on behalf of non-parties for unspecified grant terminations that Plaintiffs have not alleged harm them in any plausible, let alone concrete, way.

### D.     Plaintiffs should be ordered to post security in connection with any preliminary injunctive relief (Count V).

To the extent the Court issues any preliminary injunctive relief under Count V, Defendants respectfully request the requirement of a reasonable bond, per Fed. R. Civ. P. 65(c), because of the financial damages and other costs of that injunction to Defendants. As Plaintiffs are seeking the disbursement of grant funds, the Court should order the posting of a bond equal to the size of any payment that the Court orders on a preliminary basis here. *Nat'l Treasury Emps. Union, v. Trump*, No. 25-5157, 2025 WL 1441563, at *3 (D.C. Cir. May 16, 2025) ("clarify[ing] that injunction bonds are generally required"). Without such a protective measure, there may be no way to recover the funds lost to United States taxpayers if the Court were later to find that Defendants were "wrongfully enjoined." *See Department of Education*, 145 S. Ct. at 968–69 ("respondents have not refuted the Government's representation that it is unlikely to recover the grant funds once they are disbursed. No grantee promised to return withdrawn funds should its grant termination be

reinstated, and the District Court declined to impose bond" (quotation omitted)).

**E.     This Court should stay any relief pending the Government's determination of whether to appeal.**

Finally, should the Court enter relief, Defendants request that the Court stay any order pending appeal or, at a minimum, enter a seven-day administrative stay to allow the Solicitor General to determine whether to authorize an appeal and seek emergency appellate relief.

## <u>CONCLUSION</u>

The Court should deny Plaintiffs' motion, which is being treated as a motion for partial summary judgment on Counts I through IV and as a motion for preliminary injunction on Count V, and dismiss the Complaint for lack of jurisdiction.

Dated: May 22, 2025

Respectfully submitted,

YAAKOV M. ROTH
Acting Assistant Attorney General
Civil Division

JACQUELINE COLEMAN SNEAD
Assistant Branch Director
Civil Division
Federal Programs Branch

*/s/ Charles E.T. Roberts*
Charles E.T. Roberts
 (DC Bar No. 1780573)
Counsel
U.S. Department of Justice
Civil Division
950 Pennsylvania Avenue, N.W.
Washington, D.C. 20005
Tel.: (202) 305-1141
Fax: (202) 616-8470
E-mail: Charles.Roberts2@usdoj.gov

*Attorneys for Defendants*