### UNITED STATES DISTRICT COURT
### FOR THE DISTRICT OF COLUMBIA

|  |  |
|---|---|
| AMERICAN CENTER FOR INTERNATIONAL LABOR SOLIDARITY, *et al.*,<br><br>Plaintiffs,<br><br>v.<br><br>LORI CHAVEZ-DEREMER, in her official capacity as Secretary of Labor, *et al.*,<br><br>Defendants. | Civil Action No. 25-1128 (BAH)<br><br>Judge Beryl A. Howell |

### <u>MEMORANDUM OPINION</u>

To protect American workers from unfair labor practices and the concomitant competitive advantage to foreign trading partners that comes from those foreign countries exploiting cheap child labor and other vulnerable foreign workers, the Congress has appropriated funds to the Bureau of International Labor Affairs ("ILAB"), a component of the U.S. Department of Labor ("DOL"), to provide funding to organizations working to combat child labor and improve working conditions around the globe, with required minimum funding levels for certain programs. As the Senate Appropriations Committee explained in a report accompanying the Appropriations Act for Fiscal Year 2024, ILAB's cooperative agreement programs exist "to ensure workers and businesses in the United States are not put at a competitive disadvantage by trading partner countries not adhering to their labor commitments under trade agreements and trade preference programs." S. REP. NO. 118-84, at 31 (2023). This echoes the policy expressed by Congress nearly forty years ago in the Omnibus Trade and Competitiveness Act of 1988, Pub. L. No. 100-418, tit. I, § 1101(b)(14), 102 Stat. 1107, 1125 (Aug. 23, 1988), enacted with the signature of then-President

Reagan, that "the denial of worker rights should not be a means for a country or its industries to gain competitive advantage in international trade."

ILAB characterizes its work as having a dual purpose: promoting "the values of the American people" and "further[ing] the interests of [American] workers and businesses." *Our Work* ("*ILAB Mission Statement*"), U.S. Department of Labor Bureau of International Labor Affairs, https://www.dol.gov/agencies/ilab/our-work (last visited June 27, 2025). In March 2025, ILAB abruptly terminated all active cooperative agreements that were funding programs in foreign trading partner countries, telling the awardees that the funded projects no longer effectuated the agency's priorities. Plaintiffs in this case—three nonprofit organizations who operated, pursuant to cooperative agreements with ILAB, a combined total of fifteen labor-related projects in foreign trading partner countries—have sued DOL and Labor Secretary Lori Chavez-DeRemer, arguing, in a five-count complaint, that these across-the-board terminations of all ILAB cooperative agreements, including their own, amounted to an unlawful and unilateral executive decision to end funding for ILAB's congressionally mandated programs. Plaintiffs seek relief in the form of vacatur of the terminations and reinstatement of the cooperative agreements.

The parties now raise three legal issues for resolution. First, defendants seek dismissal of this lawsuit for lack of subject-matter jurisdiction, arguing that plaintiffs' claims fall within the exclusive jurisdiction of the Court of Federal Claims under the Tucker Act, 28 U.S.C. § 1491(a)(1). Second, both sides move for partial summary judgment on Counts I through IV of the complaint. Finally, plaintiffs move for a preliminary injunction on Count V of the complaint. As explained below, this Court may properly exercise subject-matter jurisdiction, but, on the current record, neither side has demonstrated their entitlement to partial summary judgment on any claim, nor have plaintiffs established entitlement to preliminary injunctive relief.

Accordingly, the parties' partial cross-motions for summary judgment on Counts I through IV and plaintiffs' motion for a preliminary injunction on Count V are denied.

## I.    BACKGROUND

The relevant factual and procedural background is summarized below.

### A.    The Bureau of International Labor Affairs and its Cooperative Agreements

ILAB advances its objectives of improving working conditions, promoting workers' rights, and addressing the workplace exploitation of children and other vulnerable populations overseas by "awarding and administering cooperative grant agreements" with organizations working on relevant labor issues in foreign countries that are trading partners with the United States. Defs.' Opp'n to Pls.' Mot. for a Prelim. Inj. ("Defs.' Opp'n") at 3, ECF No. 19; *see also, e.g.*, Pls.' Mem. of L. in Supp. of Pls.' Mot. for a Prelim. Inj. ("Pls.' Mem.") at 5-6, ECF No. 9-1 (describing projects funded by ILAB cooperative agreements run by the three plaintiffs in this case). Congress has provided funding to ILAB for these cooperative agreements through both annual and supplemental appropriations acts. Defs.' Opp'n at 3.

In recent years at least, Congress has annually appropriated funds to ILAB for cooperative agreements, with explicit instructions on how the funds are to be used, including the minimum amount of funding to be provided, through cooperative agreement awards, for specific purposes. For example, the Consolidated Appropriations Act, 2021 ("2021 Appropriations Act"), Pub. L. No. 116-260, 134 Stat. 1182, 1559 (Dec. 27, 2020), appropriated $67,325,000 to ILAB, with directions setting minimum and maximum appropriations levels for certain programs, specifically "not more than $53,825,000 shall be for programs to combat exploitative child labor internationally" and "not less than $13,500,000 shall be used to implement model programs that address worker rights issues" in trading partner countries. This model of funding has been repeated, with generally increasing funding amounts in subsequent appropriations laws. *See, e.g.*,

Consolidated Appropriations Act, 2022 ("2022 Appropriations Act"), Pub. L. No. 117-103, 136 Stat. 49, 434 (Mar. 15, 2022) (appropriating $74,525,000 for ILAB, with instructions that "not less than $30,175,000 shall be for programs to combat exploitative child labor internationally and not less than $30,175,000 shall be used to implement model programs that address worker rights issues through technical assistance in countries with which the United States has free trade agreements or trade preference programs"); Consolidated Appropriations Act, 2023 ("2023 Appropriations Act"), Pub. L. No. 117-328, 136 Stat. 4459, 4846 (Dec. 29, 2022) (appropriating $81,725,000 in funding for ILAB and setting the same minimum funding level of $30,175,000 for the two programs described in the 2022 Appropriations Act). For Fiscal Year 2024, Congress kept the same total level of $81,725,000 in funding for ILAB as in the 2023 Appropriations Act and also kept the same instructions on minimum spending of these funds for specified purposes, specifically, that "not less than $30,175,000 shall be for programs to combat exploitative child labor internationally and not less than $30,175,000 shall be used to implement model programs that address worker rights issues through technical assistance in countries with which the United States has free trade agreements or trade preference programs." Further Consolidated Appropriations Act, 2024 ("2024 Appropriations Act"), Pub. L. No. 118-47, 138 Stat. 460, 641 (Mar. 23, 2024). The same levels and conditions established in the 2024 Appropriations Act were maintained for 2025 when a full-year continuing resolution was signed into law on March 15, 2025. Full-Year Continuing Appropriations and Extensions Act, 2025 ("2025 Continuing Resolution"), Pub. L. No. 119-4, § 1101(a), (c), 139 Stat. 9, 10-12 (Mar. 15, 2025).

In addition to these annual appropriations acts, in 2020, when the United States entered into the United States-Mexico-Canada Agreement ("USMCA") trade agreement, Congress enacted, with the signature of President Trump in his first term, the United States-Mexico-Canada

Agreement Implementation Act ("USMCA Implementation Act"), Pub. L. No. 116-113, 134 Stat. 11 (Jan. 29, 2020), which appropriated funds to ILAB to support this agreement's implementation through "projects to support labor justice reform in Mexico." Defs.' Opp'n at 3; *see also* USMCA Implementation Act, 134 Stat. at 100. To this end, Congress appropriated $180 million, with instructions that this funding "shall be used to support reforms of the labor justice system in Mexico," in the form of cooperative agreement awards "to support worker-focused capacity building, efforts to reduce workplace discrimination in Mexico, efforts to reduce child labor and forced labor in Mexico, efforts to reduce human trafficking, efforts to reduce child exploitation, and other efforts related to implementation of the USMCA," for the four-year period ending on December 31, 2023. USMCA Implementation Act, 134 Stat. at 100. Whether funding for USMCA implementation has been renewed or supplemented by Congress beyond that December 2023 date is unclear on the current record in this case.

### B.    Plaintiffs and Their ILAB Cooperative Agreements

Before the March 2025 terminations of all ILAB cooperative agreements, ILAB had awarded fifteen active cooperative agreements to the three plaintiff organizations in this case, Defs.' Opp'n at 4, and a total of about sixty-nine such cooperative agreements, Tr. of June 11, 2025, Hr'g on Partial Cross-Mots. for Summ. J. and Mot. for Prelim. Inj. ("Mots. Hr'g Tr.") at 26:7-10, ECF No. 28 (plaintiffs' counsel stating "[o]ur understanding is that there are 54" agreements in addition to those held by plaintiffs); *see also id.* at 59:21-60:2 (plaintiffs' counsel confirming understanding that total of sixty-nine cooperative agreements were terminated in March 2025); *id.* at 60:3-6 (defendants' counsel stating, "I don't have the exact number in front of me," but that "I don't have a basis to disagree with it being in that range"). The fifteen terminated cooperative agreements awarded to plaintiffs are briefly described below.

### 1.    American Center for International Labor Solidarity

Plaintiff American Center for International Labor Solidarity ("Solidarity Center") is a nonprofit labor organization established in 1997 by the leadership of the American Federation of Labor-Congress of Industrial Organizations ("AFL-CIO"). Errata to Pls.' Mot. for a Prelim. Inj., ECF No. 13, Ex. 1, Decl. of Shawna Bader-Blau, Executive Director, Solidarity Center ("Bader-Blau Decl.") ¶¶ 3-4, ECF No. 13-1.[1] The Solidary Center has extensive experience "implementing programs related to fundamental labor rights around the world and in U.S. trade partner countries, including programs focused on workers' rights to freedom of association and to collectively bargain, as well as programs focused on the elimination of forced and child labor and human trafficking," *id.* ¶ 7, and has received funding from ILAB for this work for 25 years, *id.* ¶ 8.

As of March 1, 2025, the Solidarity Center had eleven active cooperative agreements with ILAB, which agreements supported programming in seventeen foreign countries, including Mexico, Honduras, Guatemala, El Salvador, Uzbekistan, Bangladesh, Brazil, Colombia, Peru, Liberia, Nigeria, the Republic of Georgia, Indonesia, the Philippines, Malaysia, Chile, and South Africa. *Id.* ¶¶ 9-10.[2] The total funding awarded and the congressional authorization for and general purpose of each of these eleven cooperative agreements are summarized as follows:

(1) $10 million to "strengthen workers' ability to exercise their labor rights in Mexico," as authorized and funded by the USMCA Implementation Act, with a termination date on June 15, 2025. *Id.* ¶ 10.a.

(2) $20.75 million for efforts to "build[] an independent and democratic labor movement to protect workers' rights in Mexico," as authorized and funded by

---

[1]    The Bader-Blau Declaration was initially filed as an exhibit to plaintiffs' motion, but that version of the declaration was placed under seal, at plaintiffs' request and without objection from defendants, to protect the privacy of the unredacted names and contact information of "individuals who are not party to this suit." Pls.' Unopposed Mot. to Seal Document, ECF No. 12; Min. Order (May 9, 2025) (granting plaintiffs' unopposed sealing motion). At the same time plaintiffs filed their sealing motion, they filed the cited "corrected version" of the Bader-Blau Declaration, which filing is "identical to the originally filed version, except that certain names and email addresses" of non-party individuals have been redacted. Errata to Pls.' Mot. at 1.

[2]    The Bader-Blau Declaration says the ILAB cooperative agreements supported the Solidarity Center's programming in sixteen countries, Bader-Blau Decl. ¶ 10, but seventeen countries are identified where work was performed under these agreements, *id.* ¶¶ 10.a-k.

the USMCA Implementation Act, with a termination date on July 18, 2026. *Id.* ¶ 10.b.

(3) $6.25 million for efforts to "improv[e] respect for workers' rights in key industries in" Honduras, Guatemala, and El Salvador, as authorized and funded by the 2021 Appropriations Act, with a termination date on August 31, 2026. *Id.* ¶ 10.c.

(4) $3.1 million for a program to "address[] forced labor and other labor rights violations in the cotton industry in Uzbekistan," as authorized and funded by the 2022 Appropriations Act, with a termination date on December 31, 2026. *Id.* ¶ 10.d.

(5) $3 million to "improve respect for workers' rights in Bangladesh," as authorized and funded by the 2022 Appropriations Act, with a termination date on September 30, 2026. *Id.* ¶ 10.e.

(6) $12.2 million for projects to "improve respect for labor rights in" Brazil, Colombia, and Peru, as authorized and funded by the 2022 Appropriations Act, with a termination date on December 14, 2026. *Id.* ¶ 10.f.

(7) $5 million to "elevate women's participation" in Liberia and Nigeria, as authorized and funded by the 2022 Appropriations Act, with a termination date on December 14, 2026. *Id.* ¶ 10.g.

(8) $2 million to "strengthen labor law understanding and enforcement in the Republic of Georgia," as authorized and funded by the 2023 Appropriations Act, with a termination date on September 30, 2026. *Id.* ¶ 10.h.

(9) $6 million to "promote quality infrastructure jobs on project sites . . . in Indonesia and the Philippines," as authorized and funded by the 2023 Appropriations Act, with a termination date on March 31, 2028. *Id.* ¶ 10.i.

(10) $3 million to "strengthen workers' rights in the electronics supply chain in Malaysia," as authorized and funded by the 2024 Appropriations Act, with a termination date on December 31, 2028. *Id.* ¶ 10.j.

(11) $7 million to "promote the inclusion of workers' voices in climate policymaking in Brazil, Chile, Colombia, Peru, and South Africa," as authorized and funded by the 2024 Appropriations Act, with a termination date on December 31, 2028. *Id.* ¶ 10.k.

For the 2025 calendar year, projected expenditures from these eleven awards totaled

approximately $12 million, which represented roughly 24% of the Solidarity Center's annual

budget. *Id.* ¶ 11.  As a result of the termination of this funding, the Solidarity Center has laid off 40 employees, representing 17% of the organization's employees worldwide. *Id.* ¶ 23.  These layoffs have also forced the Solidarity Center to incur additional, unplanned expenses, including "at least $400,000 in legally mandated severance, unused benefits, and employer-paid taxes" in Mexico alone. *Id.* ¶ 25.  The funding terminations have also created "substantial" legal risk for the Solidarity Center, including the potential for loss of legal registration and loss of ability to operate in certain countries. *See, e.g.*, *id.* ¶¶ 25-26 (outlining such risks in Mexico, the Republic of Georgia, and Uzbekistan).

### 2.    American Institutes for Research

Plaintiff American Institutes for Research ("AIR") is a "nonpartisan, not-for-profit organization that conducts behavioral and social science research and delivers technical assistance" on real-world policy issues "in areas such as education, health, workforce development, and labor rights." Pls.' Mot. for a Prelim. Inj. ("Pls.' Mot."), ECF No. 9, Ex. 3, Decl. of David Seidenfeld, Senior Vice President in charge of the International Development Division, AIR ("Seidenfeld Decl.") ¶ 3, ECF No. 9-3.  Since 2019, AIR has worked with the Mexican government to improve the country's capacity to institute labor reforms enacted after the signing of the USMCA and to improve the enforcement of Mexican labor laws. *Id.* ¶ 5.  This work has been "exclusively funded" by ILAB cooperative agreements. *Id.* ¶ 6.

As of March 1, 2025, AIR had three active cooperative agreements with ILAB, each of which focused on "labor reform implementation and labor law enforcement in Mexico," *id.* ¶ 7, and were authorized and funded by the USMCA Implementation Act, *id.* ¶ 8, including:

> (1) $15 million over five years to strengthen Mexican labor inspector capacity "at the federal level and in eight states, with a particular focus on priority supply chains under the USMCA," with a termination date in August 2027. *Id.* ¶ 7.a.

(2) $33.45 million over seven years to "help address some of Mexico's most pressing and immediate needs in its transition to a new labor justice system," which was enacted after the signing of the USMCA, with a termination date in December 2026. *Id.* ¶ 7.b.

(3) $10.8 million over five years "to increase the effectiveness of new labor conciliation mechanisms at the federal level and in sixteen states [in Mexico]," with a termination date in June 2026. *Id.* ¶ 7.c.

"ILAB funding was the only source of support for AIR's technical assistance work in Mexico," meaning that "without ILAB funding, AIR will need to shut down [its] programming in Mexico," terminate staff in Mexico, and close its Mexico office. *Id.* ¶ 20. The cooperative agreement terminations will impose "substantial additional costs" on AIR, including "an additional $2.7 million in costs from terminating staff." *Id.* ¶ 22.

### 3. Global March Against Child Labor

Plaintiff Global March Against Child Labor ("Global March") is a "worldwide network of trade unions, teachers' organizations, and civil society groups that works toward the shared development goals of eliminating and preventing all forms of child labor, slavery, and trafficking," with a particular focus on "creating supply chains that do not rely on child labor." Pls.' Mot, Ex. 4, Decl. of Marco Dubbelt, Senior Director, Global March ("Dubbelt Decl.") ¶¶ 3, 6, ECF No. 9-4. As of March 1, 2025, Global March had one active cooperative agreement with ILAB. *Id.* ¶ 7. The $4 million award, authorized and funded by the 2021 Appropriations Act, was made to "support a project to build the capacity of civil society organizations to fight child labor" in Nepal, Peru, and Uganda, and had a termination date in December 2025. *Id.* ¶¶ 7-9, 11.

The funding from this cooperative agreement with ILAB represented 60% of Global March's total budget. *Id.* ¶ 22. As a result of the agreement's termination, Global March "anticipate[s] reducing staff by 60%," *id.* ¶ 23, and its partner organizations have also felt the

effects, with the partner organization in Uganda "already determin[ing] that it will need to shut its doors entirely" and the partners in Nepal and Peru anticipating staff cuts of 30% due to Global March's inability to continue supporting their work, *id.* ¶ 24.

### C.    Termination of ILAB's Cooperative Agreements

On January 20, 2025, President Trump issued Executive Order 14169 ("EO 14169"), titled "Reevaluating and Realigning United States Foreign Aid," 90 Fed. Reg. 8619 (Jan. 30, 2025). This Order proclaimed that U.S. foreign aid was "not aligned with American interests," *id.* § 1, 90 Fed. Reg. at 8619, and decreed that "no further United States foreign assistance shall be disbursed in a manner that is not fully aligned with the foreign policy of the President of the United States," *id.* § 2.  To effectuate this policy, EO 14169 ordered an immediate pause in "United States foreign development assistance," *id.* § 3(a), and directed department and agency heads responsible for existing foreign aid programs to review those programs, *id.* § 3(b), and determine, within 90 days of the issuance of EO 14169, "whether to continue, modify, or cease each foreign assistance program," in consultation with the Director of the Office of Management and Budget ("OMB") and "with the concurrence of the Secretary of State," *id.* § 3(c).

Pursuant to EO 14169, on February 26, 2025, OMB issued Budget Data Request No. 25-08 ("BDR 25-08"), which required all federal agencies that "fund 'foreign assistance,'" as defined in BDR 25-08, to collect information about those programs to "assess alignment" of these programs with President Trump's foreign policy priorities.  Off. of Mgmt & Budget, Exec. Off. of the President, OMB Budget Data Request No. 25-08, at 1 (Feb. 26, 2025).  BDR 25-08 defined "foreign assistance," in relevant part, as "any assistance or support provided to, or received by, non-U.S. citizen, non U.S. person or entity; foreign non-governmental organization; or U.S. person or entity related to national security, foreign policy, defense, trade, development, and multilateral and humanitarian operations" or "any federally funded . . . grants, loans, or technical assistance of

any kind . . . that facilitates the transfer of resources from the United States government to another country, or to a foreign, international or multilateral organization." *Id.* at 3.

On March 3, 2025, each plaintiff received an email from ILAB requesting, within two days, by March 5, completion of a "lengthy questionnaire" for the agency to respond to BDR 25-08. Bader-Blau Decl. ¶ 15; Seidenfeld Decl. ¶ 13; Dubbelt Decl. ¶ 15; *see also* Defs.' Opp'n at 6 (noting that agencies were required to "collect, score and report 36 non-dispositive data elements," and that ILAB contacted its awardees about this requirement on March 3, 2025). Plaintiffs were advised that their responses would be reviewed by ILAB to "prepare submissions for OMB." Bader-Blau Decl. ¶ 15; Seidenfeld Decl. ¶ 13; Dubbelt Decl. ¶ 15. Each plaintiff timely submitted the requested responses. Bader-Blau Decl. ¶ 15; Seidenfeld Decl. ¶ 13; Dubbelt Decl. ¶ 16. ILAB submitted the gathered data to OMB on March 19, 2025. Defs.' Opp'n at 6.

In the days following submission of their responses, plaintiffs remained in contact with ILAB. The Solidarity Center, for instance, "learned informally from ILAB staff that [its] projects all scored well, that they generally met foreign policy priorities, and that a few of [its] awards were . . . among the highest scoring of any ILAB projects." Bader-Blau Decl. ¶ 15. AIR, too, "received informal feedback that [its] responses scored highly for alignment with President Trump's" foreign policy priorities. Seidenfeld Decl. ¶ 13. Global March, meanwhile, "responded to several follow-up questions from ILAB staff," Dubbelt Decl. ¶ 16, but never received any information "that project cancellation might be imminent," *id.* ¶ 17.

Notwithstanding ILAB's generally positive feedback with no negative comments to plaintiffs' responses to BDR 25-08, between March 13 and March 27, 2025, all fifteen of plaintiffs' active cooperative agreements were terminated by DOL. *See* Bader-Blau Decl. ¶ 17; Seidenfeld Decl. ¶ 15; Dubbelt Decl. ¶ 19. In addition, all other active ILAB cooperative agreements were

also terminated during the month of March 2025.  Mots. Hr'g Tr. at 43:18-23 (defendants' counsel confirming that "all cooperative grant agreements that ILAB had in effect" were cancelled "[i]n March").

On March 13, 2025, the Solidarity Center received a notice from DOL that its project in Uzbekistan had been terminated, with the sole reason given that the agreement "no longer effectuates the program goals."  *See* Bader-Blau Decl. ¶ 18; *id.*, Ex. B ("Solidarity Center Termination Letters") at 1, ECF No. 13-1 at 23-33.  The next day, March 14, 2025, the Solidarity Center received termination notices of two other cooperative agreements, which notices stated that the terminations were "pursuant to a directive from the U.S. Department of Labor Office of the Secretary," as well as ILAB, "for alignment with Agency priorities and national interest," citing 2 C.F.R. § 200.340 and "the termination conditions" of the agreements.  *See* Bader-Blau Decl. ¶ 19; Solidarity Center Termination Letters at 2-3.  That evening, DOL Secretary Lori Chavez-DeRemer posted on the social media platform X, in an apparent reference, at least in part, to the terminated agreements, "We're working with @DOGE to root out waste, fraud, & abuse.  @USDOL just saved taxpayers $30M by eliminating 'America Last' programs in foreign countries like Indonesia, Colombia, Guatemala, Chile, & Brazil.  Under @POTUS, the American Worker ALWAYS comes First."  Pls.' Mem. at 7 (quoting Secretary Lori Chavez-DeRemer (@SecretaryLCD), X (Mar. 14, 2025, 6:34 PM), https://x.com/SecretaryLCD/status/1900677057211736407 [hereinafter *March 14 Chavez-DeRemer Post*]).

The Solidarity Center's remaining eight agreements with ILAB were all terminated on March 27, 2025, by letters explaining the authorities and rationale for the terminations in identical language to the two March 14 letters.  Bader-Blau Decl. ¶ 21; Solidarity Center Termination Letters at 4-11.  Similarly, on March 26 and 27, 2025, AIR received termination notices for each

of its three agreements with ILAB, Seidenfeld Decl. ¶¶ 15-16; *id.*, Ex. A ("AIR Termination Letters") at 1-3, ECF No. 9-3 at 10-12, and Global March's single agreement was terminated on March 27, 2025, Dubbelt Decl. ¶ 19; *id.*, Ex. B ("Global March Termination Letter"), ECF No. 9-4 at 22.  Each of these letters explained the authorities and rationale for the terminations using the same language as in the two March 14 letters to Solidarity Center.  *See* Seidenfeld Decl. ¶ 16; AIR Termination Letters at 1-3; Dubbelt Decl. ¶ 19; Global March Termination Letter.  The terminations of all fifteen of plaintiffs' agreements were immediate, with the end date of the agreements updated to reflect the date of each termination letter.  *See* Solidarity Center Termination Letters at 1-11; AIR Termination Letters at 1-3; Global March Termination Letter (all 15 termination letters stating that, "[a]s part of the termination process, . . . the end date of the period of performance on this award will immediately be truncated and reflect today's date").

In apparent anticipation of the March 27, 2025, termination notices, on the afternoon of March 26, 2025, the official Department of Government Efficiency ("DOGE") account on X posted, "Great work today by @USDOL @SecretaryLCD @Sonderling47 cancelling $577M in 'America Last' grants for $237M in savings."  Bader-Blau Decl. ¶ 20; *id.*, Ex. C ("*March 26 Chavez-DeRemer Post*"), ECF 13-1 at 35.  This post included descriptions of six projects, including two of the Solidarity Center's projects for which termination letters were sent the next morning.  On the same day as the DOGE post, Secretary Chavez-DeRemer's official account re-posted the DOGE post, with additional text stating, "The era of Americans' tax dollars bankrolling foreign handouts for things like 'Improving Gender Equity in the Mexican Workplace' is over. We just saved $237M, which will be used to reinvest into developing our workforce and protecting our children.  #AmericaFirst."  *March 26 Chavez-DeRemer Post*.  On April 1, 2025, the official Department of Labor account on X reposted the same March 26, 2025, DOGE post, stating in part

that "we're reinvesting this money into the AMERICAN Workforce." Pls.' Reply Mem. in Supp. of Pls.' Mot. ("Pls.' Reply") at 20, ECF No. 24 (quoting U.S. Department of Labor (@USDOL), X (Apr. 1, 2025, 12:38 PM), https://x.com/USDOL/status/1907110344977236094 [hereinafter *April 1 DOL Post*]).

Over six weeks after sending many of the termination notices, DOL sent termination guidance to all terminated recipients, including plaintiffs, on May 16, 2025. Defs.' Opp'n, Ex. 1, Decl. of Thomas S. Kodiak, DOL's Administrator of the Office of Grants Management, Employment, and Training Administration ("Kodiak Decl.") ¶ 2, ECF No. 19-1; Kodiak Decl., Ex. A ("DOL Termination Guidance"), ECF No. 19-1 at 4. The guidance "provided express authorization that costs to the recipients . . . resulting from financial obligations incurred by the recipients . . . after termination (i.e. 'termination costs') are allowable." Kodiak Decl. ¶ 2. Permitted expenditures include "such costs as rental costs under unexpired leases, claims under subawards and accounting, legal, clerical, and similar costs reasonably necessary for the preparation and presentation to ILAB of settlement claims and supporting data with respect to the terminated portion of the Federal award." *Id.*

Apart from the at least $3.1 million in staff termination costs, *see* Seidenfeld Decl. ¶ 22 (estimating $2.7 million in costs to plaintiff AIR from terminating staff); Bader-Blau Decl. ¶ 25 (estimating at least $400,000 in costs to plaintiff Solidarity Center from terminating staff in Mexico alone), plaintiffs have no "exact figures" for the termination costs to be paid by ILAB but claim the costs are "substantial," Mots. Hr'g Tr. at 30:15-20. Defendants could provide no estimate of the termination costs to be paid for plaintiffs' terminated cooperative agreements, nor how those costs would compare simply to continuing the projects through the original end dates set out in the

cooperative agreements.  *Id.* at 60:10-61:13 (defendants' counsel discussing the process for closeout costs).

### D.    Procedural History

Plaintiffs filed the instant lawsuit on April 15, 2025, seeking, in their five-count complaint, declaratory relief that the termination of "all of ILAB's statutorily mandated grant and cooperative agreement programs is unlawful" and injunctive relief "[v]acat[ing] Defendants' ILAB termination notices and order[ing] reinstatement of [all] the ILAB cooperative agreements, including Plaintiffs' agreements."  Compl. at 24, ECF No. 1.  Three weeks later, on May 5, 2025, plaintiffs moved for a preliminary injunction requiring the reinstatement of all ILAB cooperative agreements "terminated between March 13 and March 27, 2025," including plaintiffs' agreements, and prohibiting the termination of any such agreements during the pendency of this litigation.  Pls.' Mot. at 1.

In response to the Court's order for the parties' proposal(s) for proceeding, *see* Min. Order (May 6, 2025), the parties jointly proposed to "consolidat[e] consideration of the motion for a preliminary injunction with summary judgment on the merits" as to Counts I through IV of the complaint.  Parties' Joint Statement Regarding Scheduling ("Parties' JSR") at 2, ECF No. 14.  Given that no administrative record had yet been compiled and produced by defendants, the parties further explained their agreement that resolution on summary judgment of Count V (claiming that defendants' actions in terminating the cooperative agreements were arbitrary and capricious, in violation of the Administrative Procedure Act ("APA"), *see* Compl. ¶¶ 84-87), "would be premature" on the current record.  Parties' JSR at 2.  The parties were less than clear as to whether they wished to proceed, or not, on the motion for preliminary injunctive relief as to Count V.

Given this lack of clarity, the Court directed the parties to "file . . . a proposed order reflecting exactly the briefing schedule and procedures proposed by the parties to be adopted to

govern resolution of plaintiffs' . . . Motion for Preliminary Injunction." Min. Order (May 9, 2025). The parties subsequently filed a joint proposed order, which proposed that "the motion for a preliminary injunction shall be treated as a motion for summary judgment as to Counts I through IV of Plaintiffs' complaint"—without any reservation of the pending preliminary injunction motion as to Count V—and further that resolution of summary judgment on these counts would not require the filing of any statements of material facts, as otherwise required for resolution of summary judgment motions by D.D.C. Local Civil Rule 7(h)(1). Parties' Notice of Proposed Order, ECF No. 16;[3] *see also* Min. Order (May 12, 2025) (noting this agreement). This proposed order made no mention of Count V, suggesting, based on the previously filed JSR, that the parties intended to address Count V only after the filing of an administrative record.

In accord with the parties' proposal, a briefing schedule was entered, stating, in pertinent part, that "plaintiffs' . . . Motion for Preliminary Injunction . . . shall be treated, pursuant to the agreement of the parties, as a motion for partial summary judgment on Counts I through IV of plaintiffs' complaint." Min. Order (May 12, 2025). The parties completed briefing in accordance with the schedule ordered. *See* Defs.' Opp'n; Pls.' Reply. Though defendants' opposition argued for dismissal of the entire complaint for lack of subject matter jurisdiction and, alternatively, of Counts I through IV on other grounds, defendants had no pending motion for any relief. On June 4, 2025, in response to the Court's query, the parties clarified that defendants' opposition should be treated "as a cross-motion for summary judgment on Counts I through IV." Parties' Joint Status Report at 1, ECF No. 25; Min. Order (June 4, 2025) (granting defendants' request to treat their

---

[3]     The parties' "[PROPOSED] SCHEDULING ORDER" stated, in full: "Upon consideration of the parties' Joint Status Report dated May 8, 2025, it is hereby ORDERED that briefing on Plaintiffs' Motion for a Preliminary Injunction (ECF No. 9) shall be governed by the following schedule: Defendants' Opposition May 22 Plaintiffs' Reply May 28[.]  It is further ORDERED that the motion for a preliminary injunction shall be treated as a motion for summary judgment as to Counts I through IV of Plaintiffs' complaint. A statement of material facts pursuant to Local Rule 7(h)(2) is not required." Parties' Notice of Proposed Order.

opposition as a partial cross-motion for summary judgment).  Briefing on the parties' pending partial cross-motions was complete upon defendants' filing of a reply in support of their partial cross-motion on Counts I through IV.  Defs.' Reply in Supp. of Cross-Mot. for Summ. J. on Counts I-IV ("Defs.' Reply"), ECF No. 26.

A hearing was held on June 11, 2025, to consider the parties' pending partial cross-motions for summary judgment on Counts I through IV and, as only became clear in the briefing and not in the parties' JSR or proposed scheduling order, plaintiffs' continued request for a preliminary injunction as to Count V.  *See* Defs.' Opp'n at 1 (recognizing that plaintiffs maintain their claim for preliminary injunctive relief as to Count V).  These motions are now ripe for consideration.

## II.    APPLICABLE LEGAL STANDARDS

### A.    Summary Judgment

Summary judgment shall be granted "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  FED. R. CIV. P. 56(a).  A fact is only "'material' if a dispute over it might affect the outcome of a suit under governing law," meaning that "factual disputes that are 'irrelevant or unnecessary' do not affect the summary judgment determination."  *Mayorga v. Merdon*, 928 F.3d 84, 89 (D.C. Cir. 2019) (quoting *Holcomb v. Powell*, 433 F.3d 889, 895 (D.C. Cir. 2006) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986))).  A dispute is only "genuine" if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party."  *Id.* (citation omitted).  Thus, "[i]n considering a motion for summary judgment, judges must ask themselves not whether they think 'the evidence unmistakably favors one side or the other but whether a fair-minded jury could return a verdict for the plaintiff on the evidence presented,'" because that evidence is such that "the jury could reasonably find for the plaintiff."  *Stoe v. Barr*, 960 F.3d 627, 638 (D.C. Cir. 2020) (quoting *Anderson*, 477 U.S. at 252).

"Although a moving party may not be required to support its motion with affidavits, it is still clear that summary judgment should only be granted in cases when 'whatever is before the district court demonstrates that the standard for the entry of summary judgment . . . is satisfied.'" *Beatty v. Wash. Metro. Area Transit Auth.*, 860 F.2d 1117, 1120 (D.C. Cir. 1988) (quoting *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986)).   "[T]he Federal Rules of Civil Procedure explicitly require a party opposing summary judgment to support an assertion that a fact is genuinely disputed with materials in the record," *Oviedo v. Wash. Metro. Area Transit Auth.*, 948 F.3d 386, 396 (D.C. Cir. 2020) (citing FED. R. CIV. P. 56(c)), since otherwise "[a]ccepting [ ] conclusory allegations as true [ ] would defeat the central purpose of the summary judgment device, which is to weed out those cases insufficiently meritorious to warrant the expense of a jury trial," *Greene v. Dalton*, 164 F.3d 671, 675 (D.C. Cir. 1999).

When parties file cross-motions for summary judgment, each motion is considered separately, in the light most favorable to the non-moving party, and the court must determine, for each motion, whether the Rule 56 standard has been met.  *See Baylor v. Mitchell Rubenstein & Assocs., P.C.*, 857 F.3d 939, 952 (D.C. Cir. 2017) (explaining that when considering "cross-motions for summary judgment, [courts] must accord both parties the solicitude owed non-movants"); *CEI Wash. Bureau, Inc. v. Dep't of Justice*, 469 F.3d 126, 129 (D.C. Cir. 2006) (per curiam) (noting that "[i]t is of no moment that the parties filed cross-motions for summary judgment and that neither party explicitly argued that there are genuine disputes about material facts," since "[a] cross-motion for summary judgment does not concede the factual assertions of the opposing motion"); *Sherwood v. Wash. Post*, 871 F.2d 1144, 1147 n.4 (D.C. Cir. 1989) ("The rule governing cross-motions for summary judgment . . . is that neither party waives the right to a full trial on the merits by filing its own motion; each side concedes that no material facts are at

18

issue only for the purposes of its own motion." (quoting *McKenzie v. Sawyer*, 684 F.2d 62, 68 n.3 (D.C. Cir. 1982))).

Timing-wise, Rule 56 provides that "a party may file a motion for summary judgment at any time," FED. R. CIV. P. 56(b), "even as early as the commencement of the action," *id*. 56(c)(1) committee's note to 2009 amendment, but "in many cases the motion will be premature until the nonmovant has had time to file a responsive pleading or other pretrial proceedings have been had," *id.* 56(b) committee's note to 2010 amendment. When a summary judgment motion is filed prematurely, with factual matters or disputes insufficiently supported by record evidence in the form required, *see id*. 56(c), the necessary determination of what material facts are not genuinely at issue may be difficult to determine. In this circumstance, "the court may . . . issue any [] appropriate order." *Id*. 56(e)(4).

### B.    Preliminary Injunction

A preliminary injunction is "an extraordinary remedy that may only be awarded upon a clear showing that the plaintiff is entitled to such relief." *Sherley v. Sebelius*, 644 F.3d 388, 392 (D.C. Cir. 2011) (quoting *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 22 (2008)); *see also Mazurek v. Armstrong*, 520 U.S. 968, 972 (1997) (per curiam) ("[A] preliminary injunction is an extraordinary and drastic remedy, one that should not be granted unless the movant, *by a clear showing*, carries the burden of persuasion." (emphasis in original) (internal quotation marks omitted)). As a result, such relief is "never awarded as of right." *Munaf v. Geren*, 553 U.S. 674, 689-90 (2008) (quoting *Yakus v. United States*, 321 U.S. 414, 440 (1944)).

To obtain preliminary injunctive relief, moving parties must establish that (1) they are "likely to succeed on the merits"; (2) they are "likely to suffer irreparable harm in the absence of preliminary relief"; (3) "the balance of the equities" is in their "favor"; and (4) "an injunction is in the public interest." *Winter*, 555 U.S. at 20; *see also, e.g.*, *Clevinger v. Advocacy Holdings, Inc.*,

134 F.4th 1230, 1233 (D.C. Cir. 2025); *Benisek v. Lamone*, 585 U.S. 155, 158 (2018).  The final

two factors "merge" into one when "the Government is the opposing party," *Nken v. Holder*, 556

U.S. 418, 435 (2009), because "the government's interest *is* the public interest," *Pursuing*

*America's Greatness v. FEC*, 831 F.3d 500, 511 (D.C. Cir. 2016) (emphasis in original).

## III.    DISCUSSION

Plaintiffs challenge the termination, in March 2025, of "all of ILAB's cooperative

agreements en masse," Compl. ¶ 3, alleging, in Count I, that defendants "exceeded" their

constitutional authority "and usurped legislative authority," *id*. ¶ 71; in Counts II, III and IV, that

defendants acted contrary to law, in violation of the APA, 5 U.S.C. § 706(2)(A), respectively, by

violating mandatory congressional appropriations provisions in the USMCA Implementation Act

and the 2021, 2022, 2023 and 2024 Appropriations Acts, when they "terminated all ongoing ILAB

projects and made clear, in repeated public statements, that they will not reallocate those funds for

the purposes specified by law," Pls.' Mem. at 20; *see also* Compl. ¶¶ 72-74; by violating the

Impoundment Control Act, 2 U.S.C. §§ 683-84, when they "unlawfully refused to spend money

Congress appropriated in duly enacted appropriations statutes," Pls.' Mem. at 20; *see also* Compl.

¶¶ 75-80; and by violating the Anti-Deficiency Act, 31 U.S.C. § 1512(c)(1), when they created "a

temporary 'reserve' of appropriated funds" without lawful justification for doing so, Pls.' Mem. at

22; *see also* Compl. ¶¶ 81-83; and, finally, in Count V, defendants acted arbitrarily and

capriciously, in violation of the APA, in deciding "to terminate all ILAB's cooperative agreements,

and as a result to shut down the Bureau's entire technical assistance program," Pls.' Mem. at 22;

*see also* Compl. ¶¶ 84-87.  Plaintiffs now move for partial summary judgment and permanent

injunctive relief on Counts I through IV and preliminary injunctive relief on Count V.  Pls.' Reply

at 1-2.

Defendants respond that all five of plaintiffs' claims must be dismissed for lack of subject-matter jurisdiction, arguing that each claim is "fundamentally . . . contractual" and thus falls within the exclusive jurisdiction of the Court of Federal Claims.  Defs.' Opp'n at 9; *see also id.* at 9-18. Alternatively, defendants argue that they are entitled to partial summary judgment on Counts I through IV, Defs.' Reply at 8-16, 19, and also that preliminary injunctive relief as to Count V should be denied, *see* Defs.' Opp'n at 29-30.

The "threshold matter" of subject-matter jurisdiction, *see Steel Co. v. Citizens for a Better Env't*, 523 U.S. 83, 94 (1998), is addressed first, followed by consideration of the parties' partial cross-motions for summary judgment on Counts I through IV, *see infra* Part III.B., and then plaintiffs' original motion for preliminary injunctive relief only as to Count V, *see infra* Part III.C.

## A.    Subject-Matter Jurisdiction

"The United States and its agencies are generally immune from suit in federal court absent a clear and unequivocal waiver of sovereign immunity."  *Crowley Gov't Servs., Inc. v. GSA*, 38 F.4th 1099, 1105 (D.C. Cir. 2022).  In this case, determining whether subject-matter jurisdiction exists over plaintiffs' claims requires reconciling the "competing waivers" in two statutes.  *Am. Near E. Refugee Aid v. USAID*, 703 F. Supp. 3d 126, 132 (D.D.C. 2023).  First is the APA, which waives sovereign immunity for claims against the United States "seeking relief other than money damages" when brought by parties "adversely affected or aggrieved by agency action."  5 U.S.C. § 702.  This waiver contains an important limitation that "if any other statute that grants consent to suit expressly or impliedly forbids the relief which is sought" under the APA, the APA's waiver of sovereign immunity does not apply.  *Perry Cap. LLC v. Mnuchin*, 864 F.3d 591, 618 (D.C. Cir. 2017) (quoting 5 U.S.C. § 702).

Second is the Tucker Act, 28 U.S.C. § 1491(a)(1), which grants jurisdiction to the Court of Federal Claims "to render judgment upon any claim against the United States founded . . . upon

any express or implied contract with the United States." 28 U.S.C. § 1491(a)(1).  The D.C. Circuit has interpreted this provision as conferring "exclusive jurisdiction over breach of contract claims against the United States seeking more than $10,000 in damages on the Court of Federal Claims." *Crowley*, 38 F.4th at 1106 (quoting *Hammer v. United States*, 989 F.3d 1, 2 (D.C. Cir. 2021)). This grant of exclusive jurisdiction, in turn, "'impliedly forbid[s]' contract claims against the Government from being brought in district court under the waiver in the APA." *Id.* (quoting *Perry Cap.*, 864 F.3d at 618-19.  In other words, if a claim falls within the Tucker Act's jurisdiction conferred on the Court of Federal Claims, the APA's waiver of sovereign immunity does not apply to that claim, and a federal district court would therefore lack subject-matter jurisdiction.

The D.C. Circuit's "longstanding test for determining whether a claim falls within the exclusive jurisdiction of the Claims Court pursuant to the Tucker Act" asks whether the "action against the United States . . . is *at its essence* a contract claim."  *Crowley*, 38 F.4th at 1106 (emphasis in original) (quoting *Megapulse, Inc. v. Lewis*, 672 F.2d 959, 967 (D.C. Cir. 1982)).  To make this determination, a court in this Circuit must look at both "the source of the rights upon which the plaintiff bases its claims" and "the type of relief sought (or appropriate)."  *Id.* (quoting *Megapulse*, 672 F.2d at 968).  As part of this assessment of whether the claims asserted are essentially contract claims, no matter how artfully framed, courts may inquire whether "the Court of Federal Claims can exercise jurisdiction over the claim" in the first place.  *Am. Near E. Refugee Aid*, 703 F. Supp. 3d at 132 (citing *Tootle v. Sec'y of Navy*, 446 F.3d 167, 176-77 (D.C. Cir. 2006)). As the D.C. Circuit has explained, a federal district court cannot "be deprived of jurisdiction by the Tucker Act when no jurisdiction lies in the Court of Federal Claims," *Tootle*, 446 F.3d at 176, since "[t]here cannot be exclusive jurisdiction under the Tucker Act if there is no jurisdiction under the Tucker Act," *id.* at 177; *see also Crowley*, 38 F.4th at 1109 ("Because a plaintiff could not

bring this type of . . . action in the Claims Court in the first place, that Court would not have exclusive jurisdiction of them.").

Here, defendants vigorously argue that subject-matter jurisdiction is lacking because plaintiffs' claims reflect merely a "run-of-the-mill contract dispute between the Government and private parties," which must, under the Tucker Act, "be brought in the Court of Federal Claims." Defs.' Reply at 1; *see also id.* at 2-8; Defs.' Opp'n at 1, 9-18. Plaintiffs, on the other hand, assert that their claims "do not concern contracts," Pls.' Mem. at 13, and instead "stem from the separation of powers principle embodied in the Constitution and from federal statutes including appropriations laws, the Impoundment Control Act, the Anti-Deficiency Act, and the arbitrary and capricious standards of the [APA]," *id.* at 12. Plaintiffs have the better arguments on this jurisdictional issue.

### 1.    The Rights Asserted by Plaintiffs are Constitutional and Statutory

The mere fact that a case involves a contract "does not, by triggering some mystical metamorphosis, automatically transform an action . . . into one on the contract and deprive the court of jurisdiction it might otherwise have." *Crowley*, 38 F.4th at 1107 (ellipsis in original) (quoting *Megapulse*, 672 F.2d at 968). To the contrary, the D.C. Circuit has "explicitly rejected the 'broad' notion 'that any case requiring some reference to or incorporation of a contract is necessarily on the contract and therefore directly within the Tucker Act.'" *Id.* (quoting *Megapulse*, 672 F.2d at 967-68).

### a.    *Plaintiffs Seek Relief Based on Alleged Violations of Federal Statutes and the Constitution.*

It is axiomatic that "plaintiffs are [the] 'masters of the complaint' with the power to bring th[eir] claims as they see fit." *de Csepel v. Republic of Hungary*, 714 F.3d 591, 598 (D.C. Cir. 2013) (quoting *Caterpillar, Inc. v. Williams*, 482 U.S. 386, 395 (1987)). While true that plaintiffs

cannot succeed merely by "artfully draft[ing]" their complaint "to circumvent the jurisdiction of the Court of Federal Claims," *Kidwell v. Dep't of the Army, Bd. of Corr. for Mil. Recs.*, 56 F.3d 279, 284 (D.C. Cir. 1995), defendants' "jurisdictional challenge" must be analyzed "in light of the . . . claims the [plaintiffs] actually bring[]," *de Csepel*, 714 F.3d at 598; *see also Crowley*, 38 F.4th at 1108 (asking whether the defendant "infringed [the plaintiff]'s rights *as alleged in the complaint*" (emphasis supplied)).

Here, the complaint contains five claims, each of which seeks relief based only on an alleged statutory or constitutional violation. *See generally* Compl. No count claims that plaintiffs are entitled to relief because of any term or condition of their cooperative agreements with ILAB or any alleged breach of those agreements. *Id.* In fact, plaintiffs' claims are not based on the termination of any individual cooperative agreement, but rather the argument that the *en masse* termination of the ILAB cooperative agreements was the result of a decision by the agency "to terminate ILAB's technical assistance program" in its entirety, Pls.' Mem. at 1, which decision plaintiffs allege violated both the Constitution and the relied-upon federal statutes, *see generally* Compl. In other words, the rights asserted stem only from the Constitution and federal statutes, with the result that plaintiffs can only prevail on their claims by proving that the terminations violated the Constitution or the relied-upon federal statutes in the manner alleged, regardless of the terms in their individual agreements. Thus, even proving a breach of the individual cooperative agreements would not entitle plaintiffs to relief on their claims. *Cf. Crowley*, 38 F.4th at 1108-09 (explaining that, on the facts of that case, answering whether the defendant exceeded its statutory authority "are not questions the district court can answer by examining a contractual promise").[4]

---

[4]    Notably, none of plaintiffs' cooperative agreements with ILAB have been submitted as part of the record in this case by either side. *See infra* n.7 (describing the contents of the current record). Although defendants submitted an excerpt of the terms and conditions for one of plaintiff Solidarity Center's cooperative agreements, *see* Kodiak Decl., Ex. B, Federal Award Terms and Conditions, ECF No. 19-1 at 6, this exhibit is referenced only to show the

Under such circumstances, where plaintiffs' claims "do not at all depend on whether the terms of particular awards were breached," "it would be quite extraordinary" to find that plaintiffs' claims are contractual. *AIDS Vaccine Advoc. Coal. v. U.S. Dep't of State*, 770 F. Supp. 3d 121, 137 (D.D.C. 2025); *see also, e.g.*, *Widakuswara v. Lake ("Widakuswara II")*, No. 25-5144, 2025 WL 1288817, at *12 (D.C. Cir. May 3, 2025) (Pillard, J., dissenting from grant of stay pending appeal) ("What matters is what the court must examine to resolve the case: If a plaintiff's claim depends on interpretations of statutes and regulations rather than the terms of an agreement negotiated by the parties, the claim is not in essence contractual." (citing *Crowley*, 38 F.4th at 1109-10)), *stay pending appeal vacated by* 2025 WL 1521355, at *1 (D.C. Cir. May 28, 2025) (en banc) (adopting Judge Pillard's reasoning in vacating the panel's stay); *Md. Dep't of Hum. Res. v. Dep't of Health & Hum. Servs.*, 763 F.2d 1441, 1449 (D.C. Cir. 1985) (Bork, J.) (holding that, where "claims arise under a federal grant program and turn on the interpretation of statutes and regulations rather than on the interpretation of an agreement negotiated by the parties," the claims "are not contract claims for Tucker Act purposes"); *Megapulse*, 672 F.2d at 968 (cautioning that courts "must not" interpret the Tucker Act "so broad[ly] as to deny a court jurisdiction to consider a claim that is validly based on grounds other than a contractual relationship with the government"); *S. Educ. Found. v. U.S. Dep't of Educ.*, No. 25-cv-1079 (PLF), --- F. Supp. 3d ---, 2025 WL 1453047, at *7 (D.D.C. May 21, 2025) ("While a grant agreement may operate as a contract, the Court need not look to the terms of the grant agreement at all to adjudicate [the plaintiff's] claims.").

---

government's authority to terminate the cooperative agreements, *see* Defs.' Opp'n at 12, 21, 27, 29, and to argue the cooperative agreements provide a direct benefit to the government, *see id.* at 11, 16. This reinforces the conclusion that none of the claims on which plaintiffs seek relief depend on interpreting the text of the cooperative agreements.

Defendants argue in opposition that "any funds disbursed to grantees like Plaintiffs are paid solely pursuant to grant agreements (*i.e.*, contracts), between ILAB and the grantees," Defs.' Opp'n at 12, and that no "statutory obligation" otherwise exists "as to specific funds owed" to plaintiffs, *id.* at 13, reasoning, therefore, that plaintiffs' claims must be contractual, *id.* at 12-13. The problem with defendants' reasoning is that the premises are merits arguments masquerading as jurisdictional ones. Recall that plaintiffs are the "masters of the complaint" and may choose the grounds on which they seek relief. *de Csepel*, 714 F.3d at 598 (quoting *Caterpillar*, 482 U.S. at 395). The rights claimed by plaintiffs are exclusively statutory and constitutional and do not rely on any specific term of the cooperative agreements. *See generally* Compl. To the extent plaintiffs fail to prove (1) the existence of the claimed constitutional or statutory right, or (2) a violation of such right, plaintiffs will not be entitled to relief on the corresponding claim. Any such failures to prove the merits of their claims, however, do not "transform" plaintiffs' statutory and constitutional claims into contractual ones. *See Crowley*, 38 F.4th at 1107 (quoting *Megapulse*, 672 F.2d at 968). As the D.C. Circuit cogently explained in *Megapulse*, "the jurisdictional bar of sovereign immunity in property disputes arising from contractual relationships does not necessarily apply where the government defendants are charged with having acted beyond the scope of their statutory authority." 672 F.2d at 969. That is the precise circumstance here.

### b.    *ILAB Cooperative Agreements Are Not Contracts Within the Jurisdiction of the Court of Federal Claims.*

Moreover, caselaw from the Federal Circuit and Court of Federal Claims demonstrates that those courts would not view the ILAB cooperative agreements as contracts over which the Court of Federal Claims has exclusive jurisdiction, further supporting plaintiffs' argument that the rights they assert are not "essentially contractual" and subject to the exclusive jurisdiction conferred by the Tucker Act.

26

"The Tucker Act grants the Court of Federal Claims jurisdiction over contract suits against the United States." *Nat'l Leased Hous. Ass'n v. United States*, 105 F.3d 1423, 1427 (Fed. Cir. 1997). To constitute a contract with the United States, an agreement must "contain[] the four required elements of offer, acceptance, consideration, and proper government authority." *San Antonio Hous. Auth. v. United States*, 143 Fed. Cl. 425, 463 (2019); *see also, e.g.*, *Trauma Serv. Grp. v. United States*, 104 F.3d 1321, 1326 (Fed. Cir. 1997) ("[A]ny agreement can be a contract within the meaning of the Tucker Act, provided that it meets the requirements for a contract with the Government, specifically: mutual intent to contract including an offer and acceptance, consideration, and a Government representative who had actual authority to bind the Government."); *St. Bernard Parish Gov't v. United States*, 134 Fed. Cl. 730, 735 (2017) (citing *City of El Centro v. United States*, 922 F.2d 816, 820 (Fed. Cir. 1990)). Plaintiffs do not contest the existence of offer, acceptance, and proper government authority but argue that the ILAB cooperative agreements lack sufficient consideration "to constitute 'contracts'" with the government. Pls.' Mem. at 13; *see also* Defs.' Opp'n at 15 (correctly noting that plaintiffs challenge only whether sufficient consideration exists and "do not dispute offer, acceptance, or proper government authority to enter into the agreements").

"In the context of government contracts . . . consideration must render a benefit to the government, and not merely a detriment to the contractor." *St. Bernard Parish Gov't*, 134 Fed. Cl. at 735 (ellipsis in original) (quoting *Metzger, Shadyac & Schwarz v. United States*, 12 Cl. Ct. 602, 605 (1987)). This required benefit to the federal government "must be 'tangible' and 'direct,' rather than 'generalized' or 'incidental.'" *Am. Near E. Refugee Aid*, 703 F. Supp. 3d at 132 (quoting *St. Bernard Parish Gov't*, 134 Fed. Cl. at 736).

i.    **DOL Denomination as "Cooperative Agreements"**

27

Federal law authorizes federal agencies to use different types of legal instruments to establish and structure legal relationships with individuals and organizations.  Two such legal instruments are relevant to this case.  First, federal agencies are directed to use procurement contracts when "the principal purpose" of an agreement is "to acquire . . . property or services for the *direct benefit or use* of the United States Government."  31 U.S.C. § 6303(1) (emphasis supplied).  In contrast, a cooperative agreement should generally be used when "the principal purpose of the relationship" established by the agreement "is to transfer a thing of value to the . . . recipient to carry out a *public purpose* of support or stimulation authorized by a law of the United States *instead of* acquiring . . . property or services for the direct benefit or use of the United States Government." 31 U.S.C. § 6305(1) (emphasis supplied).[5]  By authorizing federal agencies to use these types of agreements in different circumstances, Congress intended "to provide federal agencies with the 'flexibility' to determine 'whether a given transaction or class of transactions is procurement or assistance.'"  *Hymas v. United States*, 810 F.3d 1312, 1329 (Fed. Cir. 2016).

Despite the parties' agreement to skip submission of any statement of undisputed material facts in support of their respective partial cross-motions for summary judgment, among the non-disputed material facts gleaned from the briefing is that the terminated agreements between ILAB and plaintiffs were memorialized as cooperative agreements.  *See, e.g.*, Pls.' Reply at 1 (describing the agreements between plaintiffs and ILAB as "cooperative agreements"); Defs.' Opp'n at 1 (acknowledging that the challenge in this case is to "the terminations of certain cooperative grant

---

[5]     These definitions were established in the Federal Grant and Cooperative Agreement Act of 1977 ("FGCAA"), Pub. L. No. 95-224, 92 Stat. 3 (Feb. 3, 1978) (codified at 31 U.S.C. § 6301 et seq.).  In explaining the need for such legislation, Congress expressly found that a need existed "to distinguish Federal assistance relationships from Federal procurement relationships" due to "uncertainty as to the meaning of such terms as 'contract,' 'grant,' and 'cooperative agreement' and the relationships they reflect," which had led to "operational inconsistencies, confusion, inefficiency, and waste for recipients of awards as well as for executive agencies." *Id.* § 2(a)(1)-(2), 92 Stat. at 3; *see also Hymas v. United States*, 810 F.3d 1312, 1325 (Fed. Cir. 2016) (explaining the background and purposes of the FGCAA).

agreements").  To be sure, an agency's choice of instrument is not dispositive of the question whether an agreement constitutes a contract within the meaning of the Tucker Act.  *See, e.g.*, *San Antonio Hous. Auth.*, 143 Fed. Cl. at 463 (noting that "any contract, including a cooperative agreement, could fall within [the Court of Federal Claims's] jurisdiction" if it contains the four required elements, and thus that "cooperative agreements are not categorically excluded from this court's jurisdiction"); *see also id.* at 461-62 (citing *Thermalon Indus., Ltd. v. United States*, 34 Fed. Cl. 411, 417-19 (1995)).  Yet, how the government agency classifies or denominates an agreement has probative value in assessing the sufficiency of the consideration the agency expects and whether such consideration is of sufficient direct benefit to the agency to qualify as a contract for purposes of the Tucker Act.  Here, the classification of plaintiffs' agreements as "cooperative agreements" indicates that ILAB and the Department of Labor did not view these agreements as procuring services for the direct benefit of the government, but rather as carrying out a public purpose through defendants' assistance of plaintiffs' international labor work.  *See Hymas*, 810 F.3d at 1329 (explaining that "[c]ourts should exercise caution" before second-guessing an agency's decision of which type of legal instrument to use).  Thus, for example, when an agreement was "labeled 'Cooperative Agreement,'" the Court of Federal Claims has highlighted that label as evidence *against* finding a contract within that court's exclusive jurisdiction, *St. Bernard Parish Gov't*, 134 Fed. Cl. at 735, and when an agreement was labeled a "procurement contract[]," that label has been cited as evidence *supporting* a finding that a contract existed, *see Anchorage v. United States*, 119 Fed. Cl. 709, 713 (2015).

### ii.    Defendants' Claimed "Direct" Benefits

The labeling of the terminated ILAB agreements as cooperative agreements is probative, but further inquiry is necessary in assessing whether these agreements provide, as defendants

argue, multiple "direct benefits" to the government.  *See* Defs.' Opp'n at 15-17.  On the current record, none of the purported direct benefits identified by defendants are sufficient to constitute consideration and, whether considered separately or holistically, the benefits cited are too attenuated from the primary purposes of the agreements to amount to direct benefits to DOL or the government more generally.  The benefits identified by defendants are addressed *seriatim*.

### *(a)    Trade Compliance Monitoring*

First, defendants assert that plaintiffs have conceded that some of their terminated cooperative agreements "provide for and facilitate monitoring U.S. trading partners' compliance with trade agreement labor obligations" and "provided the Government with better enforced and more enforceable trade partnerships by increasing transparency regarding violations."  Defs.' Opp'n at 15 (citing Pls.' Mem. at 26, 32).  In so arguing, defendants essentially assert that, despite the label of "cooperative agreements," the ILAB agreements with plaintiffs functioned as contracts for the procurement of services.  *See, e.g.*, Mots. Hr'g Tr. at 56:17-23 (defendants' counsel claiming that "the agency uses these services" and "if it didn't have these services from plaintiffs, it would have to procure them or use them in other ways from other government agencies").[6]

Defendants' assertion finds some traction in plaintiffs' own descriptions of their agreements and declarations submitted by plaintiffs to support their pending motions.  For example, Thea Lee, the former Deputy Undersecretary for International Labor Affairs at DOL,

---

[6]    Despite defendants' seeming characterization of the cooperative agreements as procurement contracts for services, defendants make no reference to the Contracts Disputes Act ("CDA"), Pub. L. No. 95-563, 92 Stat. 2383 (Nov. 1, 1978), though this statute "applies to any express or implied contract . . . made by an executive agency for," among other things, "the procurement of services," 41 U.S.C. § 7102(a), (a)(2), and "the Tucker Act, in conjunction with the CDA, purports to make the Court of Federal Claims the exclusive trial court for hearing disputes over government contracts that fall under the CDA," *Tex. Health Choice, L.C. v. OPM*, 400 F.3d 895, 899 (Fed. Cir. 2005) (quoting *Quality Tooling, Inc. v. United States*, 47 F.3d 1569, 1572-73 (Fed. Cir. 1995)).  *See* Mots. Hr'g Tr. at 52:4-17 (defendants' counsel acknowledging that the CDA was not raised).  At the same time, plaintiffs did not comment on defendants' omission of any reference to, or reliance on, the CDA in briefing or at the hearing by way of countering defendants' characterization of the cooperative agreements as providing monitoring services to the government.  *See id.* at 8:7-19 (plaintiffs' counsel acknowledging that no reference to the CDA was made).

who led ILAB from May 2021 to January 2025, describes ILAB's work as "critical to enforcement of the Uyghur Forced Labor Prevention Act and the [USMCA], as well as other bilateral and regional trade agreements and unilateral preference programs."  Pls.' Mot., Ex. 5, Decl. of Thea Lee, former Deputy Undersecretary for International Labor Affairs, U.S. Department of Labor ("Lee Decl.") ¶¶ 1, 3, ECF No. 9-5.  Likewise, plaintiffs describe ILAB-funded projects as intended to "make America stronger and more prosperous by, among other things, 'ensur[ing] workers and businesses in the United States are not put at a competitive disadvantage' when other countries ignore their labor commitments," Pls.' Mem. at 26 (alteration in original) (quoting S. REP. NO. 118-84, at 31), and "benefit American policy interests by helping to ensure that U.S. trade partners are complying with their obligations under negotiated trade agreements," *id.* at 32.

Read in context, however, defendants overread plaintiffs' descriptions about the importance of ILAB's funding of cooperative agreements for the provision of technical assistance programs as amounting to providing monitoring services on foreign countries' compliance with United States multi-lateral and bi-lateral trade agreements.  Plaintiffs' descriptions are certainly not concessions that plaintiffs were engaged in procured monitoring work on behalf of the U.S. government, as defendants suggest.  *See* Defs.' Opp'n at 15.  Instead, plaintiffs argue throughout their briefing that their work helps support U.S. interests by "promot[ing] respect for labor rights and improv[ing] working conditions around the world."  Pls.' Mem. at 1.  These characterizations are consistent with how the Senate Appropriations Committee described ILAB's cooperative agreement programs in a report accompanying the 2024 Appropriations Act.  S. REP. NO. 118-84, at 31 (describing ILAB's technical assistance programs as helping "improve working conditions and labor standards for workers around the world").  Taken together, plaintiffs' arguments are more fairly read as claiming that plaintiffs' projects help achieve compliance with trade obligations

by improving working standards and respect for labor rights. These efforts help ensure countries have the tools and capacity to live up to labor commitments in trade agreements, a task that is important but far different from conducting monitoring on how well the countries are fulfilling specific trade agreement commitments. *See, e.g.*, Pls.' Mem. at 5 (describing plaintiff Solidarity Center's projects to "improve working conditions and respect for workers' rights in key export industries in Central America; combat unsafe working conditions in Bangladesh's garment, shrimp, and construction sectors; and build both state and union capacity in Mexico"); *id.* at 8 (referencing "partnerships with governments, unions, universities, and community organizations around the globe"); *id.* at 9 (describing plaintiff AIR's work to "provide training for government staff, unions, and workers, and to complete crucial upgrades to various electronic systems" in Mexico). That plaintiffs described these technical assistance and capacity-building efforts as *important* in helping ensure other countries' compliance with their trade commitments does not amount to a concession that plaintiffs were engaged in *monitoring* compliance with those commitments. *See also* Mots. Hr'g Tr. at 14:14-16 (plaintiffs' counsel arguing defendants' concession claim "misconstrues the nature of the program here and the nature of the types of projects that are at issue").

The context of the Lee Declaration is similarly important, revealing that the statement discussing ILAB's work as "critical to enforcement" of U.S. trade agreements described the efforts of ILAB generally and was not specific to ILAB-funded projects or plaintiffs' cooperative agreements. Lee Decl. ¶ 3 (describing "ILAB's work" as "critical to enforcement" of various trade agreements). Instead, in the declaration's description of the work of ILAB awardees, Lee explains that the awards given through cooperative agreements "support technical assistance projects addressing child labor and other workers' rights issues," *id.* ¶ 4, and "respond to critical labor

issues around the world," *id.* ¶ 5.  Examples of such projects include efforts in the wake of the USMCA to "support Mexico's compliance with the labor requirements of the trade agreement," *id.* ¶ 7; *see also* Pls.' Mem. at 5, 9 (discussing plaintiffs' capacity-building, training, and other labor rights work in Mexico), and child labor and forced labor surveys, the information from which was used by "[t]he governments of Ghana and Cote d'Ivoire . . . to develop and implement national Child Labor Action Plans to address child labor in the cocoa, fishing, and agriculture sectors," Lee Decl. ¶ 10.  Supporting improved working conditions in foreign trading countries is far different from monitoring compliance with trade agreements, and nowhere does Lee state or suggest that awardees of the cooperative agreements generally, or plaintiffs specifically, were tasked with trade agreement compliance monitoring on behalf of the U.S. government, *see generally id.*

Moreover, defendants' assertion that the government "would have to procure . . . from other government agencies" the services provided by plaintiffs, Mots. Hr'g Tr. at 56:17-20, appears to be unfounded.  The government had no specific obligation, under either the USMCA Trade Agreement or USMCA Implementation Act or congressional appropriations statutes, to provide services to workers "in Bangladesh's garment, shrimp, and construction sectors," Pls.' Mem. at 5, or "at a tire plant in Mexico," *id.* at 9, or to any of the other beneficiaries of plaintiffs' ILAB-funded projects.  As the Court of Federal Claims has explained, an agency "is acquiring [an] intermediary's services for its own direct benefit or use if the agency otherwise would have to use its own staff to provide to beneficiaries the services offered by the intermediary," while "an agency is obtaining services for a public purpose if the agency is charged with providing support or assistance to intermediaries as opposed to the final beneficiaries."  *360Training.com, Inc. v. United States*, 104 Fed. Cl. 575, 580 (2012) (citing GAO Office of General Counsel, Principles of Federal Appropriations Law, Vol. 2, Ch. 10 (3d ed. Feb. 2006)).  Here, the appropriations statutes under

which ILAB entered the terminated cooperative agreements plainly fall into the latter category, directing the agency to provide support to organizations running certain types of programs—i.e., organizations that are intermediaries like plaintiffs—rather than requiring ILAB to support any particular foreign workers as the direct beneficiaries of such programs. *See, e.g.*, 2024 Appropriations Act, 138 Stat. at 641 (directing ILAB to use funds to support "programs to combat exploitative child labor internationally" and "model programs that address worker rights issues through technical assistance"); USMCA Implementation Act, 134 Stat. at 100 (directing ILAB to provide funding "to support worker-focused capacity building, efforts to reduce workplace discrimination in Mexico, efforts to reduce child labor and forced labor in Mexico, efforts to reduce human trafficking, efforts to reduce child exploitation, and other efforts related to implementation of the USMCA").

On the current record, defendants' claim that plaintiffs engaged in monitoring of trade agreement compliance cannot constitute consideration within the meaning of the Tucker Act.

### (b)    Other Claimed "Direct" Benefits

Defendants baldly state that the achievement of "broader policy aims . . . through grant agreements are sufficient consideration" to trigger Tucker Act jurisdiction in the Court of Federal Claims. Defs.' Opp'n at 16. This is incorrect. The Federal Circuit has made clear that merely because an agreement "indirectly benefit[s]" an agency by "advanc[ing] the agency's overall mission," is insufficient to establish consideration. *Hymas*, 810 F.3d at 1328; *see also Purpose Built Fams. Found., Inc. v. United States*, 167 Fed. Cl. 714, 718 (2023) ("That the agreements indirectly benefit the VA by furthering its mission of reducing homelessness among veterans does not render the agreements procurement contracts."). As the Federal Circuit has concluded, holding otherwise would risk turning all cooperative agreements into contracts, since "nearly all

cooperative agreements" advance some government agency's "overall mission," *Hymas*, 810 F.3d at 1328—that is, after all, why the government enters into such agreements in the first place. This indirect benefit to the government, therefore, does not constitute consideration.

Defendants press on to find adequate consideration to DOL, claiming next that the government received "knowledge and information regarding the success of ILAB projects" that would help ILAB "better understand what makes certain projects successful and utilize its resources more effectively going forward." Defs.' Opp'n at 15. This strained effort is similarly unsuccessful. Such potential future government savings are too speculative to constitute a "direct" and "tangible" benefit to the government. *See, e.g.*, *St. Bernard Parish*, 134 Fed. Cl. at 732, 735-36 (finding, in a case involving a cooperative agreement to provide money to a Louisiana parish to help alleviate flood risks after Hurricane Katrina, that "a reduction in the amount of emergency funds that the Government would spend in future flooding emergencies" was "not the kind of direct benefit . . . that would support the finding" of consideration, because this benefit was only "incidental" and "generalized"). Indeed, the government could argue that *every* cooperative agreement provides "knowledge and information" about project success and resource allocation, Defs.' Opp'n at 15, meaning that accepting this argument as sufficient for consideration would risk turning all cooperative agreements into contracts under the Tucker Act, precisely the outcome rejected by the Federal Circuit, *see Hymas*, 810 F.3d at 1328 (relying in part on this concern in rejecting an indirect benefit as insufficient for consideration). Without identifying specific information provided pursuant to the agreements that produced some tangible benefit to the government, these claimed benefits can only be described as generalized, indirect, and speculative.

Nor do the cooperative agreements' Buy American and Fly American requirements, *see* Defs.' Opp'n at 16, provide the required direct and tangible benefit to the government to constitute

consideration.  Defendants argue that these clauses would "benefit the Government through any federal taxes paid on such products or airfares, as well as increasing the revenue of U.S. businesses in ways that may further increase revenues to the Government." *Id.*  As this language makes clear, however, any such benefits would accrue only through an attenuated chain of events, requiring the payment of indeterminate taxes on hypothetical future purchases and the possible collection of increased tax revenue from theoretical increases in U.S. business revenue—in other words, on the record in this case, possible *indirect* and currently *intangible* benefits amounting to no more than "[s]peculation," Pls.' Reply at 10.  As to the "royalty-free rights to media created by the grantee[s]," Defs.' Opp'n at 16, defendants offer no evidence that these rights have any, much less significant, value, *see* Pls.' Reply at 10—easily distinguishing them from defendants' citation to *Thermalon Industries*, *see* Defs.' Opp'n at 16 (arguing the grant of royalty-free rights is similar to those granted in *Thermalon Industries*), where the rights at issue "potentially had significant economic value," 34 Fed. Cl. at 415; *see also* Pls.' Reply at 10 (making this point).

In short, plaintiffs' cooperative agreements do not provide the direct and tangible benefit to ILAB, DOL or the government to qualify as consideration for a contract to fall within the jurisdictional confines of the Tucker Act.  For all these reasons, the rights claimed by plaintiffs in this case are not "essentially contractual" and do not belong in the Court of Federal Claims.

## 2.    The Relief Sought is Not Contractual

As relief for the claimed violations, plaintiffs seek an injunction "[v]acat[ing] Defendants' ILAB termination notices" and "order[ing] reinstatement" of all ILAB cooperative agreements terminated between March 13 and March 27, 2025.  Compl. at 24; Pls.' Mem. at 1.  This remedy resembles neither "the 'explicitly contractual remedy' of specific performance" nor "the

'prototypical contract remedy' of money damages—the two "types of relief that are 'specific to actions that sound in contract.'" *Crowley*, 38 F.4th at 1107 (quoting *Perry Cap.*, 864 F.3d at 619).

Consider money damages first. As the Supreme Court has explained, money damages "provide relief that substitutes for that which ought to have been done." *Bowen v. Massachusetts*, 487 U.S. 879, 910 (1988); *see also Md. Dep't of Hum. Res.*, 763 F.2d at 1446 (describing money damages as "money in compensation for the losses . . . that [the plaintiff] will suffer or has suffered"). In the instant case, plaintiffs do not seek any monetary award to compensate them for any alleged losses they have already experienced or may suffer in the future. *See* Mots. Hr'g Tr. at 11:12-23 (plaintiffs' counsel explaining that plaintiffs "don't have any request[s]" for "payment for services already rendered [or] requests to draw down on . . . grant funds for things that . . . already happened"); *see generally* Compl. Instead, they seek "prospective, nonmonetary relief to clarify future obligations," *Me. Cmty. Health v. United States*, 590 U.S. 296, 327 (2020)— here, the vacatur of the cooperative agreement terminations and reinstatement of the agreements on a forward-looking basis, Compl. at 24. The fact that such relief, if granted, might result in the government paying money to plaintiffs does not change the character of the relief sought. As the Supreme Court has "long recognized," the "fact that a judicial remedy may require one party to pay money to another is not a sufficient reason to characterize the relief as 'money damages.'" *Bowen*, 487 U.S. at 893; *see also Dep't of Educ. v. California*, 145 S. Ct. 966, 968 (2025) (per curiam) ("[A] district court's jurisdiction 'is not barred by the possibility' that an order setting aside an agency's action may result in the disbursement of funds." (quoting *Bowen*, 487 U.S. at 910)).

Nor is the relief sought by plaintiffs merely "an order requiring specific performance" of the cooperative agreements, as defendants argue. Defs.' Opp'n at 2. The equitable remedy of

specific performance "is available only to protect contract rights." 71 Am. Jur. 2d *Specific Performance* § 1 (2025). As a result, such an order is not granted "unless there has been a breach of contract," or, "[i]n unusual circumstances, . . . merely a threatened breach." Restatement (Second) of Contracts § 357 cmt. a (Am. L. Inst. 1981); *see also* 71 Am. Jur. 2d *Specific Performance* § 1 ("[A] decree of specific performance is designed to remedy a past breach of contract."). In the instant case, however, as already discussed, plaintiffs do not allege a breach of contract or seek relief on any contractual basis, *supra* Part III.A.1.a.; *see generally* Compl., and thus no remedy for breach of contract could be issued in this case.

Instead, plaintiffs allege that defendants' termination of ILAB cooperative agreements violated the Constitution and various federal statutes and seek vacatur of the cooperative agreement terminations on that basis. *See* Compl. at 21-24 (Counts I-V and Prayer for Relief). As the D.C. Circuit recently explained, "[v]acatur is the normal remedy when [courts] are faced with unsustainable agency action." *N.J. Conservation Found. v. FERC*, 111 F.4th 42, 63 (D.C. Cir. 2024) (internal quotation marks omitted) (quoting *Bhd. of Locomotive Eng'rs & Trainmen v. Fed. R.R. Admin*, 972 F.3d 83, 117 (D.C. Cir. 2020)); *see also, e.g.*, *Dep't of Com. v. New York*, 588 U.S. 752, 788-89 (2019) (Thomas, J., joined by Gorsuch, J., and Kavanaugh, J., concurring in part and dissenting in part) ("[T]he APA requires courts to 'hold unlawful and set aside' agency action that is 'arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law.'" (quoting 5 U.S.C. § 706(2)(A))); *S. Educ. Found.*, 2025 WL 1453047, at *7 (noting that setting aside unlawful agency action "is 'precisely the relief that is afforded—indeed, required—by and routinely granted under the APA.'" (quoting *AIDS Vaccine Advoc. Coal.*, 770 F. Supp. 3d at 135)). That the allegedly unlawful action plaintiffs ask to be "set aside" in this case is the termination of cooperative agreements does not transform this normal APA remedy into specific performance.

"[S]o long as an action brought against the United States or an agency thereof is not one that should be classified from the outset as a 'contract action' for Tucker Act purposes," the remedies sought "are also not contract-related, and the mere fact that an injunction would require the same government restraint that specific (non)performance might require in a contract setting is an insufficient basis to deny a district court the jurisdiction otherwise available and the remedial powers otherwise appropriate." *Megapulse*, 672 F.2d at 971.

Moreover, "[t]he type of relief plaintiffs seek is unavailable in the Court of Federal Claims, which 'has no power to grant equitable relief.'" *Widakuswara II*, 2025 WL 1288817, at *13 (Pillard, J., dissenting) (quoting *Bowen*, 487 U.S. at 905). "The Court of Federal Claims' lack of authority to address" plaintiffs' requests for declaratory and injunctive relief "underscores why it is not the appropriate court" to hear plaintiffs' claims. *Id.* (citing *Crowley*, 38 F.4th at 1109; *Nat'l Ctr. for Mfg. Scis. v. United States*, 114 F.3d 196, 201 (Fed. Cir. 1997)).

Again, whether plaintiffs have shown they are entitled to vacatur of the ILAB termination letters is a merits issue. What matters for the jurisdictional inquiry is that, in seeking the remedy of vacatur, plaintiffs have sought a remedy distinct from specific performance and "not specific to actions that sound in contract." *Crowley*, 38 F.4th at 1110 (quoting *Perry Cap.*, 864 F.3d at 619); *see also AIDS Vaccine Advoc. Coal.*, 770 F. Supp. 3d at 137 ("The critical point is that here Plaintiffs assert APA claims to invalidate agency [action], regardless of any breach of any agreement or the extent of their losses."); *Kidwell*, 56 F.3d at 284 ("[A]s long as the plaintiff's complaint only requests non-monetary relief that has 'considerable value' independent of any future potential for monetary relief . . . we respect the plaintiff's choice of remedies and treat the complaint as something more than an artfully drafted effort to circumvent the jurisdiction of the Court of Federal Claims." (internal citations omitted)).

### 3.    Recent Supreme Court Emergency Docket Decisions

Finally, defendants contend that the Supreme Court's recent emergency docket decision in *Department of Education v. California*, 145 S. Ct. 966, is "dispositive" of the Court of Federal Claims' jurisdiction over plaintiffs' claims in this case. Defs.' Opp'n at 1. In that case, the Supreme Court stayed, pending appeal, a district court order "enjoining the Government from terminating various education-related grants," finding that the government was likely to succeed on the claim that the district court lacked jurisdiction to grant such relief. *California*, 145 S. Ct. at 968. In particular, the Supreme Court explained that the district court's order amounted to an "order[] 'to enforce a contractual obligation to pay money,'" which fell within the exclusive jurisdiction of the Court of Federal Claims under the Tucker Act. *Id.* (quoting *Great-West Life & Annuity Ins. Co. v. Knudson*, 534 U.S. 204, 212 (2002)).

*California* does not control the jurisdictional issue raised in this case for at least three reasons. First, in *California*, the Supreme Court was confronted with the First Circuit's factual determination that "the terms and conditions of each individual grant award [were] at issue" in the case. *California v. Dep't of Educ.*, 132 F.4th 92, 96-97 (1st Cir. 2025). The appellate court's reliance on the terms of the contracts underlying the claims in that case might explain why the Supreme Court, while explicitly recognizing that "a district court's jurisdiction 'is not barred by the possibility' that an order setting aside an agency's action may result in the disbursement of funds," *California*, 145 S. Ct. at 968 (quoting *Bowen*, 487 U.S. at 910), nevertheless found that the district court's order in *California* was essentially one to "enforce a contractual obligation to pay money," *id.* (citation omitted). In contrast, in the instant case, plaintiffs do not seek to enforce any contractual obligations, since their claims do not depend on any term or condition of the cooperative agreements. *See supra* Part III.A.1.a., n.4; *Crowley*, 38 F.4th at 1109 (finding that the

claims at issue were not essentially contractual where, in part, they could not be resolved by "examining a contractual promise").

Second, the Supreme Court's order in *California* was issued to resolve an emergency application for a stay pending appeal and does not displace decades of binding Supreme Court and D.C. Circuit precedent governing the Tucker Act jurisdictional inquiry. *Cf. S. Educ. Found.*, 2025 WL 1453047, at *9 ("[T]he Supreme Court's stay order . . . does not displace governing law."); *Climate United Fund v. Citibank, N.A.*, No. 25-cv-698 (TSC), --- F. Supp. 3d ---, 2025 WL 1131412, at *11 (D.D.C. Apr. 16, 2025) (noting the Supreme Court's reliance on *Bowen*, 487 U.S. 893, and applying *Bowen*'s jurisdiction analysis); *New York v. Trump*, No. 25-cv-39, 2025 WL 1098966, at *2 (D.R.I. Apr. 14, 2025) (noting that *Bowen* remains "the guiding compass"). Applying *Bowen* and other binding precedents to the facts and circumstances of this case demonstrates that this Court has subject-matter jurisdiction to hear plaintiffs' claims. *See supra* Parts III.A.1-2.

In any event, "[t]o the extent that the Supreme Court's action on emergency stay orders influences how [courts] apply[] binding precedent" from the Supreme Court and D.C. Circuit,  the claims in the instant case are more analogous to those in *AIDS Vaccine Advocacy Coalition*, 145 S. Ct. 753 (2025), where the Supreme Court, again addressing an emergency docket motion by the government, declined to stay the interim injunctive relief granted by the district court despite the government's assertion that the claims belonged in the Court of Federal Claims, than to the claims at issue in *California*. *Widakuswara II*, 2025 WL 1288817, at *14 (Pillard, J., dissenting) (making the same point).  Notably, as Judge Pillard explained in dissent from the emergency panel decision granting a stay pending appeal in *Widakuswara* that was subsequently reversed by the *en banc* D.C. Circuit, *see generally id.*, the plaintiffs in *AIDS Vaccine Advocacy Coalition*:

41

> claimed a right to be free from government action—the wholesale termination of the plaintiffs' grant funding—they claimed exceeded the authority conferred by statute and the Constitution. As here, their claims did not depend on whether their contracts were breached, but on whether the agency's policy directives were unlawful in the face of federal statutes appropriating funds for specific purposes.

*Id.* (explaining the denial of the stay motion in *AIDS Vaccine Advocacy Coalition*). This description applies word for word to the claims raised by plaintiffs in this case. *See supra* Part III.A.1.a. Thus, analysis of the Supreme Court's recent emergency docket actions is another factor favoring the conclusion that subject-matter jurisdiction exists for plaintiffs' claims. *See Widakuswara II*, 2025 WL 1288817, at *14 (Pillard, J., dissenting) ("To the extent that the Supreme Court's action on emergency stay orders influences how we apply binding precedent of that court and this one, it favors denying the stay here as in *AIDS Vaccine Advocacy Coalition*.").

\*\*\*

In sum, plaintiffs' claims are not contract claims against the federal government within the exclusive jurisdiction of the Court of Federal Claims, and subject-matter jurisdiction may therefore be exercised by this Court to consider the merits of plaintiffs' claims.

### B.    Partial Summary Judgment (Counts I through IV)

Turning to the merits, the parties' partial cross-motions for summary judgment on Counts I through IV of the complaint will be considered next. Recall that these four claims challenge the termination of "all of ILAB's cooperative agreements and making it impossible for ILAB to fulfill Congress's mandate," Compl. ¶ 71, first, on the constitutional ground that this agency action was *ultra vires*, in violation of the separation of powers, by failing to comply with legislative directions in the USMCA Implementation Act and FY 2021 through 2024 DOL Appropriations Acts to "implement[] programs that combat child labor and address workers' rights issues in U.S. trading partner countries" and "spend a minimum amount on" those priorities (Count I), *id.* ¶ 70; *see id.*

¶¶ 69-71, and, second, that this action was "not in accordance with law," under the APA, but instead violated statutory requirements established in the USMCA Implementation Act and the FY 2021 through 2024 DOL Appropriations Acts (Count II), the Impoundment Control Act (Count III), and the Anti-Deficiency Act (Count IV), *see id.* ¶¶ 72-83.

The evidentiary record attached as exhibits in support of the parties' cross-motions is spare in both volume and relevant material facts. This is not helpful in identifying whether disputes of fact are present, let alone whether those disputes are genuine or relate to material facts.[7] The parties did not submit a statement of undisputed or disputed material facts that would have assisted in clarifying whether either side satisfied the applicable standard for summary judgment, under Federal Rule of Civil Procedure 56. *See* Parties' Notice of Proposed Order (stating that "[a] statement of material facts pursuant to Local Rule 7(h)(2) is not required"); Min. Order (May 12, 2025) (noting the agreement of the parties that no "statement of material facts is necessary, as otherwise required under D.D.C. Local Rule 7(h)(2)"). The current record does not identify basic information regarding the total number of ILAB cooperative agreements for which plaintiffs seek relief or confirming that all of these ILAB cooperative agreements had in fact, as alleged, been terminated within the same timeframe and for the same reason given to plaintiffs in their

---

[7]    The exhibits submitted by both sides total less than 100 pages. Plaintiffs submitted 73 pages and defendants submitted 21 pages. Plaintiffs' submissions include (1) four declarations, including one from each plaintiff organization and the former head of ILAB, *see* Bader-Blau Decl.; Seidenfeld Decl.; Dubbelt Decl.; Lee Decl.; (2) the termination letters for each of plaintiffs' cooperative agreements, *see* Solidarity Center Termination Letters; AIR Termination Letters; Global March Termination Letter; (3) a copy of one post from the social media site X, posted by the official account of Labor Secretary Chavez-DeRemer, *March 26 Chavez-DeRemer Post*; and (4) an interim evaluation of Global March's ILAB-funded project, published in January 2025, Dubbelt Decl., Ex. A., Interim Evaluation, ECF No. 9-4 at 8. Defendants, meanwhile, have submitted one declaration from the Administrator of DOL's office of grant management, *see* Kodiak Decl., as well as a copy of the termination guidance sent to plaintiffs in May 2025, *see* DOL Termination Guidance, and an excerpt of the terms and conditions of the Solidarity Center's award for work in the Republic of Georgia, *see* Kodiak Decl., Ex. B, Federal Award Terms and Conditions, ECF No. 19-1 at 6.

termination letters, as opposed to some other reason, *e.g.*, for illegal or other misconduct, warranting termination.

The holes in the current record are fatal to the parties' partial motions for summary judgment.  Given the uncertainty that still shrouds key questions in this case, neither side can show they are "entitled to judgment as a matter of law," FED. R. CIV. P. 56(a), and thus the parties' partial cross-motions for summary judgment are denied.

### 1.    APA Claim for Violation of Impoundment Control Act Is Not Precluded

Before turning to the merits of the pending summary judgment motions, defendants raise a threshold issue as to whether plaintiffs may bring an APA challenge for an alleged violation of the Impoundment Control Act, as claimed in Count III.   According to defendants, the Impoundment Control Act "provides for enforcement [only] by the Comptroller General" and "not private parties."   Defs.' Opp'n at 27 (citing 2 U.S.C. § 687).   By its terms, the APA "applies . . . except to the extent that . . . [other] statutes preclude judicial review," 5 U.S.C. § 701(a), (a)(1), because "Congress did not intend the general grant of review in the APA to duplicate existing procedures for review of agency action," *Bowen*, 487 U.S. at 903.  As a result, when "Congress has provided special and adequate review procedures" for a claim through other means, *id.* (citation omitted), that alternative means for pursuing a remedy will "oust a district court of its normal jurisdiction under the APA," *id.* at 904.

Here, defendants argue that the Impoundment Control Act provides such an adequate alternative review procedure by authorizing the Comptroller General to bring civil actions to enforce the law.  Defs.' Reply at 12 (citing 2 U.S.C. § 687; *Bowen*, 487 U.S. at 903); Defs.' Opp'n at 27.  As support for this proposition defendants rely on *Bowen*, but that case is inapposite.  There, the Supreme Court explained that "[a]t the time the APA was enacted, a number of statutes creating

administrative agencies defined the specific procedures to be followed in reviewing a particular agency's action," citing as examples provisions establishing that "Federal Trade Commission and National Labor Relations Board orders were directly reviewable in the regional courts of appeals, and Interstate Commerce Commission orders were subject to review in specially constituted three-judge district courts."  487 U.S. at 903.  Where such a provision exists, plaintiffs could not merely sue in a district court but were bound to follow the specific procedures when challenging actions of those agencies subject to them.  Yet, unlike the examples provided in *Bowen* of statutory special procedures for suit, no such statutorily-prescribed procedures are provided to funnel private claims challenging an agency's action in violation of the Impoundment Control Act.

Merely because Congress expressly provided a role and process for the Comptroller General to address perceived violations of that statute on behalf of the Congress does not operate more broadly, as defendants urge, to foreclose private parties from seeking review of agency action for violating the same statute under the APA.  If defendants were correct, as plaintiffs point out, "Plaintiffs [would] have *no* remedy" for their alleged injuries under the Impoundment Control Act—and this precise situation meets the APA prerequisite that no other adequate remedy exists through another specially designated judicial process.  Pls.' Reply at 16 (emphasis in original).

To the extent defendants are attempting to argue that APA review is impliedly precluded by the Impoundment Control Act due to the role provided by the Comptroller General, this argument is unpersuasive.  "Whether and to what extent a particular statute precludes judicial review is determined not only from its express language, but also from the structure of the statutory scheme, its objectives, its legislative history, and the nature of the administrative action involved."  *Block*, 467 U.S. at 345; *id.* at 348 (finding preclusive intent is "clear" in the operation of a "complex and delicate administrative scheme").  As the D.C. Circuit has explained, "[a]ny preclusion must

45

be 'fairly discernible in the statutory scheme' and must appear 'with sufficient clarity to overcome the strong presumption in favor of judicial review.'" *Confederated Tribes of the Chehalis Reservation v. Mnuchin*, 976 F.3d 15, 21 (D.C. Cir. 2020) (quoting first *Block*, 467 U.S. at 345, and then *Thryv, Inc. v. Click-to-Call Techs., LP*, 590 U.S. 45, 53 (2020)), *rev'd on other grounds sub nom. Yellen v. Confederated Tribes of the Chehalis Reservation*, 594 U.S. 338 (2021). Defendants have provided little analysis to support any conclusion as to the intent to preclude judicial review of claimed Impoundment Control Act violations under the APA. *See generally* Defs.' Opp'n; Defs.' Reply.   To repeat, the mere fact that the Impoundment Control Act affirmatively empowers the Comptroller General to sue is not sufficient to overcome the "strong presumption" in favor of review under the APA. *Accord AIDS Vaccine Advoc. Coal.*, 770 F. Supp. 3d at 148 n.17.  Accordingly, Count III's claim that defendants' actions were contrary to law, under the APA, by violating the Impoundment Control Act will be considered on the merits along with Counts II and IV.

### 2.    Plaintiffs' "Contrary to Law" APA Claims: Counts II, III, and IV

Both sides agree that all ILAB cooperative agreements were terminated in March 2025. *See* Pls.' Mem. at 6; Mots. Hr'g Tr. at 43:18-44:5 (defendants' counsel conceding as much).  The parties disagree, however, about facts crucial to the resolution of the APA claims in Counts II, III, and IV, including (1) the nature of the process by which DOL terminated all ILAB cooperative agreements; (2) whether DOL and its components intend to spend the funds appropriated to the ILAB for cooperative agreement programs for the purposes and in the minimum amounts statutorily required; and (3) whether efforts are underway by the agency to meet those legal requirements, if they have not already been met.

Plaintiffs challenge what they characterize as "DOL's decision to terminate all ILAB cooperative agreements," Pls.' Mem. at 6, and thus "to terminate ILAB's technical assistance

program in its entirety, *id.* at 1, due to a "policy disagreement" with the program, Compl. ¶ 74; *see also* Pls.' Mem. at 22; Mots. Hr'g Tr. at 70:14-16 (plaintiffs' counsel explaining "we conceive of this case as . . . the unlawful agency action is the elimination of all ILAB programming").  As part of that decision, plaintiffs allege that defendants have unlawfully "refused to spend" the money that Congress appropriated to ILAB, Pls.' Mem. at 22; *see also, e.g.*, *id.* at 17 (same), and thus failed to comply with the statutory requirements "to spend a minimum amount on" the priorities set out in the USMCA Implementation Act and the FY 2021-2024 Appropriations Acts, Compl. ¶¶ 70, 73.

In briefing and at the motions hearing, defendants challenge the factual accuracy of plaintiffs' allegations as to the agency's actions underlying the theory for each claim asserted. First, defendants argue that each ILAB cooperative agreement was "terminated individually," Mots. Hr'g Tr. at 46:2-6, rather than "en masse" as alleged by plaintiffs, Compl. ¶ 3, and, second, that these terminations did not represent an effort to shutter the ILAB technical assistance program entirely, Defs.' Opp'n at 30 n.10, but were based upon a determination that each agreement was not aligned with how the new Administration views the goals of the program, Defs.' Reply at 14 (claiming that ILAB made decisions to "terminate individual grants upon developing serious concerns about their alignment with agency priorities").  In other words, according to defendants, the termination of the cooperative agreements was not due to a policy disagreement with *Congress* but rather with each *cooperative agreement* in terms of how those extant agreements were intended to achieve the legislative goals.[8]

---

[8]    Defendants argue that plaintiffs' framing of the case creates a "standing problem" for plaintiffs.  Defs.' Reply at 11; *see also* Defs.' Opp'n at 30 n.10.  While not challenging plaintiffs' standing to bring APA claims in connection with their own fifteen terminated cooperative agreements, defendants urge that "Plaintiffs lack standing as to other grantee's [sic] termination decisions."  Defs.' Opp'n at 30 n.10; *see also id.* at 35-36 (discussing the scope of relief plaintiffs could receive if successful in this litigation).  This framing of the issue presupposes that defendants are correct as a factual matter that each grant termination resulted from an individual agency decision. *See id.* at 30 n.10 (stating as fact, without backup with any sworn declaration or other admissible evidence, that "the

47

Second, defendants dispute plaintiffs' allegation that the agency does not intend to spend the funds appropriated to ILAB. Instead, defendants posit that not only were the terminations of the ILAB cooperative agreements lawful, but also that at least some of the remaining funds from those terminated agreements may not be spent because the agency is legally prohibited from reallocating funds for which the authorizations have expired. *See* Defs.' Opp'n at 27 ("Plaintiffs conflate two separate, yet lawful, steps. . . . First, ILAB canceled grant agreements. Second, a statute then prohibited the agency from creating new, untimely obligations of the same funds under the expired appropriations."). Plaintiffs seemingly agree with defendants that "the authorizations to obligate funds in past appropriations bills have expired, except for the most recent continuing resolution," and that funds for which authorizations have expired cannot be reallocated. *See* Pls.' Mem. at 20. As to funds for which authorizations remain active, defendants' counsel represented that "the agency's intention is to reallocate" eligible ILAB funds "to alternative programs or grants that would be in accord with the agency's priorities." Mots. Hr'g Tr. at 62:9-13.

Exactly which funds or the amount of such funds that would be available for ILAB and DOL to reallocate is not clear from the current record. For instance, two of plaintiffs' terminated

---

agency . . . rendered individual termination decisions as to each grant agreement, so each is a discrete agency action"). That is not plaintiffs' theory of the case, however. Plaintiffs instead argue that the final agency action being challenged is defendants' over-arching decision to close down ILAB's technical assistance program funding abroad, resulting in termination of all ILAB cooperative agreements, and the claimed harms to plaintiffs. If plaintiffs are correct, they may challenge that decision, in its entirety, as unlawful. *See, e.g.*, *Nat'l Min. Ass'n v. U.S. Army Corps of Eng'rs*, 145 F.3d 1399, 1409 (D.C. Cir. 1998) ("The Administrative Procedure Act permits suit to be brought by any person 'adversely affected or aggrieved by agency action.' In some cases the 'agency action' will consist of a rule of broad applicability; and if the plaintiff prevails, the result is that the rule is invalidated, not simply that the court forbids its application to a particular individual. Under these circumstances a single plaintiff, so long as he is injured by the rule, may obtain 'programmatic' relief that affects the rights of parties not before the court." (quoting *Lujan v. Nat'l Wildlife Federation*, 497 U.S. 871, 913 (1990) (Blackmun, J., dissenting))); *see also id.* (noting that the quoted portion, although in dissent, was "apparently expressing the views of all nine Justices on this question"); *Lujan*, 497 U.S. at 890 n.2 ("If there is in fact some specific order or regulation" that is generally applicable and "is final, . . . it can of course be challenged under the APA by a person adversely affected—and the *entire* [program], insofar as the content of that particular action is concerned, would thereby be affected."). Thus, until the factual record is clearer, plaintiffs' allegations support their claims as to all terminated ILAB cooperative agreements, and they do not have the "standing problem" defendants suggest.

cooperative agreements were due to end in 2025, including one in June 2025, so likely much of the funding provided for those programs has already been spent. *See* Bader-Blau Decl. ¶ 10.a. (describing a Solidarity Center project in Mexico, funded by the USMCA Implementation Act, that originally had an end date of June 15, 2025); Dubbelt Decl. ¶ 11 (explaining that Global March's ILAB award was originally set to end in December 2025). The record, however, provides no evidence to illuminate this issue. Nor is the record clear as to whether the requisite minimum funding on specific programs has already been spent for past years across plaintiffs' fifteen terminated agreements or the fifty-four other terminated agreements. Nevertheless, defendants made clear at the motions hearing—though puzzlingly neither in their briefing nor in declarations that comport with Federal Rule of Civil Procedure 56(c)—that they dispute plaintiffs' claim that a decision was made not to spend any of the funds appropriated to ILAB. *See* Mots. Hr'g Tr. at 62:6-63:1.

To determine whether either party is entitled to summary judgment on Counts II, III and IV, the parties' respective positions on the factual circumstances surrounding the ILAB grant terminations must be tested against the current factual record in this case. A party may be granted summary judgment only if the record reveals that there "is no genuine issue of material fact" and thus that "judgment in the movant's favor is proper as a matter of law." *Soundboard Ass'n v. FTC*, 888 F.3d 1261, 1267 (D.C. Cir. 2018); *see also supra* Part II.A. To support or oppose a motion for summary judgment, parties must "cit[e] to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations . . . , admissions, interrogatory answers, or other materials," or alternatively "show[] that the materials cited [by an adverse party] do not establish the absence or presence of a genuine dispute, or that an adverse party cannot produce admissible evidence to support the fact." FED. R.

Civ. P. 56(c)(1)(A), (c)(1)(B).  As previously discussed, where, as here, both sides move for summary judgment, each motion must be evaluated separately to determine whether the Rule 56 standard has been satisfied.  *See supra* Part II.A.

Consider plaintiffs' motion first.  In support of their motion for summary judgment, plaintiffs point to three posts on the social media site X—two made by the official account of Secretary Chavez-DeRemer and one by the official account of the Department of Labor—as "probative of the intent in this mass termination program" and "the best evidence of what the agency is doing and why it is doing it."  Mots. Hr'g Tr. at 67:15-24 (plaintiffs' counsel discussing the cited posts).  Defendants strenuously oppose plaintiffs' motion, generally in the manner contemplated by Rule 56(c)(1)(B), by arguing that plaintiffs have not identified sufficient evidence to establish as undisputed their version of the facts.  *See, e.g., id.* at 65:9-66:18 (defendants' counsel arguing that "[t]here's no singular [agency] decision here that [plaintiffs] identify, which is a problem for all of their APA claims," and further that defendants "very strongly resist . . . the characterization of the [posts as stating anything about purpose"); Defs.' Reply at 11 (arguing that plaintiffs "identify no final agency action other than the 15 grant agreement terminations alleged in their Complaint"); Defs.' Opp'n at 30 n.10 (arguing first that "[p]laintiffs do not clearly articulate or provide any authority for an argument to amalgamate the termination decisions . . . and substantively review them 'en masse,'" and second that "the agency . . . rendered individual termination decisions as to each grant agreement," meaning that "each is a discrete agency action").

As an initial matter, only one of the posts relied on by plaintiffs was actually submitted as support for summary judgment in the form contemplated by Rule 56, as an exhibit to a properly sworn declaration, *see March 26 Chavez-DeRemer Post*, while the other two posts were cited only

in the unverified complaint and plaintiffs' briefs, *see* Compl. ¶ 49 (quoting *March 14 Chavez-DeRemer Post*); *id.* ¶ 55 (quoting *April 1 DOL Post*); Pls.' Mem. at 7 (quoting *March 14 Chavez-DeRemer Post*); Pls.' Reply at 20 (quoting *April 1 DOL Post*).  Though defendants did not contest in briefing or at the motions hearing the authenticity of these online posts, they contend that, even considering all three posts, this evidence falls well short of undisputed proof that DOL made a blanket decision to terminate all ILAB cooperative agreements or that defendants have decided not to reallocate appropriated funds, if legally feasible to do so.  Indeed, nothing in any of the three brief posts establishes as undisputed that all ILAB cooperative agreements were terminated, much less that the terminations were the result of a blanket decision.  Instead, the fact that the posts were made two weeks apart, in line with the two-week period over which plaintiffs' fifteen cooperative agreements were terminated, *see supra* Part I.C. (explaining that one of the Solidarity Center's agreements was terminated on March 13, two more were terminated on March 14, and the remaining twelve agreements were terminated on March 27), provides some support for defendants' claim that separate and individualized termination decisions were made for at least some of the agreements.  *See, e.g.*, *Ass'n for Educ. Fin. & Pol'y, Inc. v. McMahon*, Nos. 25-cv-999, 25-cv-1266 (TNM), --- F. Supp. 3d ---, 2025 WL 1568301, at *7 (D.D.C. June 3, 2025) (explaining, in a case challenging contract cancellations by an agency, that a multiple-week gap between cancellations "indicate[d]" that plaintiffs' claims were "improperly bundl[ed] together" and did not challenge one "circumscribed and discrete [agency] action" (alteration accepted; citation omitted)).  Still unclear from the current record is when in March 2025 the cooperative agreements held by awardees other than plaintiffs were terminated, for what reason, and following what process, *see* Mots. Hr'g Tr. at 43:21-23 (defendants' counsel conceding only that all ILAB cooperative agreements were terminated "[i]n March"), which information could better inform

which side's characterization of the agency action at issue is more accurate.  The closer in time, combined with similarity in process and reasons given for the terminations, the more plausible is plaintiffs' claim that a blanket termination decision was made constituting a final agency action. If the decisions were made intermittently, following an individualized review and decision-making process over the month of March, defendants' position that individual assessments resulted in terminations may be lent support instead.  *See Ass'n for Educ. Fin. & Pol'y*, 2025 WL 1568301, at *7.

As to the question of defendants' purpose in terminating the cooperative agreements— whether to reallocate unused funds in accord with both congressional requirements and the new Administration's policy prerogatives, as defendants' counsel represents, or to defy Congress and not spend the funds as legislatively required, as plaintiffs allege—plaintiffs rely on the same three online posts.  Two of the posts tout the termination of an unclear number of so-called "America Last" cooperative agreements, *see March 14 Chavez-DeRemer Post*; *March 26 Chavez-DeRemer Post*, providing evidence that Secretary Chavez-DeRemer disapproved of the specific projects referenced, which were apparently supported by ILAB cooperative agreements.  Moreover, the reference in the March 26 post to money "saved" resulting from the agreement terminations might suggest a plan not to spend the funds.  *See March 26 Chavez-DeRemer Post.*  At the same time, this statement could also indicate only that the funds would not be spent on the terminated agreements but would be reallocated to others more in line with the Administration's view of how to fulfill the applicable legislative mandates.  *See April 1 DOL Post* (referencing "reinvesting" the money "into the AMERICAN Workforce").  Whether plaintiffs' version of the factual circumstances of the ILAB cooperative agreement terminations is correct remains unclear on the

current record.  Consequently, plaintiffs have not shown they are entitled to summary judgment on Counts II, III and IV.

Turning to defendants' motion reveals that defendants have also failed clearly to establish as true, through admissible evidence in the record, their version of the facts.  While defendants' counsel argued at the motions hearing that each grant was evaluated and "terminated individually," Mots. Hr'g Tr. at 46:2-6, defendants have offered zero admissible evidence, in the form of a declaration of an agency official with personal knowledge, to support that claim, *see* FED. R. CIV. P. 56(c)(4).  In fact, while defendants submitted one declaration, from the Administrator of DOL's Office of Grants Management, Employment, and Training Administration, in support of their motion, that declaration does not address any aspect of the termination decisions.  *See generally* Kodiak Decl.  The same is true of defendants' counsel's representation at the motions hearing that "the agency's intention is to reallocate" eligible ILAB funds to fund new projects in line with the Trump Administration's policy priorities. Mots. Hr'g Tr. at 62:9-13.  This representation, again, surfaced only at the motions hearing, without any prior appearance anywhere in the record, as defendants' counsel conceded, *id.* at 62:20-63:1, and is not supported by any sworn declaration, *see generally* Kodiak Decl.  "[A] lawyer's argument . . . does not substitute for admissible evidence in support of or in defense against a summary judgment motion." *Am. Postal Workers Union, AFL-CIO v. USPS*, 65 F. Supp. 3d 134, 145 (D.D.C. 2014) (citing *Tom Sawyer Prods., Inc. v. Progressive Partners Achieving Sols., Inc.*, 550 F. Supp. 2d 23, 29 (D.D.C. 2008); *Davis v. District of Columbia*, No. 05-cv-2176, 2006 WL 3917779, at *5 (D.D.C. Sept. 28, 2006)); *see also Twin Rivers Paper Co. v. SEC*, 934 F.3d 607, 613 (D.C. Cir. 2019) (noting that, where an "affidavit or other evidence" is required, "briefs 'are not evidence'" (citation omitted)).  Defendants' counsel's representations, therefore, cannot weigh in favor of defendants' motion for summary judgment,

and defendants have not presented other evidence supporting these claims, much less establishing them as undisputed facts.

When a party fails to support properly a motion for summary judgment with admissible evidence, Rule 56 gives courts discretion in how to resolve the motion, including "(1) giv[ing the party] an opportunity to properly support . . . the fact," "(2) consider[ing] the fact undisputed for purposes of the motion," "(3) grant[ing] summary judgment if the motion and supporting materials — including the facts considered undisputed — show that the movant is entitled to it," or "(4) issu[ing] any other appropriate order." FED. R. CIV. P. 56(e)(1)-(4).  Here, denial of defendants' cross-motion is the appropriate step for several reasons.  First, under the circumstances in this case, where neither party has demonstrated that they are entitled to summary judgment, denial of defendants' cross-motion will allow defendants another opportunity to submit and support properly a motion for summary judgment.  Such a future motion may have the benefit of a more fulsome evidentiary record, including the forthcoming administrative record.  *See* Parties' JSR at 2.  Moreover, although defendants' counsel's representations at the motions hearing, without more, do not constitute admissible evidence, plaintiffs have not *asked* for any facts to be considered undisputed.  Finally, with respect to the cross-motion, defendants are the moving party, and their failure adequately to support their motion means they are not entitled to summary judgment.  For these reasons, denial of defendants' motion is proper under Rule 56(e).

On the current record, then, the factual issues of (1) the process by which DOL terminated the ILAB cooperative agreements, (2) whether the agency intends to spend the available funds appropriated to ILAB as required by Congress, and (3) whether DOL and ILAB are undertaking efforts to, or have already, satisfied the congressional minimum spending requirements set out in appropriations acts and other laws, remain genuinely disputed by the parties.  To see why the

outcomes of these factual disputes are material to resolution of summary judgment on Counts II, III, and IV, and thus why they preclude granting summary judgment to either party, consider the claims at issue in each count.

In Count II, plaintiffs allege that defendants' decision to "eliminat[e] ILAB's entire federal financial assistance portfolio," Compl. ¶ 74, violated the requirements of the USMCA Implementation Act and the FY 2021-2024 Appropriations Acts. *See* Compl. ¶¶ 72-74. If plaintiffs establish that defendants made a decision to eliminate all ILAB spending and not to reallocate those funds, plaintiffs would likely prevail on their claim that defendants' action was in violation of congressional spending mandates. *See In re Aiken Cnty.*, 725 F.3d 255, 260 (D.C. Cir. 2013) ("[T]he President and federal agencies may not ignore statutory mandates or prohibitions merely because of policy disagreement with Congress." (citing *Lincoln v. Vigil*, 508 U.S. 182, 193 (1993))); *Lincoln*, 508 U.S. at 193 ("Of course, an agency is not free simply to disregard statutory responsibilities: Congress may always circumscribe agency discretion to allocate resources by putting restrictions in the operative statutes."). On the other hand, if defendants are correct that each agreement was terminated following individualized review and determination that the programs funded did not meet the legislative goals in a manner consistent with the new Administration's policy choices, plaintiffs likely would have to challenge each termination separately, as a discrete final agency action, and likely could not point to any one agency decision that amounted to a violation of spending requirements, since ILAB funds are appropriated "not *to* any of the plaintiffs" but "rather . . . *to* ILAB." Defs.' Opp'n at 26 (emphasis in original); Pls.' Mem. at 24-25 (acknowledging that "the appropriations statutes authorizing ILAB to fund technical assistance and other projects abroad provide Defendants with wide latitude in both substance and form, giving the agency multiple ways to implement these programs and providing

only broad guidelines on the types of international labor issues to be targeted").  Furthermore, if defendants intend to reallocate funds from the terminated cooperative agreements to meet statutory requirements, or if the statutory requirements have already been satisfied by previous spending, plaintiffs' claim that defendants violated the requirement in the appropriations acts is less likely to prevail.  *See* Pls.' Mem. at 25 (arguing only that "[w]hat Defendants cannot do is decide not to spend the funds Congress appropriated for these purposes").

Similarly, Count III claims that defendants have unlawfully impounded funds by terminating the agreements and refusing to spend the money.  *See* Compl. ¶ 80.  As before, if plaintiffs establish that defendants decided to terminate all ILAB cooperative agreements with the intention of not spending funds as Congress required in appropriation acts, they are more likely to succeed on their claim of a violation of the Impoundment Control Act. If defendants intend to reallocate the available funds, however, plaintiffs likely could not show that an unlawful impoundment exists.

The same logic applies to Count IV, which claims that defendants violated the Anti-Deficiency Act by "refusing to spend funds that Congress has appropriated for ILAB's programming."  Compl. ¶ 83.  If defendants decided to cancel the agreements with the intention of withholding required spending, the violation alleged may exist.  At the same time, however, the converse is true: if after terminating the agreements, defendants do intend to spend the funds at issue, no violation of the Anti-Deficiency Act would be established.  *See id.*

\*\*\*

Since the identified disputes about the basic facts of this case are material but remain murky and unresolved on the current record, summary judgment must be denied to both sides as to Counts II, III, and IV.

### 3.    Count I

In Count I, plaintiffs allege that defendants' termination of ILAB's cooperative agreements was "*ultra vires*," Compl. ¶ 68, and "usurped legislative authority," *id.* ¶ 71, by failing to comply with minimum required spending levels set by the USMCA Implementation Act and the FY 2021-2024 Appropriations Acts, and thereby violated the Constitution's separation of powers, *see id.* ¶¶ 68-71.  This claim rests on the same allegations asserted to be contrary to law, in violation of the APA, set out in Count II.  *See* Compl. ¶¶ 72-74.  This commonality means that Count I, like Count II, requires plaintiffs to prove that defendants have violated the spending requirements established by the USMCA Implementation Act and FY 2021 through 2024 Appropriations Acts.  Since the record is unclear on this point and a genuine dispute of material facts remains, *see supra* Part III.B.2., summary judgment must be denied to both sides on Count I.

Defendants urge that *ultra vires* review is categorically unavailable in this case.  *See* Defs.' Opp'n at 19.  Before enactment of the APA, when "those challenging agency action often lacked a statutory cause of action," "courts recognized a right to equitable relief where an agency's action was ultra vires—that is, 'unauthorized by any law and . . . in violation of the rights of the individual.'"  *Nuclear Regul. Comm'n v. Texas*, 145 S. Ct. 1762, 1775 (2025) (quoting *Am. Sch. of Magnetic Healing v. McAnnulty*, 187 U.S. 94, 110 (1902)).  Since the APA was enacted, however, the Supreme Court has "strictly limited nonstatutory ultra vires review" to avoid creating an "easy end-run around the limitations of . . . judicial-review statutes."  *Id.*; *see also Am. Foreign Serv. Ass'n v. Trump*, No. 25-5184, 2025 WL 1742853, at *2 (D.C. Cir. June 20, 2025) ("*[U]ltra vires* review . . . is 'strictly limited' when 'other judicial-review statutes' are present." (quoting *Nuclear Regul. Comm'n*, 145 S. Ct. at 1775)); *Griffith v. FLRA*, 842 F.2d 487, 493 (D.C. Cir. 1988) (describing *ultra vires* review as "of extremely limited scope").  Specifically, *ultra vires* review

"applies only when an agency has taken action entirely 'in excess of its delegated powers and contrary to a *specific prohibition*' in a statute," *Nuclear Regul. Comm'n*, 145 S. Ct. at 1776 (emphasis in original) (quoting *Ry. Clerks v. Ass'n for Benefit of Non-Contract Emps.*, 380 U.S. 650, 660 (1965)), and is "also unavailable if . . . a statutory review scheme provides aggrieved persons 'with a meaningful and adequate opportunity for judicial review,'" *id.* (quoting *Bd. of Governors, FRS v. MCorp Fin., Inc.*, 502 U.S. 32, 43 (1991)). Even where an *ultra vires* claim is available, such a challenge "rarely succeeds," *Nyunt v. Chairman, Broadcasting Bd. of Governors*, 589 F.3d 445, 449 (D.C. Cir. 2009) (Kavanaugh, J.), and requires satisfying the traditional factors for injunctive relief, since this type of review "is a suit in equity," *Am. Foreign Serv. Ass'n*, 2025 WL 1742853, at *2.

Here, defendants argue that an *ultra vires* claim is unavailable to plaintiffs for two reasons, but neither is availing on the current record. First, defendants claim that the Tucker Act precludes plaintiffs' *ultra vires* claim because "seek[ing] relief from the Court of Federal Claims," Defs.' Opp'n at 19, provides a "'meaningful and adequate means of vindicating' plaintiffs' rights," *id.* (quoting *MCorp Fin.*, 502 U.S. at 43). Since plaintiffs' claims do not fall within the bounds of the Tucker Act, however, *see supra* Part III.A., the Tucker Act does not offer an alternative means for plaintiffs to vindicate their rights and thus cannot preclude plaintiffs' *ultra vires* claim.

Second, defendants argue that Count I "repeats Plaintiffs' allegations concerning their statutory claims and nothing else," Defs.' Opp'n at 20, and that "[t]he Supreme Court has made clear that 'claims simply alleging that the President has exceeded his statutory authority are not constitutional claims, subject to judicial review,'" *id.* (internal quotation marks omitted) (quoting *Dalton v. Specter*, 511 U.S. 462, 473 (1994)). According to defendants, Count I runs afoul of "the

long tradition of 'distinguish[ing] between claims of constitutional violations and claims that an official has acted in excess of his statutory authority.'" *Id.* (quoting *Dalton*, 511 U.S. at 472).

In *Dalton,* the Supreme Court explained that "where a claim 'concerns not a want of [Presidential] power, but a mere excess or abuse of discretion in exerting a power given, it is clear that it involves considerations which are beyond the reach of judicial power.'" 511 U.S. at 474 (alteration in original) (quoting *Dakota Cent. Tel. Co. v. South Dakota ex rel. Payne*, 250 U.S. 163, 184 (1919)). In other words, if an official acts pursuant to a power granted by a statute, and a plaintiff claims that official exceeded that power's scope, an *ultra vires* claim is unavailable. On the other hand, in cases where "no statutory authority was claimed" to support the official's action, and where "[t]he only basis of authority asserted was the [official]'s inherent constitutional power," the questions "necessarily turn[] on whether the Constitution authorize[s] the . . . actions." *Id.* at 473 (citing *Youngstown Sheet & Tube Co. v. Sawyer*, 343 U.S. 579, 585, 587)).

Whether plaintiffs can bring a viable *ultra vires* claim in this case likely depends on the same unanswered questions previously detailed—namely, whether the termination of plaintiffs' cooperative agreements along with all other ILAB agreements was a final agency decision to entirely dismantle ILAB's funding program due to disagreement or disapproval of Congress's policy choices embodied in legislation, as plaintiffs contend, or whether defendants terminated each of these agreements, after review, in order to reallocate the funds, consistent with legal mandates but in a manner better aligned with the current Administration's policy priorities. *See supra* Part III.B.2. If defendants are correct about their characterization of the terminations, the parties agree that "the appropriations statutes authorizing ILAB to fund technical assistance and other projects abroad provide Defendants with wide latitude in both substance and form, giving the agency multiple ways to implement these programs and providing only broad guidelines on

the types of international labor issues to be targeted."  Pls.' Mem. at 24-25; Defs.' Mem. at 26 (citing approvingly the quoted language).  Plaintiffs' challenge would, under these circumstances, amount to asserting "a mere excess or abuse of discretion in exerting a power given," *Dalton*, 511 U.S. at 474 (quoting *Dakota Cent. Tel. Co.*, 250 U.S. at 184), and thus an *ultra vires* claim likely would not be available.

On the other hand, if plaintiffs are correct that defendants sought to end the ILAB funding program entirely due to a policy disagreement with Congress, *see* Compl. ¶ 71, the claim would then become one alleging that "Defendants acted in the *absence* of any statutory authority—and indeed, in direct defiance of contrary statutory authority—when they cancelled all ILAB programs."  Pls.' Reply at 13; *accord AFL-CIO v. Dep't of Labor*, No. 25-cv-339 (JDB), --- F. Supp. 3d ---, 2025 WL 1129227, at *22 (D.D.C. Apr. 16, 2025) (finding an *ultra vires* claim existed where "[t]he best reading of [the] argument [at issue] . . . is that [defendant] is operating without any legal authority *whatsoever*, whether statutory or constitutional" (emphasis in original)); *Chi. Women in Trades v. Trump*, No. 25-cv-2005, 2025 WL 1331743, at *1, *5 (N.D. Ill. May 7, 2025) (finding, in a case challenging the termination of grants as violating the Spending Clause and separation of powers, that "no . . . discretionary power exists," because "[t]he Executive Branch *must* respect congressional appropriations," and thus that the claim in the case was "best characterized as a claim that the President acted in the absence of any authority, and not a claim that he exceeded statutory authority" (emphasis in original)).  Under such circumstances, plaintiffs could likely bring a viable *ultra vires* claim.  *See, e.g.*, *In re Aiken County*, 725 F.3d at 261 n.1 ("[A] President sometimes has policy reasons . . . for wanting to spend less than the full amount appropriated by Congress for a particular project or program.  But in those circumstances, even the President does not have unilateral authority to refuse to spend the funds."); *Arpaio v. Obama*,

27 F. Supp. 3d 185, 210 n.14 (D.D.C. 2014) ("[T]he President cannot refuse to expend funds appropriated by Congress."); *Guadamuz v. Ash*, 368 F. Supp. 1233, 1244 (D.D.C. 1973) (explaining that, when funds have been appropriated for a purpose, "the Executive has no residual constitutional power to refuse to spend these appropriations"); *AIDS Vaccine Advoc. Coal.*, 770 F. Supp. 3d at 126-27.

Since a genuine dispute of material facts exists as to whether defendants have refused to spend the amounts required by the USMCA Implementation Act and the FY 2021-2024 Appropriations Acts, *see supra* Part III.B.2., summary judgment on Count I must be denied to both sides.

### C.  Preliminary Injunction

For essentially the same reasons as those already discussed, plaintiffs' motion for a preliminary injunction on Count V, which claims defendants acted arbitrarily and capriciously under the APA, "by terminating, without warning or justification, Plaintiffs' cooperative agreements and forcing them to abandon their projects, which are consistent with longstanding American labor and trade policy," Compl. ¶ 87, must also be denied. This APA claim rests on the same allegations underlying Counts I, II, III and IV that defendants "deci[ded] to terminate all ILAB's cooperative agreements, and as a result to shut down the Bureau's entire technical assistance program," Pls.' Mem. at 22; *see also* Pls.' Reply at 21 (challenging defendants' "decision to cancel all of ILAB's cooperative agreements"), a decision described by plaintiffs as "unreasonable" and in pursuit of the "unlawful goal of entirely terminating a congressionally mandated program," Compl. ¶ 85. Given the uncertainty on the current record about whether defendants terminated all ILAB cooperative agreements to defy compliance with congressional mandates or rather to pursue those mandates by reallocating the funds in an alternative manner,

*see supra* Part III.B.2., plaintiffs have not made the required "clear showing," *Winter*, 555 U.S. at 22, that they are likely to succeed on the merits of their claim.

"When a plaintiff has not shown a likelihood of success on the merits, there is no need to consider the remaining factors." *Greater New Orleans Fair Hous. Action Ctr. v. U.S. Dep't of Hous. & Urb. Dev.*, 639 F.3d 1078, 1088 (D.C. Cir. 2011) (citing *Ark. Dairy Coop. Ass'n, Inc. v. U.S. Dep't of Agric.*, 573 F.3d 815, 832 (D.C. Cir. 2009), and *Apotex, Inc. v. FDA*, 449 F.3d 1249, 1253 (D.C. Cir. 2006)); *see also Guedes v. ATF*, 920 F.3d 1, 10 (D.C. Cir. 2019) ("[B]ecause the plaintiffs have shown no likelihood of success on the merits, we choose not to 'proceed to review the other three preliminary injunction factors.'" (quoting *Ark. Dairy Coop.*, 573 F.3d at 832)). Since plaintiffs have failed to show, on the current record, that they are likely to succeed on the merits of Count V, their motion for a preliminary injunction as to Count V is denied.

## IV.    CONCLUSION

For the reasons explained, defendants' contention that dismissal of the complaint is warranted because the Court of Federal Claims has exclusive jurisdiction, under the Tucker Act, over the constitutional and APA claims in this case is rejected. Subject matter jurisdiction may be properly exercised by this Court to address the merits of plaintiffs' claims. On the current record, however, neither side has demonstrated entitlement to the relief sought, requiring denial of both sides' partial cross-motions for summary judgment on Counts I, II, III and IV and plaintiffs' motion for a preliminary injunction on Count V.

An order consistent with this Memorandum Opinion will be entered contemporaneously.

Date:  June 30, 2025

_____
**BERYL A. HOWELL**
United States District Judge